No. 23-2362

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

OLISER HERNANDEZ,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
3:19MJ23508-MSB-AJB*

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 2**

TARA K. MCGRATH
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division*

ANDREW Y. CHIANG
*Assistant U.S. Attorney*

*880 Front St., Rm. 6293
San Diego, CA 92101
(619) 546-8756*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NUMBER _19mj23508_ |
| vs | ) | ABSTRACT OF ORDER |
| | ) | Booking No. _88596298_ |
| Oliser Hernandez | ) | |
| | ) | |

TO THE UNITED STATES MARSHAL AND / OR WARDEN, METROPOLITAN CORRECTIONAL CENTER:

Be advised that under date of _____10/1/19_____

the Court entered the following order:

___X___ Defendant be released from custody.

_____ Defendant placed on supervised / unsupervised probation / supervised release.

_____ Defendant continued on supervised / unsupervised probation / supervised release.

___X___ Defendant released on $ _8,000 P/S_ bond posted.

_____ Defendant appeared in Court. FINGERPRINT & RELEASE.

_____ Defendant remanded and ( _____ bond) ( _____ bond on appeal) exonerated.

_____ Defendant sentenced to TIME SERVED, supervised release for_____ years.

_____ Bench Warrant Recalled.

_____ Defendant forfeited collateral.

_____ Case dismissed.

_____ Case dismissed, charges pending in case no. _____

_____ Defendant to be released to Pretrial Services for electronic monitoring.

_____ Other._____

_Michael S. Berg_

UNITED STATES DISTRICT/MAGISTRATE JUDGE

OR

Received _____ DUSM

JOHN MORRILL            Clerk
by _____       _M. Rutledge_
        Deputy Clerk

Crim-9   (Rev. 8-11)                    ★ U.S. GPO: 1996-783-398/40151

CLERK'S COPY

SER-2

1 | **REBECCA C. FISH**
California State Bar No. 305183
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California 92101-5030
Telephone: (619) 234-8467
4 | Facsimile: (619) 687-2666
Becky_Fish@fd.org
5 |
6 | Attorneys for Defendant
OLISER HERNANDEZ-VILLALOBOS

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO.:  19-mj-23508-MSB |
|---|---|
| Plaintiff, | Hon. Michael S. Berg |
| v. | Courtroom 2C
Date: October 29, 2019
Time: 2:30 p.m. |
| OLISER HERNANDEZ-VILLALOBOS, | **Memorandum of Points and Authorities in Support of Mr. Hernandez-Villalobos's Pretrial Motions** |
| Defendant. | |

## I.    Statement of Facts[1]

On August 22, 2019, Border Patrol Agent Luke Nirelli arrested Mr. Hernandez and another man—Luis Alonso Argueta-Zavala. *See* Exs. P, T. The area of arrest was about two and a half miles north of the border and included small roads as well as multiple outdoor recreational sites. *See* Exs. P, T, X. At about 4:15 p.m. that day, another Border Patrol agent had seemingly seen two people walking in the area using a scope. Following this observation, officers in a helicopter came to help find the two people. It is unclear from discovery provided to date whether the helicopter was related, owned, operated, or otherwise connected to the U.S.

---

[1] This statement of facts is based on discovery received to date from the government. Mr. Hernandez does not adopt this statement as his own and maintains the right to take a contrary position in future litigation, including at trial.

1  Marine Corps or another branch of the military. *See* Dkt. No. 1; Exs. P, Q. The
2  officers in the helicopter seemingly guided Agent Nirelli to the location of the two
3  people. *See id.*

4          When Agent Nirelli approached Mr. Hernandez and Mr. Argueta, he *first*
5  detained them. He did so prior to asking any questions. Agent Nirelli was in full
6  uniform, clearly marked as law enforcement, and was presumably armed. *See* Ex.
7  P. During this time, the official helicopter was seemingly also flying overhead. *See*
8  Exs. P, Q. Agent Nirelli then questioned Mr. Hernandez as to his citizenship and
9  immigration status. *See* Dkt. No. 1; Ex. P. At about 4:35 p.m., Agent Nirelli had
10 Mr. Hernandez and Mr. Argueta transported back to the Brownsfield Border Patrol
11 Station. *See* Ex. P.

12         Agents detained Mr. Hernandez for approximately four hours before reading
13 him his rights. *See* Exs. P, R. Conditions at Border Patrol stations along the
14 U.S./Mexico border have been described as "inhumane and punitive"—arrestees
15 sleep on a concrete floor in very cold temperatures and receive little food or water.
16 *See* Exs. A, B, and C. One station held 900 people even though its maximum
17 capacity was 125; detainees were frequently forced to wear soiled clothing and
18 stand on toilets in order to have enough air to breathe. *See* Ex. D. In the last year,
19 at least seven children have died after being held in such stations. *See* Ex. E. Mr.
20 Hernandez endured similar conditions.

21         At almost 8:30 p.m. on August 22, 2019, another Border Patrol Agent read
22 Mr. Hernandez his rights. He read them rapidly, without pausing to see if Mr.
23 Hernandez understood. *See* Exs. R, S at 2:34–3:10. And during this advisement, the
24 Agent translated the *Miranda* advisement to say: "If you do not have the money to
25 employ an attorney, one can be provided to you before we ask any questions, if you
26 wish." *See* Exs. R, S at 2:34–3:10; *United States v. Garcia-Carillo*, 16-cr-2217-
27 LAB, Dkt. No. 9 at Ex. C (certified English translation of identical Spanish-
28 language *Miranda* advisement). The agent obtained a purported waiver from Mr.

---

                                    2                       19-mj-23508-MSB
                                 MEMORANDUM

Hernandez and proceeded to question him about the alleged offense. *See* Exs. R, S. Following this interrogation, Agents kept Mr. Hernandez at the Border Patrol station, in painful conditions, *see supra*, overnight before bringing him to Court. *See* Dkt. Nos. 1, 3.

Mr. Argueta, it appears, told agents of his fear of being deported to El Salvador. Agents removed him to Mexico and ordered him to remain their pending a future court date to adjudicate his claim for protection in the United States. *See* Ex. T. Indeed, it appears Mr. Argueta was removed to Mexico before counsel was even appointed for Mr. Hernandez. *See* Exs. T, U, V; Dkt. No. 3.

On the morning of August 23, 2019, pursuant to the procedures of the Southern District of California's "Streamline Court," Mr. Hernandez met with his appointed counsel in a converted garage used for initial attorney-client meetings. During this meeting, Mr. Hernandez was shackled, and still quite tired.

That afternoon, Mr. Hernandez had his initial appearance and arraignment. The government moved to detain Mr. Hernandez on the basis that his undocumented status meant that she had no ties to the community and was thus a flight risk. *See* Dkt. No. 3. The Magistrate Judge denied this motion and set bond a $8,000 with a 50 percent cash deposit. *See* Dkt. Nos. 3, 5. Due to their poverty and medical issues, Mr. Hernandez's family was not able to post this bond. Over a month later, this Court held a hearing regarding Mr. Hernandez's request to modify his conditions of release. At that point, the Court agreed to allow The Bail Project, a non-profit organization, to post Mr. Hernandez's bond, and he was released on October 1, 2019. *See* Dkt. Nos. 12–15. Mr. Hernandez spent approximately 40 days in custody before he was able to be released on bond.

On September 5, 2019, Mr. Hernandez, through counsel, requested full discovery from the government. *See* Ex. W. To date, the government has produced 97 pages of paper discovery, audio recordings of dispatch tapes, video recordings from arrest-related surveillance, and a videotape of the station interrogation.

MEMORANDUM

1    Defense counsel expects that the government's production of discovery is still
2    ongoing.

3        The government charged Mr. Hernandez by complaint with attempted illegal
4    entry under 8 U.S.C. § 1325(a)(1). The complaint alleges:

> On or about August 22, 2019, within the Southern
> District of California, defendant, Oliser HERNANDEZ,
> an alien, knowingly and intentionally attempted to enter
> the United States of America with the purpose, i.e.,
> conscious desire, to enter the United States at a time and
> place other than as designated by immigration officers,
> and committed an overt act, to wit, crossing the border
> from Mexico into the United States, that was a substantial
> step towards committing the offense, all in violation of
> Title 8, United States Code, Section 1325, a
> misdemeanor.

11   Dkt. No. 1. Mr. Hernandez has pled not guilty and requested a trial. *See* Dkt. Nos.
12   9, 10. These motions follow.

13   **II.   Argument**

14       **A.   The Court should dismiss the complaint because Congress**
15           **violated the non-delegation doctrine when it enacted 8 U.S.C. §**
            **1325(a)(1).**

16       Under 8 U.S.C. § 1325(a)(1), Congress has made it a crime for any "alien"
17   to "enter[] or attempt[] to enter the United States at any time or place other than as
18   designated by immigration officers[.]" An immigration officer is "any employee . .
19   . designated by the Attorney General . . . to perform the functions of an immigration
20   officer[.]" 8 U.S.C. § 1101(a)(18). An "immigration officer" includes any "[b]order
21   patrol agent[.]" See 8 C.F.R. § 287.5(c)(1)(i). Congress, then, made it a crime for a
22   non-citizen to enter, or attempt to enter, the United States during a time or at a place
23   that any immigration officer, including any Border Patrol agent, has not designated
24   for entry. That means whether a defendant's conduct amounts to a crime depends
25   on what an executive-branch official has designated. Congress, then, has delegated
26   to the executive branch the ability to define a criminal provision's scope.

27       At issue is whether § 1325(a)(1) violates the non-delegation doctrine. The
28   doctrine prohibits Congress from delegating away its core legislative functions to

4                    19-mj-23508-MSB

MEMORANDUM

another branch of government. As explained below, Congress delegated away its core legislative function when it allowed "immigration officers" to determine in their discretion what times and places to designate for entry without providing those officers with any guidance about how they should exercise their discretion. *See* 8 U.S.C. § 1325(a)(1). Congress's delegation in § 1325(a)(1) thus violates the non-delegation doctrine. This Court must therefore dismiss this case.

1.    The non-delegation doctrine prohibits Congress from delegating its core legislative authority, and Congress violates that prohibition if it allows an executive-branch official to decide a statute's scope without providing an "intelligible principle" to guide the official.

The Constitution establishes a tripartite system of government that divides power among the three federal branches. While the branches must work together, no branch can do a task exclusively assigned to another branch. "[D]iffus[ing] power" in three separate, co-equal branches helps to "secure liberty[.]" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The non-delegation doctrine protects the constitutional separation of powers by prohibiting Congress from delegating its core legislative powers to another branch. As Chief Justice Marshall explained, Congress may not "delegate . . . powers which are strictly and exclusively legislative." *Wayman v. Southard*, 10 Wheat. 1, 42–43 (1825). This protects "'the integrity and maintenance of the system of government ordained by the Constitution." *Mistretta v. United States*, 488 U.S. 361 (1989) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

The core of the "legislative function" that the Constitution prohibits Congress from delegating is a "determination of . . . legislative policy" that results in the "promulgation" of "a defined and binding rule of conduct[.]" *Yakus v. United States*, 321 U.S. 414, 424 (1944). The prohibition against Congress delegating its core legislative function has particular salience in the criminal context. "[D]efining crimes," the Supreme Court has said, is a "legislative function," *United States v. Evans*, 333 U.S. 483, 486 (1948), and Congress cannot delegate away "the

MEMORANDUM

1   inherently legislative task" of determining what conduct "should be punished as

2   crimes," *United States v. Kozminski*, 487 U.S. 931, 949 (1988).

3       Of course, Congress may "seek[] assistance, within proper limits, from its

4   coordinate Branches." *Touby v. United States*, 500 U.S. 160, 165 (1991). "Thus,

5   Congress does not violate the Constitution merely because it legislates in broad

6   terms, leaving a certain degree of discretion to executive or judicial actors." *Id*. That

7   means Congress can permit an executive-branch official to fill in the details of a

8   legislative scheme, as long as Congress "lay[s] down by legislative act an

9   intelligible principle to which the person or body authorized to [exercise the

10  authority] is directed to conform." *Mistretta*, 488 U.S. at 372 (quoting *J.W.*

11  *Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928)).

12      In 1935, the Supreme Court for the first time struck down a statute on non-

13  delegation grounds. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S.

14  495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935). First, in *Panama*

15  *Refining*, the Court struck down a statute authorizing the President to criminalize

16  the interstate transportation of petroleum "produced or withdrawn" in violation of

17  state law. 293 U.S. at 406, 414–19. Next, in *Schechter Poultry*, the Court struck

18  down a statute authorizing the President to create a "code of fair competition" for

19  the poultry industry. 295 U.S. at 525, 529–34. With these statutes, Congress had

20  failed to lay out a "legislative objective," "[p]rescribe the method of achieving that

21  objective," and lay "down standards to guide" the exercise of executive discretion

22  in achieving that objective. *See Yakus*, 321 U.S. at 423.

23      Since *Panama Refining* and *Schechter Poultry*, Congress has generally

24  provided an intelligible principle when enacting statutes that include delegated

25  authority. This has avoided non-delegation problems. *See Mistretta*, 488 U.S. at

26  373 (citing cases). For example, in *Touby*, the Court held that Congress did not

27  violate the non-delegation doctrine in the Controlled Substances Act. 500 U.S. at

28  165–66. There, the defendant argued that Congress had violated the non-delegation

MEMORANDUM

doctrine by allowing executive-branch officials to "schedule a drug temporarily" and then attaching criminal liability to manufacturing that substance. *Id*. 165–66. The Court did not dispute that giving an executive-branch official the ability to define what constituted criminal behavior was a delegation. The Court held, however, that it was a permissible delegation because Congress gave the executive-branch official sufficient guidance. *Id*. at 166. Specifically, Congress, by statute, had allowed the Attorney General to schedule a drug temporarily only "'to avoid an imminent hazard to the public safety.'" *Id*. (quoting 21 U.S.C. § 811(h)(1)). Congress further listed by statute "three factors" for the Attorney General to use to make that determination. *Id*. (citing 21 U.S.C. §§ 811(c)(4)–(6), 811(h)(3)). This detailed guidance meant the statute did not violate the non-delegation doctrine. *Id*.

A case from this past term suggests that the lower federal courts should approach with caution the government's attempt to read narrowly the requirement of an intelligible principle. In *Gundy v. United States*, 139 S. Ct. 2116 (2019), the Court addressed whether Congress violated the non-delegation doctrine in the Sex Offender Registration and Notification Act ("SORNA"). In SORNA, Congress provided that the "Attorney General shall have the authority to specify the applicability" of the Act to those convicted of sex offenses before the Act took effect. 34 U.S.C. § 20913(d). Justice Kavanaugh did not take part in the case.

A sharply divided Court upheld the delegation. The four-Justice plurality re-affirmed that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" 139 S. Ct. at 2123. It held, however, that Congress had not done that in SORNA. Congress had "supplied an intelligible principle" to the Attorney General to guide his "use of discretion." *Id*. The plurality, reviewing SORNA's test and structure, affirmed that Congress meant for "SORNA's registration requirements to apply to pre-Act offenders." *Id*. at 2124. The "Attorney General's role," then, was "limited": he had to "apply SORNA to pre-Act offenders as soon as he thought it feasible to do so." *Id*. at 2125–26. As a

7

MEMORANDUM

1     result, the plurality affirmed the defendant's conviction.

2          Justice Alito concurred, concluding that he could not "say that the statute

3     lacks a discernable standard" under the Court's case law. *Id*. at 2131. He stated,

4     however, that he might vote differently in the future with a full Court. *Id*.

5          Justice Gorsuch in dissent, joined by Chief Justice Roberts and Justice

6     Thomas, disagreed with the majority about the scope of the delegated authority. *Id*.

7     at 2131–33 (Gorsuch, J., dissenting). More generally, the dissenters believed that

8     the Court should expand the non-delegation doctrine and that the delegation in

9     SORNA failed that stricter standard. *See id*. at 2133–42.

10        *Gundy* suggests, then, that courts should construe the "intelligible principle"

11    narrowly. And that suggests that this Court should approach with caution any

12    government attempt to interpret it broadly.

>       2.    <u>The delegation of legislative authority in 8 U.S.C. § 1325(a)(1)
> violates the non-delegation doctrine because Congress never
> articulated any intelligible principle to immigration officers to
> guide how they exercise their discretion to designate times and
> places for entry.</u>

16        As noted above, in 8 U.S.C. § 1325(a)(1), Congress has allowed executive-

17    branch officials—"immigration officers"—the discretion to determine a criminal

18    statute's scope. In this way, the statute is like the portion of the Controlled

19    Substances Act discussed in *Touby*. That statute, like this one, allowed an

20    executive-branch official to make a decision (there, designate a substance as

21    controlled), that altered a criminal statute's scope. *See* 500 U.S. at 165–67. Whether

22    that delegation is permissible depends on whether Congress provided an

23    "intelligible principle" to the executive-branch official to guide and constrain the

24    exercise of their discretion. *Id*. at 165–66. With the Controlled Substance Act,

25    Congress did. *Id*. at 166. With § 1325(a)(1), Congress did not.

26        The origin of 8 U.S.C. § 1325(a)(1) can be traced to legislation Congress

27    passed in 1917. *United States v. Aldana*, 878 F.3d 877, 880 (9th Cir. 2017)

28    (discussing § 1325's history). In 1917, Congress provided that non-citizens should

8            19-mj-23508-MSB

MEMORANDUM

1   "be taken into custody and deported" if they "have entered the United States by
2   water at any time or place other than one designated as a port of entry for aliens by
3   the Commissioner General of Immigration, or at any time not designated by
4   immigration officials[.]" Immigration Act of 1917, Pub L. No. 64-301, § 19, 39
5   Stat. 784, 889.

6        A decade later, in 1929, Congress eliminated the distinction between land
7   and water entries and added a criminal penalty to its 1917 prohibition. "No good
8   reason [was] seen for perpetuating the distinction made . . . between entering by
9   water or by land." H.R. Rep. No. 70-2418, at 4 (1929) (cited in *Aldana*, 878 F.3d
10  at 880). Under the revised statute, Congress for the first time made it a misdemeanor
11  for an "alien" to "enter[] the United States at any time or place other than as
12  designated by immigration officials[.]" *Aldana*, 878 F.3d at 880 (quoting Act of
13  Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551, 1551). This is essentially the
14  language Congress adopted in 1952 when it enacted 8 U.S.C. § 1325(a)(1). *See*
15  Immigration and Nationality Act, Pub. L. No. 82-414, § 275, 66 Stat. 163.

16       Congress, however, has never provide guidance to immigration officials
17  about how they should determine what times and places to designate for entry. This
18  lack of guidance was not an oversight. Congress believed immigration officials,
19  with help from their bureaucratic supervisors, would decide on an ad hoc basis
20  when and where to designate: "Immigration officials, of course, will designate
21  times and places only as authorized by their superior officers." H.R. Rep. No. 70-
22  2418, at 4 (1929).

23       Immigration officials have continued to recognize their boundless discretion
24  to designate times and places for entry. They have, however, somewhat formalized
25  how they exercise their discretion to designate places. In 8 C.F.R. § 100.4,
26  immigration officials have designated various physical ports of entry as places for
27  entry. *See Aldana*, 878 F.3d at 881 (discussing this regulation). But "[t]he
28  designation" of places "may be withdrawn whenever, in the judgment of the

9

19-mj-23508-MSB

MEMORANDUM

Commissioner, such action is warranted." 8 C.F.R. § 100.4(a). Thus, executive-branch authorities have reserved the right to undesignate a place for entry for whatever reason the Executive Branch wants. Moreover, immigration officials have never formalized the times designated for entry. That decision appears to be made at the local level. For example, according to the CBP website, the Andrade Port of Entry is open for entry from 6 a.m. to 10 p.m. each day of the week. By contrast, the Otay Mesa Port of Entry is open 6 a.m. to 8 p.m. Monday through Friday and is closed on the weekends. Indeed, the executive branch has threatened to entirely close Ports of Entry on the Southern Land border for political purposes. *See* Nick Miroff, et. al., *Trump Extends Threat of Border Closure, Shifting Ultimatum to U.S. Lawmakers*, WASH. POST (April 3, 2019), https://www.washingtonpost.com/immigration/trump-extends-threat-of-border-closure-this-time-pressuring-us-lawmakers/2019/04/03/988ff5ee-5634-11e9-8ef3-fbd41a2ce4d5_story.html?noredirect=on.

In any event, no matter how immigration officials have used their discretion, the key point is this: Congress never gave "immigration officers" any "guidance" so that it is possible to determine "whether the will of Congress has been obeyed" when those officials designate times and places for entry. *See Yakus*, 321 U.S. at 426. This makes § 1325(a)(1) different from the Controlled Substance Act (upheld in *Touby*) or SORNA (upheld in *Gundy*). It instead makes the statute the same as the statutes at issue in *Panama Refining* and *A.L.A. Schechter Poultry*. As a result, Congress violated the non-delegation doctrine when it enacted § 1325(a)(1).

In short, while the Supreme Court might soon expand the non-delegation doctrine's reach, § 1325(a)(1) violates even the more modest version of the doctrine. Thus, the statute that government has alleged that Mr. Hernandez violated is unconstitutional. This Court, then, must dismiss this case.

MEMORANDUM

**B.    The Court should dismiss the complaint because Congress violated the Due Process Clause's prohibition on vague laws when it enacted 8 U.S.C. § 1325(a)(1).**

The government violates the Fifth Amendment's Due Process Clause "by taking way someone's life, liberty, or property" based on a "vague" criminal law. *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). First, a statute is impermissibly vague if it "fails to give ordinary people fair notice of conduct it punishes[.]" *Johnson*, 135 S. Ct. at 2556. Second, a statute is impermissibly vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. The vagueness "doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

Here, § 1325(a)(1) flunks these requirements. As explained above, the scheme Congress and executive-branch officials created in § 1325(a)(1) allows an immigration officer, including a Border Patrol agent, to decide what places and times to designate for entry. An immigration officer can decide what to designate for any reason or no reason at all. There are no "standards to govern the actions of" immigration officers. *See Dimaya*, 138 S. Ct. at 1212. It is up to the officer's whim. Thus, the statute, and the implementing regulation, "authorize[] . . . arbitrary and discriminatory" enforcement. *See Hill*, 530 U.S. at 732. Indeed, because the immigration officer's discretion is unbounded, it is hard to imagine a scheme more amenable to arbitrary enforcement.

In short, § 1325(a)(1) violates the prohibition against vague laws. Thus, the statute that government has alleged that Mr. Hernandez violated is unconstitutional. This Court, then, must dismiss this case.

MEMORANDUM

### C. The Court should dismiss the complaint because it fails to allege all the elements of the charged offense.

A charging document must include the "essential facts constituting the offense charged[.]" FED. R. CRIM. P. 7(c)(1). That is, a charging document "must set forth each element of the crime that it charges." *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998). A charging document "that tracks the words of the statute violated is generally sufficient" to allege the elements of an offense. *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995). But not always. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007). "[I]mplied, necessary elements, not present in the statutory language, must be included in an indictment." *Jackson*, 72 F.3d at 1380; *accord United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). Thus, in general, if a "statute is silent on *mens rea*," the government must allege the *mens rea* in the charging document. *United States v. Morrison*, 536 F.2d 286, 288 (9th Cir. 1976); *see also Du Bo*, 186 F.3d at 1179. If a charging document fails "to recite an essential element of the charged offense," that is a "'fatal flaw requiring dismissal'" of the charging document. *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005) (applying rule to an indictment); *see also United States v. Hatch*, 919 F.2d 1394, 1398 (9th Cir. 1990) (applying rule to an information); *Hotch v. United States*, 208 F.2d 244, 250 (9th Cir. 1953) (applying rule to a complaint).

Here, the government has charged Mr. Hernandez with violating the attempt portion of § 1325(a)(1). Its charging document, however, is deficient because it fails to contain the implied *mens rea* for the attempt portion of § 1325(a)(1) and fails to allege that he knew he was an "alien" when he attempted to enter the United States. As a result, this Court must dismiss this case because the charging document fails to allege the elements of the charged offense.

The complaint charging Mr. Hernandez with violating the attempt portion of § 1325(a)(1) is deficient because it fails to allege that Mr. Hernandez knew he was

MEMORANDUM

an "alien" when he committed the charged offense. Thus, the government's failure to allege that Mr. Hernandez knew he was an alien when he allegedly committed the charged offense means this Court must dismiss this case.

### 1. If a defendant believes he is a U.S. citizen, he has not committed an attempted illegal entry.

To commit an attempt offense, the defendant must have the "intent to commit the underlying offense" and commit an "overt act constituting a substantial step towards the commission of the offense." *United States v. Gonzalez-Monterroso*, 745 F.3d 1237, 1243 (9th Cir. 2014) (internal quotation marks omitted). Under the intent element, "a defendant should be treated in accordance with the facts as he supposed them to be," not as they actually are. *United States v. Quijada*, 588 F.2d 1253, 1255 (9th Cir. 1978); *accord United States v. Hinkson*, 585 F.3d 1247, 1265 n.27 (9th Cir. 2009); *United States v. Steward*, 16 F.3d 317, 320 n.4 (9th Cir. 1994). A defendant is guilty of attempt, then, only if, under the facts as he believes them to be, his intended acts would amount to the underlying offense. So if a defendant bought a substance he thought was cocaine, he is guilty of attempting to purchase a controlled substance, even if the substance is actually powdered sugar. *Hinkson*, 585 F.3d at 1265 n.27. Conversely, if under the defendant's understanding of the facts "the result desired or intended it not a crime, the actor will not be guilty of an attempt even [if] he firmly believes that his goal is criminal." Wechsler, Jones & Korn, *The Treatment of Incohate Crimes in the Model Penal Code of the American Law Institution: Attempt, Solicitation, and Conspiracy*, 61 COLUM. L. REV. 571, 579 (1961) [*hereinafter* "Wechsler"].

Applying this logic to § 1325(a)(1) establishes that a defendant commits attempted illegal entry only if he knows that he is an "alien." *See* 8 U.S.C. § 1325(a)(1). If a defendant genuinely (but incorrectly) believes that he or she is a U.S. citizen, and then enters the United States, the defendant is not an alien who enters the United States under the "facts as [he or she] supposed them to be[.]" *See*

---

13

19-mj-23508-MSB

MEMORANDUM

*Quijada*, 588 F.2d at 1255. In other words, if the defendant were correct that he was not an "alien," the acts he intended to commit—the "results he desired"—would not constitute the crime of illegal entry under § 1325(a)(1). *See* Wechsler, *supra*, at 579.

Even though knowledge of alienage is an element of an attempted illegal entry, the charging document does not allege that *mens rea*. Thus, the charging document contains a "fatal flaw requiring dismissal[.]" *See United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001) (internal quotation marks omitted).

> 2. If a defendant believes he is a U.S. citizen, he has not committed any offense in § 1325(a), including attempted illegal entry.

As just explained, basic principles of attempt law require that the government prove in an attempted illegal entry case that the defendant knew he was an alien. But, setting that argument aside, anytime the government charges a defendant with committing any offense in § 1325(a), the government must prove that the defendant knew he was an alien.

To determine the particular *mens rea* for an element of a criminal offense, this Court must begin with the "longstanding presumption, traceable to common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). This presumption helps to "separate wrongful from innocent acts." *Id.* at 2197. The presumption applies "even when Congress does not specify any scienter in the statutory text" and "where the most grammatical reading of the statute does not support" a scienter. *Id.* at 2197 (internal quotation marks omitted). Indeed, statutes that require no *mens rea*—that is, strict-liability offenses—"generally are disfavored," and are "limited" to so-called "'public welfare' or 'regulatory' offenses" that "regulate potentially harmful

MEMORANDUM

1   or injurious items." *Staples v. United States*, 511 U.S. 600, 606-07 (1994).

2   Recently, the Supreme Court in *Rehaif* addressed how the presumption of
3   *mens rea* applies to an offense that requires the government to prove that the
4   defendant is an "alien." At issue was a statute that makes it a crime for "felons and
5   aliens who are 'illegally or unlawfully in the United States'" to possess a firearm.
6   139 S. Ct. at 2194 (quoting 18 U.S.C. § 922(g)). The question was: did the
7   defendant need to know "both that he engaged in the relevant conduct (that he
8   possessed a firearm) and also that he fell within the relevant status (that he was a
9   felon, an alien unlawfully in this country, or the like)?" *Id*. The Court answered
10  "yes." The Court determined that there was "no convincing reason to depart from
11  the ordinary presumption in favor of scienter." *Id*. at 2195. The Court noted that but
12  for the defendant's status, his conduct was lawful. *Id*. at 2197. "It is therefore the
13  defendant's *status*, and not his conduct alone, that makes the difference." *Id*.
14  (emphasis in original). Thus, the Court held that the government needed to prove
15  both that the defendant knew that he had engaged in the relevant conduct and that
16  he fell within the relevant status.

17  With respect to § 1325(a), there is "no convincing reason to depart from the
18  ordinary presumption in favor of scienter." See 139 S. Ct. at 2195. Just as in *Rehaif*,
19  "the defendant's *status*, and not his conduct alone, that makes the difference"
20  between criminal and non-criminal conduct. *See Rehaif*, 139 S. Ct. at 2197. A U.S.
21  citizen who just enters or attempts to enter the United States at a non-designated
22  time or place has committed no offense.[2] As a result, to convict a defendant of
23  violating § 1325(a)(1), the government must prove both that the defendant knew
24

25  _____
    [2] A U.S. citizen commits a crime only by "intentionally" failing to "enter the United
26  States . . . at a border crossing point designated by the Secretary" and then not
    "reporting the arrival" and "present[ing] themselves, and all articles accompanying
27  them[,] for inspection." *See* 19 U.S.C. § 1459(a), (e), (g). Thus, if a U.S. citizen
    enters the United States at a non-designated time or place, no crime has been
28  committed unless the U.S. citizen both intentionally entered outside a border
    crossing and intentionally failed to present promptly for inspection.

15

MEMORANDUM                                           19-mj-23508-MSB

that he had "engaged in the relevant conduct" (that he entered or attempted to enter the United States) and also that he knew "that he fell within the relevant status" (that he was an alien). *See Rehaif*, 139 S. Ct. at 2194.

In charging Mr. Hernandez with violating § 1325(a)(1), the government recites only § 1325(a)(1)'s statutory language. That is insufficient. The government needed to allege explicitly that Mr. Hernandez knew he was an alien, an "implied, necessary element[], not present in the statutory language[.]" *See Jackson*, 72 F.3d at 1380. Thus, the charging document fails to allege all the elements of the charged offense, and this Court must therefore dismiss it. *See Du Bo*, 186 F.3d at 1179–80.

**D.**     **The Court should dismiss the complaint because the "streamline" prosecution violates equal protection, principles of selective enforcement/prosecution, and due process**

    1.     The Court should dismiss the complaint because the government's prosecution of Mr. Hernandez violates his right to equal protection.

Federal law contains three classes of misdemeanors. A Class A misdemeanor is an offense punishable by "one year or less but more than six months." 18 U.S.C. § 3559(a)(6). A Class B misdemeanor is punishable by "six months or less but more than thirty days." 18 U.S.C. § 3559(a)(7). And a Class C misdemeanor is punishable by "thirty days or less but more than five days." 18 U.S.C. § 3559(a)(8). Federal law categorizes Class B and Class C misdemeanors as "petty offenses." 18 U.S.C. § 19. So illegal entry under § 1325, which is a Class B misdemeanor, is considered a "petty offense."

Every year, the Government prosecutes thousands of petty offenses in the Southern District of California through the Central Violations Bureau ("CVB"). According to its website, offenses prosecuted through CVB include violations of "certain federal laws" as well as violations of certain state laws that occur on federal property under the Assimilative Crimes Act at 18 U.S.C. § 13. *See* Ex. F. Offenses that appear in the Code of Federal Regulations that have a maximum sentence of six months or more are also frequently prosecuted through CVB. *See*

MEMORANDUM

1   Ex. G.

2   But more serious crimes—including some felonies—are also prosecuted in

3   CVB court. These crimes include unlawful possession of a firearm (18 U.S.C.

4   § 922(g)), assault on a federal officer (18 U.S.C. § 111), identity theft (18 U.S.C.

5   § 1028), interstate domestic violence (18 U.S.C. § 2262), theft of government

6   property (18 U.S.C. § 641), and possession of weapons or firearms in a federal

7   facility (18 U.S.C. § 930). *See* Ex.t H. In fact, between July 2018 and July 2019—

8   during the same time period that Streamline has been in effect—the Government

9   has charged at least 383 defendants in CVB court with Title 18 and Title 21

10   offenses that are class B misdemeanors or higher. *See* Ex. H.[3]

11   Even though these 383 defendants prosecuted in CVB court were charged

12   with equally serious (or more serious) crimes than § 1325, none were held in

13   criminal custody. Rather, at the time of apprehension, everyone was released with

14   a citation. *See* Ex. I. Occasionally, a person may be briefly handcuffed or held for

15   questioning by law enforcement officials for several hours. *See* Ex. I at 1-2. But

16   even in these rare cases, the person is released the same day. *See* Ex. I at 2.

17   Several weeks later, a defendant in CVB court will receive a notice to

18   appear in the mail instructing him or her to appear at one of the upcoming

19   misdemeanor courts. *See* Ex. I at 2. This court proceeding does not take place in a

20   courtroom and is not presided over by a judge. *See* Ex. I at 2. Rather, it is held in

21   one of the jury rooms of the federal courthouse, where the defendants freely come

22   and go throughout the morning. *See* Ex. I at 3. Each defendant will meet with his

23   or her defense attorney, after which the defense attorney will attempt to negotiate

24

25   _____

26   [3] Hundreds of other defendants were charged with offenses that would be a felony
    under California law and so are punishable as a felony under the Assimiliative
27   Crimes Act. *See* 18 U.S.C. § 13 (stating that a person who "would be punishable"
    under state law "shall be guilty of a like offense and subject to a like punishment"
28   under the Assimilative Crimes Act).

a disposition with the prosecutor. *See* Ex. I at 2-3. At a later date, the magistrate judge will then review and approves this disposition. See Ex. I at 3.

Nearly all the offenses in CVB court will eventually be dismissed or resolved through a fine or a deferred prosecution agreement. For instance, of the 383 cases charged under Titles 18 and 21 of the United States Code in CVB court last year, 98.6 percent were dismissed and 1.4 percent were resolved through forfeiture of collateral. *See* Ex. H. Not a single one resulted in a conviction.

But the Government does not place individuals accused of § 1325 in CVB court. They are not released into the community on the day of their arrest. They are not allowed to remain out of custody to await the written notice of their charges. They are always shackled when meeting with their attorneys (and sometimes in court). They are not offered any deferred prosecution options. And while 100% of defendants convicted of § 1325 are punished with at least *some* custodial time, none of these 383 CVB defendants last year received *any* jail time.

These disparities do not exist because of the level of severity of the offense. The 383 Title 18 and 21 crimes the Government charged in CVB court last year carried penalties *as* serious or *more* serious than § 1325. Nor do these disparities exist because § 1325 defendants are less likely to show up for court. In the year since Streamline court began on July 9, 2018, Pretrial Services and various magistrate judges in the Southern District of California have reported that 79 of the 299 § 1325 defendants released on bond into the community have failed to appear for court—an in absentia rate of 26.4 percent. But of the 383 CVB defendants charged with federal offenses last year, 134 did not show up for court—an in absentia rate of 35 percent. *See* Ex. H. In other words, § 1325 defendants are nearly 8.6 percent *more* likely to show up for court when released on bond than CVB defendants.[4]

---

[4] Nor are Border Patrol officers precluded from issuing CVB citations—for instance, one citation shows that a person in the pedestrian lane at the San Ysidro

MEMORANDUM

1    In sum, by prosecuting § 1325 defendants in "regular court," the
2    Government does not permit them to take advantage of the substantial benefits of
3    CVB court, even though § 1325 defendants are charged with a similar or less
4    serious offense than defendants charged in CVB court and pose less risk of flight.
5    Accordingly, the Government discriminates against § 1325 defendants as
6    compared to other individuals charged with petty offenses in the Southern District
7    of California.

8    The Fourteenth Amendment provides that states shall not "deprive any
9    person of life, liberty, or property, without due process of law; nor deny to any
10   person within its jurisdiction the equal protection of the laws." U.S. CONST.
11   amend. XIV. This guarantee of equal protection also extends to the federal
12   government. *See United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty
13   protected by the Fifth Amendment's Due Process Clause contains within it the
14   prohibition against denying to any person the equal protection of the laws.").
15   While the government retains broad discretion to classify individuals where it is
16   reasonable to do so, classifications based on alienage, national origin, and race are
17   "inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*,
18   403 U.S. 365, 371-72 (1971). This is because "[a]liens as a class are a prime
19   example of a discrete and insular minority for whom such heightened judicial
20   solicitude is appropriate." *Id.* at 372 (quotations and citation omitted). To survive
21   strict scrutiny, disparate treatment on the basis of alienage, national origin, or race
22   must be compelling and narrowly tailored to achieve its objective, and there can
23   be no less discriminatory means of achieving the goal. *See, e.g., Grutter v.*

---

25   port of entry was prosecuted for being a possession of firearm by a prohibited
     possessor under 18 U.S.C. § 922—an offense carrying a potential *life sentence*
26   depending on the accused's priors. *See* Ex. O. Another person prosecuted in CVB
27   court was apprehended at a port of entry while possessing a full syringe of black
     tar heroin. *See* Ex. O. So Border Patrol officers can and do issue CVB citations
28   for serious offenses at or near the border.

MEMORANDUM

*Bollinger*, 539 U.S. 306, 326 (2003).

Here, that high standard is not met. Defendants in the Southern District of California who are charged with petty offenses *other than* § 1325 are not held in pre-trial custody, are not subject to shackling, are not limited in their ability to consult counsel, are not prevented from seeking alternative dispositions, and are not punished by incarceration. Meanwhile, Mr. Hernandez and other defendants charged with § 1325 are, by definition, set apart on the basis of their alienage,[5] as well as by their national origin and race. In other words, by making § 1325 defendants the only petty offenders subject to pretrial incarceration and shackling, convictions, and jail sentences, the Government is not simply prosecuting illegal entrants for a crime—it is punishing them more severely than similary-situated defendants on the basis of their alienage, national origin, and race.

Even if § 1325's *facial* elements did not trigger strict scrutiny, the Supreme Court has held that facially-neutral government action motivated by "invidious racial discrimination" violates equal protection. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). And within the past year, numerous courts have recognized that comments made by President Trump both before and after he took office create a plausible equal protection violation on the basis of discrimination against Mexicans and Central Americans. For example, courts have relied on the following statements to find animus on the basis of race and national origin:

---

[5] The Government may argue that its charging practices do not discriminate on the basis of alienage but rather on the basis that § 1325 defendants are undocumented, which is not a protected class and thus not subject to strict scrutiny. *See, e.g.*, But this argument fails because a defendant may be convicted under § 1325 even though he has legal status. *See, e.g.*, *United States v. Sanchez*, 258 F. Supp. 2d 650, 662 (S.D. Tex. 2003) (holding that a lawful permanent resident may be convicted of § 1325); *United States v. Figueroa–Corrales*, 845 F.2d 329 (9th Cir. 1988) (unpublished); *Gunaydin v. United States Immigration and Naturalization Serv.*, 742 F.2d 776 (3d Cir. 1984).

MEMORANDUM

- In discussing protections for nationals from Latin America (including El Salvador), the president asked, "'Why are we having all these people from shithole countries come here?'" and expressed a preference for immigrants from countries like Norway, which is overwhelmingly white;[6]

- The president "spoke publicly about the need to protect 'the West' and 'civilization' from forces from 'the South or the East'";[7]

- The president has described Mexicans and Central Americans as "gang members, killers, and rapists"; "'criminals' and 'thugs'"; "'bad hombres'"; and "true animals";[8]

- The president stated that Judge Gonzalo Curiel could not be fair in presiding over a lawsuit because he was "'of Mexican heritage,' 'Hispanic,' and a member of a Latino Lawyers' Association";[9]

- Referring to an article about a recent crime wave on Long Island, the president said "'They come from Central America. They're tougher than any people you've ever    met . . . . They're killing and raping everybody out there'";[10]

- Referring to immigrants, the president stated, "'You know they're bad. They're pouring in from El Salvador, Guatemala, Honduras, Mexico, all over. They're just pouring into our country!'";[11]

- In May 2018 (immediately before the zero-tolerance policy began),

---

[6] *Ramos v. Nielson*, 321 F. Supp. 3d 1083, 1099-100 (N.D. Cal. 2018); *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1060-61 (N.D. Cal. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 315 (D. Md. 2018).

[7] *CASA de Maryland*, 355 F. Supp. 3d at 315.

[8] *S.A.*, 363 F. Supp. 3d at 1059; *CASA de Maryland*, 355 F. Supp. 3d at 325; *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 401 (D. Mass. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276-77 (E.D.N.Y. 2018).

[9] *CASA de Maryland*, 355 F. Supp. 3d at 315; *S.A.*, 363 F. Supp. 3d at 1059; *Batalla Vidal*, 291 F. Supp. 3d at 276–77.

[10] *S.A.*, 363 F. Supp. 3d at 1059; *Centro Presente*, 332 F. Supp. 3d at 401.

[11] *S.A.*, 363 F. Supp. 3d at 1060.

MEMORANDUM

the president said of people crossing the Mexican border into the United States: 'You wouldn't believe how bad these people are. These aren't people. These are animals.'"[12]

Citing such statements, one court observed: "One could hardly find more direct evidence of discriminatory intent towards Latino immigrants." *CASA de Maryland*, 355 F. Supp. 3d at 325.

Here, the abrupt decision in April 2018 to begin prosecuting § 1325 misdemeanors in the Southern District of California at record levels almost certainly originated from this hostility. *See* Exs. L, M, N. And even though local prosecutors may have had no intent to discriminate on the basis of race or national origin, "their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process." *Ramos*, 321 F. Supp. 3d at 1123. *See also CASA de Maryland*, 355 F. Supp. 3d at 325 (finding that the president's racial animus against El Salvadorans could be imputed to a subordinate because "[a]n action is not cured of discriminatory taint because it is taken by an unprejudiced decision-maker who is manipulated or controlled by another who is motivated by discriminatory intent"); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (ascribing the president's "anti-Latino animus" to those "involved in the decision-making process"). So even assuming that no local prosecutors were motivated by race or national origin, President Trump's demonstrated animus towards people from Mexico and Central America requires strict scrutiny.[13] And

---

[12] *S.A.*, 363 F. Supp. 3d at 1061.

[13] Even if strict scrutiny did not apply, the Ninth Circuit has held that a "dogged animus" against a disfavored group cannot satisfy rational-basis review because "such animus cannot constitute a legitimate state interest." *Arizona Dream Act Coal.*, 855 F.3d at 970. *See also Romer v. Evans*, 517 U.S. 620, 634 (1996) (holding that government action cannot survive rational-basis review where there exists "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected").

MEMORANDUM

because the government cannot show that its decision to prosecute Mr. Hernandez in regular court, rather than CVB court, satisfies strict scrutiny, the Court should dismiss the indictment.

> 2. <u>The Court should dismiss the complaint because the government's prosecution of Mr. Hernandez violates the prohibition on improper selective prosecution and selective enforcement.</u>

Alternatively, the Court could also adjudicate Mr. Hernandez's equal protection challenge through the legal framework of a selective prosecution or selective enforcement claim. *See United States v. Armstrong*, 517 U.S. 456, 464–65 (1996) (grounding selective prosecution claims in "the equal protection component of the Due Process Clause of the Fifth Amendment"). Although § 1325 defendants and CVB defendants are both technically being "prosecuted" for a crime, courts may consider whether the government is relying on impermissible grounds to prosecute similarly-situated defendants in different systems. *See, e.g.*, *United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018) (stating that "the demographics of those prosecuted in state and federal courts for the same crime" may "evince differential treatment of similarly situated individuals") (citing *Armstrong*, 517 U.S. at 466–67, 470); .

"To establish a claim of selective prosecution, a defendant must show both discriminatory effect and discriminatory purpose." *Id*. at 852. Courts apply a "rigorous standard" to such claims because "[p]rosecutors occupy a special province of the executive branch and have broad discretion to enforce our nation's laws." *Id*. at 853 (quotations omitted). But a prosecutor's discretion is still "subject to constitutional constraints," including equal protection. *United States v. Batchelder,* 442 U.S. 114, 125 (1979). So prosecutorial decisions may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 456 (1962). *See also Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (adjudicating a selective

23

19-mj-23508-MSB

1   prosecution claim on the basis of national origin). Thus, a defendant can succeed

2   on a selective prosecution claim by showing that the administration of a criminal

3   law is "directed so exclusively against a particular class of persons ... with a mind

4   so unequal and oppressive" that the system of prosecution amounts to "a practical

5   denial" of equal protection of the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373

6   (1886).

7        Here, the government's disparate treatment of § 1325 defendants has a

8   "discriminatory effect." As explained above, the U.S. Attorney's office in the

9   Southern District of California prosecutes people who are of a different alienage,

10  national origin, and race in a separate system than "similarly situated individuals"

11  charged with equivalent crimes. Because of its decision to file criminal

12  complaints in some cases and CVB citations in other cases, one set of defendants

13  is not arrested, does not serve jail time, and rarely ends up with a conviction,

14  while the other does. As explained above, this disparate treatment also has a

15  discriminatory purpose, given President Trump's history of disparaging

16  comments about immigrants and people from Mexico and Central America. *See*

17  Ex. L; Section I.A.[14] So the government's policy of prosecuting everyone *except*

18  § 1325 defendants in CVB court violates equal protection under the doctrine of

19  selective prosecution.

20        Alternatively, this policy violates equal protection under the doctrine of

21  selective enforcement. To show selective enforcement, a party is generally

22  required to show that law enforcement officers are enforcing an "unconstitutional

23  policy" by "extrapolating from a series of enforcement actions." *Hoye v. City of*

24

25  _____

26  [14] Arguably, Mr. Hernandez need not even show a discriminatory purpose because § 1325, on its face, has an element of alienage, which is a protected class subject

27  to strict scrutiny. *See Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985) ("A showing of discriminatory intent is not necessary when the equal protection claim

28  is based on an overtly discriminatory classification.").

*Oakland*, 653 F.3d 835, 855 (9th Cir. 2011). *See also Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993) (selective enforcement requires the showing of a "policy, plan, or a pervasive pattern"). But because law enforcement officers do not enjoy the "same presumption of regularity and deference" as prosecutors, a claim of selective enforcement need not satisfy "as rigorous a standard" as a claim of selective prosecution. *Sellers*, 906 F.3d at 853.

Here, there is unquestionably a "policy, plan, or a pervasive pattern" of federal law enforcement officers in the Southern District of California treating petty offenders differently based on their alienage, national origin, and race. Individuals who commit § 1325 are arrested, detained in horrific conditions, offered no alternative disposition, and sentenced to jail time. But individuals who commit any federal petty offense *other* than § 1325 are released, sent a citation, told to show up to "traffic court," usually offered a fine or other alternative disposition, and rarely sentenced to jail. For these reasons, Ms. Martinez's arrest, prosecution, and conviction violated the doctrines of selective enforcement and selective prosecution.

> 3. <u>The Court should dismiss the complaint because the government's prosecution of Mr. Hernandez violates his rights to procedural and substantive due process.</u>

The Due Process Clause of the Fifth Amendment also guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. This Clause protects individuals in two ways. Substantive due process "prevents the government from engaging in conduct that shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quotations and citations omitted). But when government action survives substantive due process scrutiny, it must still be implemented in a fair manner under the doctrine of procedural due process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). To determine whether governmental action satisfies procedural due process, courts employ a three-factor

MEMORANDUM

test that weighs (1) the interest at stake for the individual, (2) the risk of erroneous deprivation of such interest and the probable value of safeguards, and (3) the costs and administrative burden on the Government. *Id.* at 335.

Streamline court survives neither analysis. First, substantive due process has been violated because it "shocks the conscience" for the Government to blatantly deprive § 1325 defendants of the substantial benefits of CVB court while extending those benefits to defendants charged with similar or *more* serious crimes who have a similar or *greater* risk of flight.

But even if this deprivation survived substantive due process, it could not survive procedural due process under the *Mathews v. Eldridge* factors. First, the interest at stake for the individual is substantial, as defendants charged with § 1325 face a significant loss of liberty, the traumatizing experience of being held in custody in substandard conditions, and an overwhelmingly greater chance of being convicted of an offense. Second, there is no question that charging § 1325 defendants in CVB court would almost entirely alleviate the risk that they would be held in custody, subject to horrendous conditions, and convicted of an offense. Finally, the costs and administrative burden on the Government are minimal, as nothing suggests that absorbing Streamline defendants into CVB proceedings would be problematic, or that there would be a greater than average risk of absconding. And if anything, placing § 1325 defendants in CVB court would greatly *lessen* the burden on the Government to provide housing, food, and transportation during the criminal proceedings. Thus, the Government's discriminatory treatment violates both substantive and procedural due process under the *Mathews v. Eldridge* factors.

### E.   The Court should dismiss the complaint because 8 U.S.C. § 1325 is unconstitutional.

Mr. Hernandez moves to dismiss the complaint because the definition of alienage in 8 U.S.C. § 1325 is unconstitutional as it improperly treats men and

MEMORANDUM

1    women differently. *See argument in United States v. Madero-Diaz*, Case No. 17-

2    50347. He understands other courts have disagreed (*See Madero-Diaz*), but

3    believes this motion is meritorious and nonetheless makes the motion.

**F.    The Court should compel the government to preserve and produce complete discovery.**

5    Mr. Hernandez, through counsel, requested Rule 16 and *Brady* discovery

6    directly from the government. *See* Ex. R. Mr. Hernandez moves this Court to order

7    the government to preserve and produce all discovery to which he is owed under

8    Rule 16 and the Constitution. Rule 16 requires the government to produce evidence

9    that "is material to preparing the defense[.]" FED. R. CRIM. PROC. 16(1)(E)(i).

10   Indeed, this rule carries a "low threshold" of materiality, asking only whether

11   information would help to prepare the defense. *United States v. Hernandez-Meza*,

12   720 F.3d 760, 768 (9th Cir. 2013). This includes material that "simply causes a

13   Defendant to 'completely abandon' a planned defense and 'take an entirely

14   different path.'" *Id.* (quoting *United States v. Doe*, 704 F.3d 1134, 1151 (9th Cir.

15   2013).

> A defendant needn't spell out his theory of the case in
> order to obtain discovery. Nor is the government entitled
> to know in advance specifically what the defense is going
> to be. The relevant subsection of Rule 16 is written in
> categorical terms: Upon defendant's request, the
> government must disclose any documents or other
> objects within its possession, custody or control that are
> "material to preparing the defense."

21   *Hernandez-Meza*, 720 F.3d at 768 (quoting FED. R. CRIM. PROC. 16(a)(1)(E)(i).

22   This rule applies to evidence helpful to preparing a defense at trial, as well

23   as evidence helpful to pre-trial litigation. Specifically, the Ninth Circuit has

24   repeatedly held that evidence helpful and relevant to pre-trial suppression motions

25   is discoverable under Rule 16. *See, e.g.*, *United States v. Soto-Zunig*a, 837 F.3d 992,

26   1001 (9th Cir. 2016) (holding that statistics pertaining to an alleged immigration

27   checkpoint was discoverable under Rule 16 as it was relevant to a suppression

28   motion); *United States v. Thomas*, 726 F.3d 1086, 1096–97 (9th Cir. 2013) (holding

27                                    19-mj-23508-MSB

MEMORANDUM

that various records related to a law enforcement dog relied on to search the defendant were discoverable as relevant to a suppression motion); *United States v. Cedano-Arellano*, 332 F.3d 568, 571 (9th Cir. 2003) (holding that evidence related to a dog's training and experience related to a suppression motion was discoverable under Rule 16).

Mr. Hernandez asks the Court to order the government to preserve and produce all requested discovery. Mr. Hernandez here addresses more specifically certain items that he fears the government may not preserve or produce without the Court's order:

First, Mr. Hernandez requests discovery on whether the National Guard or U.S. military was involved in his case in any way. The National Guard and the U.S. Marines have been deployed to assist in border enforcement, and their involvement may violate the Posse Comitatus Act. *See United States v. Dreyer*, 804 F.3d 1266, 1272–74 (9th Cir. 2015) (en banc) (explaining that the Posse Comitatus Act forbids military personnel from participating in civilian law enforcement activities). If the National Guard or any military personnel were involved in his case, Mr. Hernandez will make a specific, follow-up discovery request with the prosecutor or Court if necessary, and will likely file a motion to dismiss under the Posse Comitatus Act.

Second, Mr. Hernandez requests any recordings from the surveillance leading up to and including the arrest. This includes any scope video, dispatch tapes, seismic intrusion device photographs, bodycams, or dashcams, drone recordings, and citizen's reports if any exist. Mr. Hernandez has received dispatch tapes and video surveillance. This may be all the surveillance that was taken, but if not, Mr. Hernandez requests all other surveillance surrounding his arrest.

Third, Mr. Hernandez requests any "batch sheets," apprehension reports, or other notes taken contemporaneously with the surveillance or arrest of him or anyone arrested alongside him.

Fourth, Mr. Hernandez request all information in the government's

28

19-mj-23508-MSB

MEMORANDUM

possession regarding Mr. Argueta-Zavala, the man arrested alongside him in this case. Mr. Argueta is a percipient witnesses to the arrest, as relevant to pretrial motions (below), and likely is also a witness with important information as to the alleged offense. Based on discovery received to date as well as counsel's own investigation, it appears that Mr. Argueta was immediately removed from the United States to Mexico, despite his claim of fear of returning to his home country in Central America. *See* Exs. T, U, V. This appears to be pursuant to the government's Migrant Protection Protocols (MPP), *see generally* DEP'T OF HOMELAND SECURITY, MIGRANT PROTECTION PROTOCOLS (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols. The government has yet to produce all of Mr. Argueta's statements or all information that counsel believes the government likely has in its possession, including contact information for Mr. Argueta.

Fifth, if the government intends to rely on any testimony either related to a stop motion or at trial that the area of arrest is "high crime" or is commonly used by people entering the United States without documents, then the Court should compel the government to produce all information, data, reports, guidance, or other materials its witnesses may rely on to make such statements. Further, such testimony would be expert testimony and the government must produce full expert notice in compliance with the Rules of Evidence and of Criminal Procedure, or any such testimony should be excluded.

Finally, Mr. Hernandez asks the Court to set a deadline at least one week in advance of any motion hearing for the government to complete reviews required under *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), and to produce resulting discovery. The Assistant United States Attorney ("AUSA") assigned to this case should oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material. *See Kyles v. Whitley*, 514 U.S. 437, 438 (1995) (holding

29

19-mj-23508-MSB

MEMORANDUM

that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Henthorn*, 931 F.2d 29. This request includes, but is not limited to, any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, and whether or not any disciplinary action was ultimately recommended. Mr. Hernandez further requests production of any such information at least one week prior to any further motion hearing and three weeks prior to trial. If the prosecutor is uncertain whether certain information should be disclosed pursuant to this request, this information should be produced to the Court in advance of the motion hearing and the trial for an in camera inspection.

Mr. Hernandez also specifically requests disclosure and all information in the government's possession that any agent involved in this case was ever a member of the "I'm 10-15" facebook group or of another social media group publishing white supremacist or bigoted posts. Media reports have recently shed light on a previously clandestine facebook group for Border Patrol agents. This group included posts mocking immigrants who died and legislators who inspected immigration detention facilities, among other posts using vulgar and demeaning language and images. *See, e.g.*, A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, PROPUBLICA (July 1, 2019), https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes. Media reports also revealed many law enforcement agents from many agencies who were members of and active in explicitly white supremacist social media groups. *See, e.g.*, Will Carless & Michael Corey, *To Protect and Slur: Inside Hate Groups on Facebook, Police Officers Trade Racist Memes, Conspiracy Theories and Islamophobia*, REVEAL: CENTER FOR INVESTIGATIVE REPORTING (June 14, 2019),

MEMORANDUM

1  https://www.revealnews.org/article/inside-hate-groups-on-facebook-police-
2  officers-trade-racist-memes-conspiracy-theories-and-islamophobia/.

3      The Court should order the government to produce all information in its
4  possession regarding and disclose whether any agent involved in this case was a
5  member of the "I'm-1015" group or any social media group publishing white
6  supremacist or other bigoted posts. Mr. Hernandez asks the Court to set a deadline,
7  at least one week prior to a future motion hearing (or a specially set status hearing)
8  for the government to produce this discovery to defense counsel and to the Court
9  for in camera review if necessary. Mr. Hernandez asks that such deadline be
10  imposed so that any issues may be timely brought to the Court. Such discovery is
11  required under *Henthorn* and *Brady*, and their progeny.

### G.     The Court should dismiss the case or impose alternative remedies due to the government's removal of a witness.

14  "'Whether grounded in the Sixth Amendment's guarantee of compulsory
15  process or in the more general Fifth Amendment guarantee of due process, the
16  Constitution guarantees criminal defendants a meaningful opportunity to present a
17  complete defense.'" *United States v. Leal-Del Carmen*, 697 F.3d 964, 969 (9th Cir.
18  2012) (citing *United States v. Stever*, 603 F.3d 747, 755 (9th Cir.2010)). As
19  indicated above, the government removed from counsel's access and from the
20  subpoena power a percipient witness to Mr. Hernandez's arrest and other events
21  relevant to the alleged offense.

22      Defense counsel has requested and has not received complete information
23  about this witness. The government has indicated the man was from Central
24  America, claimed asylum, and was sent to Mexico under the government's MPP.
25  But the government has yet to provide his complete statements, or any contact
26  information for him (which should be within the government's possession as part
27  of the MPP). The government has thus prevented Mr. Hernandez from presenting
28  a full defense and from receiving a trial that comports with due process, in violation

1    of the Fifth and Sixth Amendments. When such actions—destroying evidence or
2    making witnesses unavailable—are done in bad faith (a legal term of art), dismissal
3    is the appropriate remedy. Further discovery is likely needed as well as findings of
4    fact. The Court should compel discovery and order an evidentiary hearing on the
5    issue. Following any evidentiary hearing, this Court should remedy the
6    government's actions by dismissal if the actions were in bad faith, or by an
7    evidentiary remedy and appropriate jury instructions (or Court's instructions), or
8    similar, if not.

9       The government's destruction of evidence, including removal of witnesses,
10   warrants dismissal when (1) the government acts in bad faith and (2) "the missing
11   evidence is of such a nature that the defendant would be unable to obtain
12   comparable evidence by other reasonably available means." *See United States v.*
13   *Sivilla*, 714 F.3d 1168, 1173–74 (9th Cir. 2013). "If the government destroys
14   evidence under circumstances that do not violate a defendant's constitutional rights,
15   the court may still impose sanctions including suppression of secondary evidence.
16   In so doing, the court must balance the quality of the Government's conduct and
17   the degree of prejudice to the accused." *United States v. Flyer*, 633 F.3d 911, 916
18   (9th Cir. 2011) (internal quotations omitted). "The Government bears the burden of
19   justifying its conduct and the defendant bears the burden of demonstrating
20   prejudice." *Id*.

21      The Ninth Circuit has adopted a similar two-part test to determine whether
22   the deportation of a noncitizen witness violates a defendant's constitutional rights.
23   *Leal-Del Carmen*, 697 F.3d at 969. First, a "defendant must show that the
24   government acted in bad faith." *Id*. at 969–70 (citing *United States v. Dring*, 930
25   F.2d 687, 693 (9th Cir. 1991)). Second, a defendant must show that deportation of
26   the noncitizen witness prejudiced his case. *Id*. at 970 (citing *Dring*, 930 F.2d at
27   693). The Ninth Circuit has provided the legal standard for determining whether
28   the government acted in bad faith in removing witnesses:

32                                    19-mj-23508-MSB
MEMORANDUM

> When the government doesn't know what a witness will say, it doesn't act in bad faith by deporting him. But if the government interviews the witness *or has other information suggesting that he could offer exculpatory evidence*, *the government may not deport him without first giving defense counsel a chance to interview him*. The question of bad faith thus turns on what the government knew at the time it deported the witness.

*Leal-Del Carmen*, 697 F.3d 964, 970 (internal citation omitted) (emphasis added).

The Ninth Circuit has held that bad faith should be found where the government destroys a piece of evidence after a defendant reveals in her or his own post-arrest interrogation a potential defense and the potential usefulness of the evidence in presenting that defense. *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 979 (9th Cir. 2015) ("when potentially useful evidence has been destroyed by the government, the bad faith inquiry initially turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.") (internal quotations omitted). Even if the particular agent indicates that the loss of evidence was a mere oversight, or that she or he disbelieved the defendant's account indicating the exculpatory value of the evidence, the Court must find bad faith where the government agents had reason to know of the exculpatory value of evidence but failed to preserve it. *Id.* at 979–80 ("the strength of [the Defendant's] defense and whether [the Agent] believed the claim do not diminish the potential usefulness of the [evidence]."). Ongoing negotiations or the government's belief that a case may resolve before trial also do not excuse the government from its obligation to preserve and produce exculpatory evidence. *Id.* at 980–81.

Mr. Hernandez asks this Court to first compel the government to produce all discovery regarding Mr. Argueta, including any statements by him and the disposition or any further contacts with him by the government. The Court should then order an evidentiary hearing or allow supplemental submission of exhibits regarding this issue. Finally, if the Court finds that the government acted in bad

MEMORANDUM

1  faith by removing a witness in this case, and that Mr. Hernandez cannot reasonably
2  obtain comparable evidence, the Court should dismiss the indictment. *Sivilla*, 714
3  F.3d at 1173; *see also Zaragoza-Moreira*, 780 F.3d at 982 (reversing denial of
4  motion to dismiss indictment where case agent "knew of the potential usefulness of
5  the video footage and acted in bad faith by failing to preserve it").

6       Even if the Court does not find bad faith, however, "the court may still
7  impose sanctions including suppression of secondary evidence." *United States v.*
8  *Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring),
9  *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir.
10  2008). The Court also may give a remedial, adverse-inference instruction. *Sivilla*,
11  714 F.3d at 1173; *see also United States v. Zuniga-Garcia*, 472 F. App'x 498 (9th
12  Cir. 2012) (unpublished) (vacating conviction where district court failed to give
13  adverse evidence instruction after the government lost or destroyed material
14  evidence).

15       Mr. Hernandez is particularly concerned because as detailed below, he has
16  strong arguments that his arrest and interrogation at arrest violated his constitutional
17  rights. Mr. Argueta is a percipient witness to these events. He could testify
18  impartially as to the area of arrest, Mr. Hernandez's position when Agent Nirelli
19  approached, the show of force by Agent Nirelli, and his questioning. As such, Mr.
20  Hernandez is prejudiced by the government's removal of Mr. Argueta before his
21  counsel was even appointed.

22  **H.    The Court should suppress all evidence resulting from the stop**
23  **and arrest of Mr. Hernandez.**

24       1.    Agent Nirelli lacked reasonable suspicion to stop Mr.
       Hernandez.

25  The Fourth Amendment's prohibition of unreasonable searches and seizures
26  extends to seizures of people. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878
27  (1975). A law enforcement officer may approach and seize a person for purposes
28  of investigating possible criminal behavior only if that officer has specific facts to

34                          19-mj-23508-MSB

MEMORANDUM

form reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1 (1968). Courts look to the totality of the circumstances to determine whether "the detaining officer has ***a particularized and objective basis*** for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations omitted) (emphasis added). An officer cannot rely on a "mere hunch" to justify a stop. *Id.* at 273–74. Though a government agent may conduct a limited seizure to investigate whether a person is an immigrant without legal documentation, the officer must "provide a rational basis for separating out the illegal alien from American citizens and legal aliens." *Orhorhaghe v. INS*, 38 F.3d 488, 497 (9th Cir. 1994) (internal citations omitted).

Neither location nor simple appearance, without sufficient independent cause for suspicion, can create reasonable suspicion that a person is in the United States unlawfully. While officers can consider whether the area is a "high-crime area," *Terry* still demands individualized suspicion under the totality of circumstances. *Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016). Indeed, the Ninth Circuit has held that a location or route frequented by immigrants lacking legal documents, but also by many legal residents, is not sufficient or significantly probative in a reasonable suspicion anlaysis. *United States v. Ballesteros*, 258 F.3d 1117, 1126 (9th Cir. 2002). Moreover, an individual's apparent Latino ethnicity cannot by itself justify an investigative stop in a border area. *United States v. Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006). Most importantly, a court cannot "accept what has come to appear to be a prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." *Id.*

Here, Agent Nirelli and the other agents at most saw Mr. Hernandez and Mr. Argueta in an area with multiple outdoor recreational sites, including hiking trails and a gun club. *See* Exs. P, T, X. Agent Nirelli purports that they were "hiding" underneath a bush. However, the arrest occurred on August 22, 2019—the middle of San Diego County's hot and sunny summer. The behavior described, even if

35

19-mj-23508-MSB

MEMORANDUM

accepted as true, is perfectly consistent with a hiker or hunter stopping for shade on a hot day. And, as noted above, the government has produced no statistics or other evidence other than Agent Nirelli's bald assertion to support a statement that the area is commonly used for illegal entry into the United States. As such, Agent Nirelli lacked reasonable suspicion to stop Mr. Hernandez and the government should suppress all evidence obtained from the stop.

> 2. **Agent Nirelli effectively arrested Mr. Hernandez without probable cause.**

Further, even if the Court finds that Agent Nirelli had reasonable suspicion, his actions rose beyond a mere stop to an actual seizure or arrest of Mr. Hernandez without probable cause. Agent Nirelli's own account indicates that he not only stopped Mr. Aguayo, but indeed detained and arrested him as defined under the Fourth Amendment. And Agent Nirelli lacked the required probable cause to arrest Mr. Hernandez.

"A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). The Supreme Court, in articulating this rule, provided examples of some factors that could cause law enforcement contact with an individual to escalate to a seizure under the Fourth Amendment:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

MEMORANDUM

Here, Agent Nirelli effectively arrested Mr. Hernandez under the Fourth Amendment. Agent Nirelli was in full uniform and presumably armed. There was an official helicopter overhead, seemingly surrounding Mr. Hernandez and Mr. Argueta. Agent Nirelli indeed physically detained both men prior to asking them any questions. It appears that Agent Nirelli actually physically restrained Mr. Hernandez and Mr. Argueta. Agent Nirelli claims he did so for officer safety. However the location was over two miles from the border, there were other law enforcement officials overhead in the helicopter and seemingly nearby in communication on the radio. Agent Nirelli was close to a road and there was no indication that either Mr. Hernadnez or Mr. Argueta presented any danger. *See* Ex. P. Agent Nirelli's and the helicoptor's show of force was substantial. It certainly "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp*, 538 U.S. at 629.

And Agent Nirelli lacked the requisite probable cause to make this arrest. Indeed, whether the particular officer believes his actions are merely investigative or not, a *de facto* seizure or arrest requires probable cause:

> *Terry* and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest.

*Florida v. Royer*, 460 U.S. 491, 499 (1983). "'Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *United States v. Diaz*, 491 F.3d 1074, 1077 (9th Cir. 2007) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)).

MEMORANDUM

Here, at the time Agent Nirelli effectively arrested Mr. Hernandez, he knew only that Mr. Hernandez was one of two men in an area with various outdoor recreational landmarks. Agent Nirelli purports to believe that the area is commonly used to further illegal entries into the United States. *See* Ex. P. But, as noted above, no statistics or basis for this opinion has been provided in discovery. These facts alone would allow agents to arrest almost anyone who happens to be in this public area, or potentially who fears police. These sparse facts certainly not enough to "warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Diaz*, 491 F.3d at 1077. The Court should thus find that Agent Nirelli's arrest of Mr. Hernandez violated the Fourth Amendment, and should suppress all evidence stemming from that arrest.

### 3.   Agent Nirelli lacked the authority to arrest Mr. Hernandez.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures [] shall not be violated." U.S. Const. amend IV. Officers may not "stop and briefly detain a person for investigative purposes" under the Fourth Amendment unless they have "reasonable suspicions supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Indeed, a so-called *Terry* stop requires that, given the totality of the circumstancestances, "the detaining officer has *a particularized and objective basis* for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations omitted) (emphasis added).

And probable cause is generally required for a formal arrest or its functional equivalent. *See Florida v. Royer*, 460 U.S. 491, 499 (1983). "'Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is

MEMORANDUM

1   being committed.'" *United States v. Diaz*, 491 F.3d 1074, 1077 (9th Cir. 2007)

2   (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)).

3        However, the statute that gives Border Patrol agents their authority further

4   limits their authority to arrest. Section 1357 limits authority of immigration officers

5   to make warrantless arrests, searches, and interrogations. *See* 8 U.S.C. § 1357. For

6   example, Congress allows officers of the [Immigration] Service to make criminal

7   arrests, but in limited circumstances only. *See* §1357(a)(5). Subsection (a)(5)(A)

8   authorizes arrests "for any offense against the United States, if the offense is

9   committed in the officer's or employee's presence." In other words, an agent who

10   arrests a suspected noncitizen for a federal misdemeanor must have personally

11   witnessed the alleged crime occurring or the agent has no legal authority to make

12   that arrest. *See id*. This is the only part of 1357 that authorizes misdemeanor

13   criminal arrests. Alternatively, subsection (a)(2) contemplates violations of

14   immigration laws.

15        Any officer or employee of the [Immigration and Naturalization]
16   Service authorized under regulations prescribed by the Attorney
     General shall have power without warrant— to arrest any alien who in
17   his presence or view is entering or attempting to enter the United States
     in violation of any law or regulation ***made in pursuance of law***
18   ***regulating the admission, exclusion, expulsion, or removal of aliens***,
     or to arrest any alien in the United States, if he has reason to believe
19   that the alien so arrested is in the United States in violation of any ***such***
     law or regulation ***and*** is likely to escape before a warrant can be
20   obtained for his arrest, ***but*** the alien arrested shall be taken without
21   unnecessary delay for examination before an officer of the Service
     having authority to examine aliens as to their right to enter or remain
22   in the United States[.]

23   8 U.S.C. § 1357(a)(2) (emphasis added).

24

25        Turning to this case, a border patrol agent could have arrested Mr. Hernandez

26   for a federal misdemeanor *only if* that crime occurred in the agent's presence. *See*

27   8 U.S.C. § 1357(a)(5). Although the agent could have made a non-criminal,

28   immigration arrests without having personally witnessed the suspected illegal

MEMORANDUM

1  crossing, the border patrol agent must still a) have probable cause that Mr.
2  Hernandez would flee before obtaining a warrant and b) presented Mr. Hernandez
3  as soon as possible for immigration processing. 8 U.S.C. § 1357(a)(2).

4      When an agent arrests a suspected noncitizen for a misdemeanor that was not
5  committed in his presence, the fact that he could have arrested that person for an
6  immigration violation and processed him for removal does not excuse the illegal
7  arrest, unless the agent also complied with other statutory requirements by, having
8  probable cause that the person would flee and presenting the person for immigration
9  processing without delay. *See id.* But even if the agent presented the suspected
10  person for immigration processing and completed such processing, the agent still
11  does not possess statutory authority to convert the non-criminal, immigration arrest
12  to a criminal arrest, unless the agent witnessed the crime. *See id.*

13      Here, there is no plausible argument that Agent Nirelli actually witnessed
14  Mr. Hernandez committing a crime. Further, there is no indication that Mr.
15  Hernandez presented a flight risk or that agents could not have obtained a warrant.
16  Administrative warrants, after all, are exceedingly easy to obtain—requiring only
17  approval by one of *many* supervisory immigration agents, and not requiring review
18  or approval by a neutral magistrate. The Court should find here that Agent Nirelli
19  lacked the authority to arrest Mr. Hernandez.

20          4.   <u>The Court should remedy the illegal stop and arrest with</u>
21  <u>dismissal or suppression of evidence.</u>

22      As for a remedy, dismissal is the appropriate remedy for the unauthorized
23  arrest of Mr. Hernandez. Although the arrest in this case violates the Fourth
24  Amendment and relevant statute, it also violated Mr. Hernandez's due process
25  rights because the agency did not follow its own laws and regulations. Failure to
26  follow procedures specified in the relevant regulations violates due process. *United*
27  *States v. Barajas-Alvarado*, 655 F.3d 1077, 1084-85 (9th Cir. 2011). "[T]he
28  Supreme Court has ruled that when Congress enacts a procedure, aliens are entitled

40              19-mj-23508-MSB
MEMORANDUM

1    to it." *Id.* (citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544

2    (1950) ("Whatever the procedure authorized by Congress is, it is due process as far

3    as an alien denied entry is concerned.")); *see also United States v. Ramos*, 623 F.3d

4    672, 683 (9th Cir. 2010) ("It is a well-known maxim that agencies must comply

5    with their own regulations.") (quoting *Ramon-Sepulveda v. I.N.S.*, 743 F.2d 1307,

6    1310 (9th Cir.1984) (internal quotation marks omitted)). In Operation Streamline,

7    the Attorney General has specifically instructed agents to arrest suspected

8    noncitizens for misdemeanor crimes without regard for the statutory limits on their

9    authority to make arrests. The government cannot now rely on the limited arresting

10    authority that agents do have to make civil immigration arrests to excuse the extra-

11    legal criminal arrests. These illegal arrests were not simply the good faith mistakes

12    of individual agents, but were made as a matter of policy. Because the Attorney

13    General explicitly ordered border patrol agents and other immigration officers to

14    arrest people in excess of their statutory authority by creating Zero

15    Tolerance/Streamline, the complaint should be dismissed.

16        In the alternative, suppression of evidence is also appropriate. Because the

17    stop and seizure here violated the Fourth Amendment, the Court must suppress all

18    fruits from the stop and arrest. It is well established that the Fourth Amendment

19    exclusionary rule applies to statements and evidence obtained as a product of an

20    unlawful detention. *See generally Wong Sun v. United States*, 371 U.S. 471 (1963);

21    *see also United States v. Romero-Bustamente*, 337 F.3d 1104 (9th Cir. 2003)

22    (finding Fourth Amendment violation, suppressing alien material witnesses, and

23    requiring dismissal of indictment). "The exclusionary rule has traditionally barred

24    from trial physical, tangible materials obtained either during or as a direct result of

25    an unlawful invasion." *Wong Sun*, 371 U.S. at 485. It also prohibits introduction of

26    testimony concerning knowledge acquired during an unlawful search or arrest. *See*

27    *Silverman v. United States*, 365 U.S. 505 (1961). "The essence of a provision

28    forbidding the acquisition of evidence in a certain way is that not merely evidence

41            19-mj-23508-MSB

MEMORANDUM

1    so acquired shall not be used before the Court but that it shall not be used at all."
2    *Wong Sun*, 371 U.S. at 485 (quoting *Silverthorne Lumber Co., Inc. v. United States*,
3    251 U.S. 385, 392 (1920)). Unless evidence is obtained on the basis of information
4    wholly unconnected with the initial unlawful stop, search, or arrest, it must be
5    suppressed. *See Murray v. United States*, 487 U.S. 533, 540 (1988).

6    Here, the Court must suppress any and all statements, photographs, agent
7    testimony regarding observations of Mr. Hernandez or the other individual arrested
8    contemporaneously with him, or other evidence that were obtained from the stop.
9    Although Mr. Hernandez's body cannot be suppressed, certainly the Court can, and
10   should, suppress his fingerprints as they were wrongfully obtained for an
11   investigative purpose. *See United States v. Ortiz-Hernandez*, 427 F.3d 567, 578 (9th
12   Cir. 2005) (recognizing that the proper remedy for having unlawfully obtained the
13   first set of fingerprints is suppression).

14   **I.    The Court should suppress all statements taken from Mr. Hernandez in this case.**
15
16          1.    The Court should suppress purported field statements because they were taken in violation of *Miranda*.

17   The Court should suppress any statements that the arresting agent
18   purportedly obtained from Mr. Hernandez in conjunction with his arrest. When
19   individuals are subjected to custodial interrogation, they are entitled to procedural
20   safeguards to ensure that they are not compelled to be witnesses against themselves.
21   *See Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir. 2002); U.S. CONST. AMEND. V.
22   Specifically, people are entitled to *Miranda* warnings "whenever a person in
23   custody is subjected to either express questioning or its functional equivalent."
24   *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

25          When determining if an individual is in custody the ultimate inquiry is
26   "whether there [was] a 'formal arrest or restraint on freedom of movement' of the
27   degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322
28   (1994) (quoting *California v. Beheler*, 463 U.S. 1121 1125 (1983)). A person need

MEMORANDUM

1   not be in a police station to be in custody for purposes of *Miranda*. *See Orozco v.*

2   *Texas*, 394 U.S. 324, 326–27 (1969). To determine whether a person is in custody

3   under *Miranda*, courts must inquire whether a law enforcement "stop exerts upon

4   a detained person pressures that sufficiently impair his free exercise of his privilege

5   against self-incrimination to require that he be warned of his constitutional rights."

6   *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). The Ninth Circuit utilizes an

7   objective reasonable person test to determine whether a person is in custody:

> In this circuit an objective reasonable man test is
> employed in determining whether a person is in custody.
> The factors to be considered are the language used to
> summon him, the physical surroundings of the
> interrogation, the extent to which he is confronted with
> evidence of his guilt, and pressure exerted to detain him.
> If the person reasonably believes that he cannot leave
> freely, he is considered in custody and a *Miranda*
> warning is required.

13  *United States v. Luther*, 521 F.2d 408, 410 (9th Cir. 1975). Thus, if a reasonable

14  person in Mr. Hernandez's position would have felt he was not free to leave, then

15  Mr. Lin was in custody.

16         Here, a presumably uniformed and armed law enforcement agent approached

17  Mr. Hernandez and another man while a law enforcement helicopter hovered

18  overhead. He physically detained him before asking him any questions. And then

19  questioned him about his right to simply be present where he was. In this situation,

20  a reasonable person would feel her liberty restricted akin to an arrest. There is thus

21  far no indication that the impact of this show of authority was in any way mitigated

22  for Mr. Hernandez. Applying the test laid out in *Luther*, this Court must conclude

23  that Mr. Hernandez was in custody for purposes of *Miranda*.

24         Interrogation occurs when a person "is subjected to either express

25  questioning or its functional equivalent." *Innis*, 446 U.S. at 301. Routine booking

26  questions do not necessarily require *Miranda* warnings be given. *See generally*

27  *Pennsylvania v. Muniz*, 496 U.S. 582 (1980). Routine booking questions *may*

28  include information such as identity, nicknames, age, and address. *United States v.*

MEMORANDUM

*Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006). However, such questions *would* require *Miranda* warnings if they would cause an accused to make inculpatory statements. *See United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000); *see also Muniz*, 496 U.S. at 602 .14 ("police may not ask questions, even during booking, that are designed to elicit incriminatory admissions") (internal citation omitted). Here, Agent Nirelli's questions about Mr. Hernandez's citizenship and immigration status were precisely designed to elicit incriminating responses for the offense charged—attempted illegal entry by an alien. Questions rise to the level of interrogation requiring *Miranda* warnings if the questioning officer "should know [the questions] are reasonably likely to elicit an incriminating response." *Innis*, 447 U.S. at 391. This is assessed by looking at "all the circumstances involved in a given case." *United States v. Booth*, 669 F. 2d 1231, 1237 (9th Cir. 1981). Here, questions about Mr. Hernandez's citizenship, U.S. immigration status, and entry directly relate to the elements of the crime charged here.

The arresting agent did not provide any *Miranda* warning prior to asking these questions at the time of arrest. Because the field statements were thus the result of un-warned custodial interrogation, they must be suppressed.

### 2.   The field statements must also be suppressed as involuntary.

In accordance with Mr. Hernandez's constitutional rights, and under 18 U.S.C. § 3501(b), the Court must also determine whether any statements by him were made voluntarily before they may be admitted as evidence. The statute provides a touchstone list of factors to be considered in determining the voluntariness of a statement:

> (1) [T]he time elapsing between arrest and arraignment of the defendant making the confession, ... (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could

44

MEMORANDUM

> be used against him, (4) whether or not such defendant
> had been advised prior to questioning of his right to the
> assistance of counsel; and (5) whether or not such
> defendant was without the assistance of counsel when
> questioned and when giving such confession.

18 U.S.C. § 3501(b).

In addition, under *United States v. Gamez*, in the case of a person who the government considers to be a foreign national or non-native English speaker, there are additional factors to be considered:

> (1) whether the defendant signed a written waiver; (2)
> whether he was read his rights in his native language; (3)
> whether he appeared to understand those rights; (4)
> whether he had the assistance of a translator; (5) whether
> his rights were explained painstakingly; and, (6) whether
> he had experience with the American criminal justice
> system.

301 F.3d 1138, 1144 (9th Cir. 2002) (internal citations omitted).

Looking at all of these factors, the Court must suppress Mr. Hernandez's statements as involuntary. As stated above, Mr. Hernandez anticipates that the government intends to admit statements allegedly made without any *Miranda* warnings and without even an interpreter in his native language present. As such, the factors under *Gamez* tip in favor of Mr. Hernandez, because, at the time he allegedly made those statements, he was: not presented with a written waiver nor signed one, not read his rights in his native language, did not understand those rights, and did not have the assistance of a qualified translator. In addition, other statutory factors also tip in Mr. Hernandez's favor: he had not been advised at that time that he did not have to make a statement or that he could seek the assistance of counsel nor had the assistance of counsel, and Mr. Hernandez did not know that he could or would be criminally charged at the time of the statements.

Ultimately, in determining the voluntariness of the statement, the Court must evaluate the "totality of the circumstances," *see Gamez*, 301 F.3d at 1144, *see also*

---

45                                    19-mj-23508-MSB
MEMORANDUM

*United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc). Under the circumstances here, the government has not met its burden to show that these statements were made voluntarily.

Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, FED. R. CRIM. PROC. 12 obligates courts to make factual findings. *See United States v. Prieto-Villa*, 910 F.2d 601, 606–10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" *id*. at 610 (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence. An evidentiary hearing is required to complete the picture of what occurred through testimony of the agent(s) involved, and Mr. Hernandez requests such a hearing under § 3501 at the date of the motion hearing or such other date designated by this Court.

> 3.  <u>The Court should suppress the station interrogation for lack of a valid *Miranda* waiver.</u>

Applying the rules above, it is uncontroversial that Mr. Hernandez was subjected to custodial interrogation at the Border Patrol Station. *See* Ex. S. The question for the Court is whether adequate safeguards were taken prior to this interrogation. "Whether there has been a valid waiver depends on the totality of the circumstances, including the background experience and conduct of [the defendant]." *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). Here, the totality of the circumstances weigh against finding a valid waiver of Mr. Hernandez's *Miranda* rights. The translation that the agent used did not properly convey Mr. Hernandez's right to the assistance of counsel—the agent told Mr. Hernandez: "If you do not have the money to employ an attorney, *one can be provided* to you before we ask any questions, if you wish." The government, therefore, cannot establish that Mr. Hernandez's waiver was knowing, voluntary, and intelligent, or made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*,

MEMORANDUM

1  475 U.S. 412, 421 (1986).

2      In *United States v. Connell*, the Ninth Circuit found that the defendant's

3  confession should have been suppressed in part because officers' advisement to the

4  defendant that "a lawyer *may* be appointed to represent you … did not clearly

5  inform [the defendant] that if he could not afford an attorney one would be

6  appointed for him prior to questioning." 869 F.2d 1349, 1353 (9th Cir. 1989)

7  (emphasis added). The Ninth Circuit specifically found that "[t]he oral warning,

8  using the word 'may,' leaves the impression that providing an attorney, if [the

9  defendant] could not afford one, was discretionary." *Id.*

10      Similarly here, the language used left uncertainty about whether Mr.

11  Hernandez would be provided an attorney. The agent read Mr. Hernandez a

12  statement that an attorney "can be provided to you . . . if you wish." Just as with the

13  use of "may" in *Connell* this does not correctly convey the rights under *Miranda*.

14  Provision of an attorney at no cost is not something that law enforcement agencies

15  are merely allowed to or able to do, it is something they are required to do. As the

16  Supreme Court explained in *Miranda v. Arizona*:

17        In order fully to apprise a person interrogated of the extent of his rights
18        under this system then, it is necessary to warn him not only that he has
19        the right to consult with an attorney, but also that **if he is indigent a
      lawyer *will be* appointed to represent him**. Without this additional
20        warning, the admonition of the right to consult with counsel would
21        often be understood as meaning only that he can consult with a lawyer
      if he has one or has the funds to obtain one. The warning of a right to
22        counsel would be hollow if not couched in terms that would convey to
23        the indigent—the person most often subjected to interrogation—the
      knowledge that he too has a right to have counsel present.42 As with
24        the warnings of the right to remain silent and of the general right to
25        counsel, only by effective and express explanation to the indigent of
      this right can there be assurance that he was truly in a position to
26        exercise it.

27  384 U.S. 436, 473 (1966) (emphasis added). The statement that a lawyer "can be

28  provided" to Mr. Hernandez "if [he] wish[es]" does not contain the certainty that a

47

19-mj-23508-MSB

MEMORANDUM

lawyer will be provided that *Miranda* requires—he, an indigent and uneducated man, was not sufficiently assured that his rights would be respected. Thus, no waiver of this right could be valid.

>       4.       The Court should suppress the station interrogation as involuntary.

Applying the rules detailed above, the Court should further suppress the station of interrogation of Mr. Hernandez because the statements were involuntary. As detailed above, he was held for almost 4 hours. His detention at the Border Patrol station included troubling conditions of confinement that would impel a reasonable person to do whatever they could to try to be removed or transferred from such detention. Mr. Hernandez asks the Court to hold an evidentiary hearing regarding this treatment then to suppress the station interrogation statements as involuntary.

**J.      The Court should grant leave to file further motions.**

Discovery is still forthcoming in this case and defense counsel is still investigating the case. Mr. Hernandez therefore seeks leave to file further motions or to supplement these motions as additional relevant discovery is produced.

**III.    Conclusion**

Mr. Hernandez asks this Court to grant the above motions to ensure his rights are honored.

Respectfully submitted,

Dated:  October 16, 2019          *s/ Rebecca C. Fish*
                                  Federal Defenders of San Diego, Inc.
                                  Attorneys for Defendant
                                  OLISER HERNANDEZ-VILLALOBOS
                                  Email:  Becky_Fish@fd.org

ROBERT S. BREWER, JR.
United States Attorney
NICOLE RIES FOX
Assistant U.S. Attorney
California Bar No. 268819
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8783
Email: Nicole.ries.fox@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OLISER HERNANDEZ-VILLALOBOS,<br><br>Defendant. | Case No.: 19-MJ-23508-MSB<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO**<br><br>**(1) Dismiss the complaint**<br>**(2) Compel discovery**<br>**(3) Suppress evidence**<br>**(4) Grant leave to file further motions**<br><br>Date: November 12, 2019<br>Time: 9:00 a.m.<br><br>**The Honorable Michael S. Berg** |

The United States submits its Response in Opposition to Defendant's Motions. (ECF No. 16). The motions should be denied.

## BACKGROUND

On August 22, 2019, Border Patrol Agent Luke Nirelli was conducting assigned "line watch" duties in the Brown Field Border Patrol Station's area of responsibility. ECF No. 1 ("Compl.") at 2; ECF No. 16-1 ("Mot.") Ex. P. Around 4:16 p.m., a scope

operator notified agents that he had observed a group of individuals in an area known as the "48 Saddle." *Id.* The area is approximately eight miles west of the Tecate, California Port of Entry and approximately two and a half miles north of the U.S.-Mexico border. Compl. at 2.

Agent Nirelli responded to the area where the scope operator had last spotted the individuals. Mot. Ex. P. Shortly thereafter, a Customs and Border Protection Air and Marine Operations helicopter arrived. *Id.*; see Mot. Ex. Q (Air Interdiction Agent report). The helicopter spotted the two individuals and guided Agent Nirelli to the location. Mot. Ex. P. Agent Nirelli walked to the area and found two individuals "trying to hide under a bush." Compl. at 2. One of those individuals was Defendant Oliser Hernandez. *Id.* Agent Nirelli approached them and conducted an immigration inspection (in the Spanish language). Mot. Ex. P. Both individuals stated that they were citizens of countries other than the United States—one from El Salvador and the other (Defendant Hernandez) from Mexico. *Id.*; Compl. at 2. They both also stated they did not have immigration documents that would allow them to enter or remain in the United States legally. *Id.* Agent Nirelli placed both individuals under arrest and transported them back to the station for processing. Mot. Ex. P.

Back at the station, another agent read Defendant his *Miranda* rights. Compl. at 2. Defendant signed an initialed a form indicating that he understood those rights and wished to answer questions without an attorney. Mot. Ex. R. The interview was recorded. See U.S. Ex. 1 (transcription and translation of recorded interview). Defendant "stated that he is a citizen of Mexico illegally present in the United States." Compl. at 2. He admitted that he had illegally entered the United States the day before, on August 21, 2019. *Id.*

Records checks revealed that Defendant has a criminal record in the United States. ECF No. 1-1 (Rap Sheet Summary Chart). He has sustained convictions for driving under the influence (in 2011), inflicting corporal injury on a spouse or cohabitant (in 2014), and a hit and run (in 2015). *Id.* In November 2018, Defendant was deported to Mexico. *Id.*

The other individual arrested with Defendant is Luis Alonso Argueta-Zavala. Mot. Ex. T. Argueta "stated that he has fear of returning to El Salvador, and that he has no immigration petitions pending on his behalf." *Id.* Argueta was transported to Mexico, where he will await further immigration proceedings under the Migrant Protection Protocol. *Id.* There is no criminal case pending against him.

Defendant was charged with attempting to enter the United States at a time and place other than as designated by immigration officers. Compl. at 1. Defendant has been released from custody on a $8,000 bond with a 50% cash deposit posted by the Bail Project. ECF Nos. 13-15.

## **ARGUMENT**

## I.   **RESPONSES TO MOTIONS TO DISMISS**

### A. **Non-Delegation**

Defendant moves to dismiss the complaint on the ground that Congress violated the non-delegation doctrine when it enacted 8 U.S.C. § 1325(a)(1). Mot. at 4. As another court in this district recently held, the argument lacks merit. *United States v. Nunez-Soberanis*, No. 18-cr-4781-MDD, 2019 WL 4141265 (S.D. Cal. Aug. 30, 2019).

Under the non-delegation doctrine, Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)).

At the same time, the doctrine permits Congress to "obtain the assistance of its coordinate Branches—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Id.*; see also *id.* ("[T]he Constitution does not deny to the Congress the necessary resources of flexibility and practicality [that enable it] to perform its functions.") (cleaned up). Congress can "permit an executive-branch official to fill in the details of a legislative scheme as long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.'" *Nunez-Soberanis*, 2019 WL 41421265, at *1 (quoting *Gundy*, 139 S. Ct. at 2129). Based on these principles and the "necessities of government," the Supreme Court has "over and over upheld even very broad delegations." *Gundy*, 139 S. Ct. at 2130, 2129 (citing examples). Indeed, "[o]nly twice in this country's history"— both times in 1935—has the Supreme Court held a statute violated the non-delegation doctrine. *Id.* at 2129.

Section 1325(a)(1), like the many other statutes courts have upheld, reflects a permissible delegation of authority. For example, the Supreme Court upheld Congress' delegation of "'the authority' to 'specify the applicability' of [sex-offender] registration requirements and 'to prescribe rules for [their] registration,'" *Gundy*, 139 S. Ct. at 2122 (quoting 34 U.S.C. § 20913), even though that delegation functionally permitted the Attorney General to decide criminal liability for hundreds of thousands of people. And the Court has blessed the delegation to the Federal Communication Commission the power "to regulate broadcast licensing 'as public interest, convenience, or necessity'" requires. *Id.* (citation omitted).

The delegation that Congress effected in § 1325 is "analogous to the delegation in *Gundy*." *Nunez-Soberanis*, 2019 WL 4141265, at *3. "Congress determined that entering

the United States outside a port of entry was prohibited and properly and practically delegated authority to implement Section 1325(a) to the Executive Branch, the agency that would be responsible for staffing and operating the ports of entry." *Id.* Just as Congress told the FCC to regulate broadcast licensing with only the broadest conditions, DHS may regulate the times and places that Ports of Entry are open. Congress did not need to be more specific.

Defendant contends that Congress was required to spell out for the Executive how to determine where and when Ports of Entry are open. Defendant reads the non-delegation doctrine far too broadly. Congress has determined that there should be Ports of Entry, but has properly allowed the Executive to determine where, when, and how those Ports operate. It is not accurate to suggest that "any individual immigration official can designate any piece of land as a place for entry." *Nunez-Soberanis*, 2019 WL 4141265, at *2. Rather, "Ports of entry can only be designated or de-designated by the Secretary of Homeland Security subject to the Administrative Procedures Act." *Id.* (citing 8 C.F.R. § 100.4(a)). They "also necessarily include facilities, staffed by immigration officials that are set up to accept applications for admission." *Id.* As a result, "[t]o interpret Section 1325(a) to permit a border patrol agent to designate a portion of the border fence 'on a whim' is in direct conflict with Congress's clear statutory scheme." *Id.*

The Supreme Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Gundy*, 139 S. Ct. at 2129. This Court should similarly reject the invitation to strike down § 1325(a)(1) on the grounds that it violates the non-delegation doctrine.

**B. Vagueness**

Defendant's vagueness challenge to § 1325(a)(1) (Mot. at 11) also fails. Defendant is charged with *attempting* to enter at a time or place other than as designated. Compl. at 1. As a result, "how the area was designated is irrelevant to this prosecution." *Nunez-Soberanis*, 2019 WL 4141265, at *3. Even if, as a technical matter, the border fence was somehow designated as a port of entry, it would make no difference for the crime of attempted entry.

Nor is there merit to Defendant's claim that individual Border Patrol agents can arbitrarily will Ports of Entry into and out of existence. As Judge Dembin reasoned in rejecting this argument:

> Ports of entry are identified by federal regulation. Ports of entry necessarily require facilities where immigration officers can accept applications for admission from aliens. Moreover, the process to designate a port of entry requires formal action by the Secretary of Homeland Security. … Given the formal procedures required to designate and de-designate a port of entry, and Congress's determination that a port of entry is the only place an alien may lawfully seek admission, the Court finds that Section 1325(a)(1) is surely valid in the vast majority, if not all, of its intended applications and Defendant's hypothetical argument is insufficient to support a facial attack.

*Nunez-Soberanis*, 2019 WL 4141265, at *3-4 (citing 8 C.F.R. §§ 235.1 & 100.4(a); *United States v. Aldana*, 878 F.3d 877, 881 (9th Cir. 2017)).

Defendant's Motion relies on *Hill v. Colorado*, 530 U.S. 703, 732 (2000) for the standard on evaluating whether a statute is unconstitutionally vague. Mot. at 11. Notably, *Hill* collected cases rejecting vagueness challenges and upheld the law at issue because "it is clear what the ordinance as a whole prohibits." 530 U.S. at 733 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). Section 1325(a)(1) is also clear in what it prohibits:

"aliens who enter or attempt to enter outside of an open port of entry." *United States v. Corrales-Vazquez*, 931 F.3d 944, 950 (9th Cir. 2019); *Aldana*, 878 F.3d 877. The location of Ports of Entry (and whether they are open) is obvious to any observer. Defendant knew he was not at one when he jumped the international border fence. The law is not unconstitutionally vague.

### C. Sufficiency of the Complaint

Defendant argues that the charging document fails to allege all of the elements of the § 1325(a)(1) offense. Mot. at 12. That is incorrect as well. The charging document "tracks the words of the statute." *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995); see also *United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) (§ 1326 indictment sufficiently alleged implied elements of attempt by tracking language of the statute). Especially where, as here, the statutory elements "already incorporate a mens rea requirement," that tracking of the words of the statute is sufficient. *United States v. Mapalo*, 70 F. App'x 440, 442 (9th Cir. 2003) (unpublished).

The complaint does not need to allege that Defendant "knew he was an 'alien' when he committed the charged offense," as Defendant contends. Mot. at 12. Defendant bases his argument on *Rehaif v. United States*, 139 S. Ct. 2191 (2019), a gun possession case that did not address § 1325 at all. Defendant's reliance on *Rehaif* "fails to make an important distinction between the relevant status at issue in *Rehaif*, and [a § 1325 defendant's] own status." *Nunez-Soberanis*, 2019 WL 4141265, at *5. Specifically, "[i]n *Rehaif*, the defendant's relevant status was that he was an alien 'unlawfully in the United States.' Here, at issue is Defendant's status as an 'alien.'" *Id.* "*Rehaif*'s violation of § 922(g) did not turn on his status as an alien" because the statute "does not prohibit an alien who is *lawfully present* from possessing a firearm." *Id.* (emphasis added). Thus, the Supreme Court's

conclusion that the government had to prove that "Rehaif knew he fell into the relevant status group that made his conduct unlawful" meant that the government had to prove that he knew he was "unlawfully in the United States." *Id.* Section 1325, by contrast, "does not require proof that the defendant was unlawfully in the United States." *Id.* Rather, the United States need only prove that Defendant knew that he was "attempt[ing] to enter the United States at any time or place other than as designated by immigration officers." 8 U.S.C. § 1325(a)(1). Defendant's status "is not a crucial element that makes his conduct unlawful." *Nunez-Soberanis*, 2019 WL 4141265, at \*6. Accordingly, "the rationale in *Rehaif* is not directly applicable to a prosecution under § 1325 and does not require the Government to allege or prove that Defendant knew he was an alien." *Id.* at \*5.

In addition, the policy considerations that animated the Supreme Court's decision in *Rehaif* "are not present here and do not support applying *Rehaif* to this case." *Nunez-Soberanis*, 2019 WL 4141265, at \*7. The decision in *Rehaif* "primarily turned on the statutory construction of Sections 922(g) and 924(a)(2)." *Id.* The Court observed that § 924(a)(2) "includes an express scienter requirement in the text of the statute," and endeavored to "decide the scope of the requirement." *Id.* Here, by contrast, "Congress did not incorporate a 'knowing' requirement into the text of Section 1325" and "[t]here is no evidence that Congress intended to apply a scienter requirement to Defendant's status as an alien." *Id.* Further, the Supreme Court considered § 924(a)92)'s "particularly 'harsh' penalty including up to 10 years in prison" as evidence that Congress "intend[ed] the express knowledge requirement to apply to a defendant's status." *Id.* That consideration is absent here, as § 1325(a) "is punishable only as a misdemeanor with a maximum prison term of six months." *Id.*

Finally, it bears emphasis that the underlying goal of *Rehaif* was to "separate wrongful from innocent acts." 139 S. Ct. at 2197. That goal has already been achieved by the Ninth Circuit in addressing this statute. In attempted unlawful entry cases such as this one, the Government must "prove Defendant acted with the specific intent to violate the statute and enter or attempt to enter 'free from official restraint.'" *Nunez-Soberanis*, 2019 WL 4141265, at *7. That requirement in and of itself was designed to avoid criminalization of otherwise innocent conduct. *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1190, 1193 (9th Cir. 2000). Thus, Ninth Circuit case law already achieves the stated goal of *Rehaif* of "separat[ing] wrongful from innocent acts." 139 S. Ct. at 2197. The Court need not impose a further heightened mens rea requirement to do so here.

### D. Equal Protection and Due Process

Defendant next contends that the complaint against him should be dismissed because this prosecution violates Equal Protection, Mot. at 16, and Due Process, *id.* at 25. A number of courts in this district have rejected both of these arguments. See, e.g., *United States v. Silva-Sosa*, 2019 WL 1470868, No. 18-MJ-23270-KSC (S.D. Cal. Apr. 3, 2019); *United States v. Felix-Terrazas*, No. 18-mj-22357-BEN, ECF No. 15 (S.D. Cal. Dec. 3, 2018); *United States v. Chavez-Diaz*, No. 18-mj-20098-KSC-AJB, ECF No. 29 (S.D. Cal. Oct. 30, 2018).[1] There is no reason for this Court to deviate from those unanimous holdings here.

---

[1]      *Chavez-Diaz* is currently on appeal to the Ninth Circuit. See 9th Cir. No. 18-50391. The appeals of other cases raising similar issues have been stayed pending its resolution. See, e.g., *Felix-Terrazas*, 18-MJ-22357-BEN, ECF No. 31.

1.  <u>Equal Protection</u>

For purposes of equal protection analysis, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity and must be upheld if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Aleman v. Glickman*, 217 F.3d 1191, 1200 (9th Cir. 2000) (citation omitted). Indeed, "a statutory classification . . . must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 1200-01. "The government has no obligation to produce evidence to sustain the rationality of a statutory classification; [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (citations omitted).

As an initial matter, this Court's General Orders relating to the Central Violations Bureau (CVB) do not distinguish on the basis of alienage, national origin, or race. Rather, the prosecution of § 1325 defendants "with others similarly charged [i]s based on the charges, not the alienage of the defendants." *Silva-Sosa*, 2109 WL 1470868, at *2.

But even if § 1325 were treated as making an alienage-based distinction, because it relates to the admission of non-citizens, "rational basis" review would apply. See *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) ("Because issues related to admission of non-citizens have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of [the] Court to control, the Supreme Court applied a standard of review similar to rational basis review."). Furthermore, where a classification is made based on the undocumented status of aliens – a classification distinct from that of alienage – the Supreme Court has held that "[u]ndocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a

'constitutional irrelevancy.' . . . [I]t is 'a routine and normally legitimate part' of the business of the Federal Government to classify on the basis of alien status . . . and to 'take into account the character of the relationship between the alien and this country.'" *Plyler v. Doe*, 457 U.S. 202, 223-225 (1981) (citations omitted).

A brief explanation of the CVB docket readily demonstrates why that docket passes "rational basis" review. The CVB is "a national center charged with processing violation notices (tickets) issued and payments received for petty offenses committed on federal property." Central Violations Bureau, www.cvb.uscourts.gov (last visited Sept. 7, 2019). This Court's General Order 203-L and subsequent orders identify a series of offenses that would be handled on the CVB calendar; the General Orders list offenses such as traffic violations on federal property (i.e., in national parks), fish-and-game offenses (i.e., hunting out of season), boating offenses, camping offenses, and the like. See S.D. Cal. General Order 203-L (2002). As explained on the District Court's website, a CVB proceeding is initiated when a violator receives a "violation notice" (i.e., a ticket) from a federal law enforcement officer. Central Violations Bureau, www2.casd.uscourts.gov/cvb/ (last visited Sept. 7, 2019). Violation notices are then mailed by law enforcement to the CVB for processing. *Id.* Approximately four weeks later, CVB mails violators a notice to appear in court. *Id.* In short, CVB matters differ from other types of criminal cases in this district (including § 1325 cases) based on a combination of the nature of the offense and the manner in which proceedings are initiated, processed, and pursued.

Defendant's case is not suitable for disposition through the CVB. For one, the charges in Defendant's case – criminal violations under Title 8 of the United States Code – are not the types of offenses for which, under the General Orders of this Court, the CVB calendar was designed. Indeed, the charges here involve no nexus to a petty offense

committed on federal property. Furthermore, the procedures applicable in Defendant's case are incompatible with the CVB calendar. Defendant was arrested, consistent with the responsibilities of Border Patrol, instead of being given a "violation notice." Under Rule 5 of the Federal Rules of Criminal Procedure, Defendant was entitled to be taken "without unnecessary delay" before a magistrate judge; and he was. In light of his arrest, his case could not have been routed to the CVB for processing, and could not have been set on the Court's CVB calendar.

For these reasons, courts in this district have consistently rejected equal protection challenges like Defendant's here. For example, in *Chavez-Diaz*, Judge Battaglia explained that the relevant classification in procedures is not based on alienage, but instead is based on the type of offense at issue. See 18-mj-20098-KSC-AJB, ECF No. 29, at 6-7. Then, applying the "rational basis test," Judge Battaglia determined that "[i]t is both rational and a matter of common sense for a court to separately calendar matters that fall into groups by charge and type of proceedings." *Id.* at 7. He explained:

> In the end, defendant's charges could not be handled on the CVB calendar. The predicate of a violation of law on federal property is nonexistent. The argument that misdemeanors are misdemeanors is not the point. The jurisdictional underpinnings of the basis for the charges, the manner of "arrest" and prosecutorial discretion are all factors. In no way does alienage play a part from the Court's perspective of scheduling the various matters brought by the Government.

*Id.* at 9. In short, "[n]o separate 'court' has been created or exists." *Silva-Sosa*, 2109 WL 1470868, at *2 (quoting *Chavez-Diaz*). As the courts of this district have unanimously

concluded, in the system the court has designed, "all § 1325 misdemeanor defendants are treated equally, fully receiving all rights and protections they are guaranteed." *Id.*[2]

Defendant's additional argument that the prosecution of § 1325 offenses is motivated by "invidious discrimination" also lacks merit. The only Equal Protection issue Defendant has raised in this case involves the actions *of the court* in calendaring the § 1325 misdemeanors for initial appearance, not the actions of the prosecutors in deciding whether to charge the cases in the first place. Defendant has not shown, or even argued, that the district court for the Southern District of California was itself motivated by "invidious racial discrimination" when it set up the § 1325 misdemeanor calendar. Nor is there any evidence to support such a claim. The court made clear that its motivation for instituting a "streamline" calendar for the initial appearance of § 1325 defendants was to deal with a volume of cases which, for convenience and similarity, are grouped into distinct batches. Even if Defendant had made out a case of racial hostility, it would have no bearing on his actual equal protection claim.

Finally, as Defendant acknowledges, Mot. at 26-27, his gender-based claim has already been rejected by the Ninth Circuit. He offers no reason for this Court to deviate from that holding here.

---

[2]     Defendant suggests that "the Court could also adjudicate [his] equal protection challenge through the legal framework of a selective prosecution or selective enforcement claim." ECF No. 16-1 at 23. For the reasons identified above, the procedures the court designed to handle § 1325 cases have no "discriminatory effect or discriminatory purpose" that would give rise to a selective prosecution claim. See *id.* (citing *United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018)).

2. <u>Due Process</u>

Nor is there any merit to Defendant's due process claims. As to substantive due process, the "threshold question is whether the [government action] is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Substantive due process targets governmental conduct that violates the "decencies of civilized conduct[,]" *Rochin v. California*, 342 U.S. 165, 173 (1952), interferes with rights "'implicit in the concept of ordered liberty[,]'" *id.* at 169, and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency[.]" *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957). As is apparent, "the 'shock the conscience' standard erects a high hurdle for would-be claimants." *Aguilar v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 21 (1st Cir. 2007).

Defendant's motion fails to clear this high hurdle. By appearing in "regular" court, that is non-CVB court, Defendant has received the full panoply of rights afforded criminal defendants under the U.S. Constitution and the Federal Rules of Criminal Procedure. *Silva-Sosa*, 2019 WL 1470868, at *3. After arrest, he appeared within hours before a U.S. Magistrate Judge, who appointed counsel and set bond. He is represented by very able counsel and is exercising his right to proceed to trial. In short, "[t]here is a rational basis for the Court's procedures and there is nothing shocking or outrageous about the way 8 U.S.C. § 1325 cases are handled in this District." *Id.*

For the same reason, Defendant's claim based on procedural due process also lacks merit. He has not even attempted to identify what process he is entitled to under the Federal Rules that he has not already received. Rather, as other courts in this district have found,

the procedures here "satisfied the requirement of providing the defendant with the rights afforded under the U.S. Constitution and the Federal Rules of Criminal Procedure." *Id.*

## II.   RESPONSE TO MOTION TO COMPEL DISCOVERY

Defendant moves for a motion to compel "complete discovery." ECF No. 16-1 at 27. The United States has and will continue to abide by its discovery obligations. The United States responds to Defendant's specific requests as follows.

1.   <u>Discovery on whether the National Guard or U.S. military was involved in his case in any way</u>. As reflected in the reports already produced in discovery, neither the National Guard nor the military participated in Defendant's arrest or any other aspect of this case.

2.   <u>Recordings from any surveillance leading up to and including the arrest</u>. On September 17, 2019, the United States produced a DVD containing the dispatch recordings and scope video relating to Defendant's arrest. The undersigned is unaware of any other surveillance of Defendant that was recorded.

3.   <u>Batch sheets, apprehension reports, or other notes</u>. All reports have already been produced in discovery. The undersigned has been informed that there are no "batch sheets" or notes related to Defendant's case that have not been produced.

4.   <u>Information Regarding Argueta-Zavala</u>. The United States has produced an I-213 report relating to Mr. Argueta, as well as his Record of Sworn Statement. The undersigned has requested any additional records regarding Mr. Argueta, including any contact information in the government's possession.

Defendant contends that in removing Mr. Argueta to Mexico to await his further immigration proceedings, the United States has prevented Defendant from a meaningful opportunity to present a defense. Mot. at 31. To substantiate that claim, Defendant must

show that "the government acted in bad faith" and that "the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *United States v. Leal-Del Carmen*, 697 F.3d 964, 970 (9th Cir. 2012). Defendant cannot make that showing with respect to Argueta. The only statements of Argueta's are neither "material" nor "favorable" to any defense Defendant might raise. Argueta stated only that "[w]e jumped a border wall near Tecate, California last Tuesday (08/22/2019) around 03:00 AM." U.S. Ex. 2. He did not state whether he crossed with Defendant, nor did he provide any information about the Defendant.[3] Defendant thus fails both prongs of the *Leal-Del Carmen* test. He cannot show that sending Mr. Argueta to Mexico was in bad faith. See *Leal-Del Carmen*, 697 F.3d at 970 ("When the government doesn't know what a witness will say, it doesn't act in bad faith by deporting him."). Nor can he show that any testimony by Mr. Argueta would be "material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.*

5.      <u>Testimony about the area of arrest</u>. The United States does not anticipate relying on any information, data, reports, guidance, or other materials to establish information about the area of Defendant's arrest, but will instead likely rely on the training and experience of the apprehending agent. If there is any additional information the United States expects to rely on, it will produce that information promptly in advance of trial.

6.      *Henthorn review*. The undersigned will conduct the required *Henthorn* review and produce any impeachment material in advance of trial. This will include any

---

[3]      Indeed, Argueta may not have even crossed with Defendant. Defendant stated in his post-arrest statement that he crossed on "Wednesday 21" at "three or four" "in the afternoon." U.S. Ex. 1 at 9.

information in the government's possession about the involvement of any agent in this case with the "I'm 10-15" Facebook group or any similar social media group. The United States has no objection to Defendant's request that the Court set a deadline for the production of this discovery.

## III.   RESPONSE TO MOTIONS TO SUPPRESS

Defendant contends that Agent Nirelli lacked reasonable suspicion to arrest him, that Agent Nirelli "effectively arrested" Defendant without probable cause, and that Agent Nirelli lacked the authority to arrest him. Mot. at 34-42. Defendant also moves to suppress his field admissions and post-*Miranda* statement and field admissions. *Id.* at 42-48. There is no reason to suppress any evidence here.

### A. Reasonable Suspicion

Agent Nirelli had reasonable suspicion to stop and question Defendant in the "48 Saddle" on August 22, 2019. The Court must consider the "totality of the circumstances of the case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (cleaned up). The 48 Saddle is an area that is frequently used to further illegal entry into the United States. But Agent Nirelli did not rely on that fact alone. Rather, he was alerted to the presence of a group of individuals by a scope operator and personally saw the two individuals "trying to hide under a bush." Compl. at 2. As the Ninth Circuit has explained, "[a]ny number of factors may be taken into account in deciding whether there is reasonable suspicion to stop [someone] in the border area." *United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005) *overruled on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Relevant behavior includes "obvious attempts to evade officers," *id.*, including "hiding in the brush." *United States v.*

*Ramos*, 397 F. App'x 314 (9th Cir. 2010) ("Border Patrol agents had reasonable suspicion to believe that Ramos was in the country illegally" where "Ramos was found hiding in the brush with five other individuals approximately eight miles north of the Mexican border, in an area well-known to be a border-crossing route."). As the evidence at trial will readily demonstrate, these circumstances, combined with Agent Nirelli's experience and training, was sufficient to provide reasonable suspicion for the stop.

### B. Probable Cause and Authority to Arrest

Defendant claims that Agent Nirelli lacked probable cause or authority to arrest him because 8 U.S.C. § 1357 "limits authority of immigration officers to make warrantless arrests, searches, and interrogations." ECF No. 16-1 at 39. Agent Nirelli acted within that authority here.

Under § 1357, a Border Patrol agent acting without a warrant is authorized "(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; and (2) ... to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrestee shall be taken without unnecessary delay ... before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States." 8 U.S.C. § 1357(a).

"The phrase 'has reason to believe' has been equated with the constitutional requirement of probable cause." *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). The Ninth Circuit has held that reasonable suspicion, combined with an "uncoerced admission" that the individual "came from Mexico" is a "clearly sufficient basis for [a] warrantless arrest" under the statute. *Id.* Defendant was hiding in a bush and when

contacted by Agent Nirelli, immediately admitted that he was a citizen of Mexico and did not have authorization to be in the United States. Compl. at 2. Under these circumstances, the requirements of § 1357 (as well as the probable cause requirement) are satisfied.

### C. Field Admissions

Defendant moves to suppress his field admissions. Mot. at 42. It is well-established, however, that admissions provided to Border Patrol Agents in the field are admissible in evidence. "[T]he Ninth Circuit has repeatedly held that brief questioning near the border is a non-custodial Terry stop that does not trigger *Miranda*." *United States v. Gutierrez-Salinas*, 640 Fed. App'x 690 (9th Cir. 2016) (citing *United States v. Medina-Villa*, 567 F.3d 507, 519-20 (9th Cir. 2009)); see also *United States v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001) (field interview is "ordinarily a *Terry* stop, not custodial questioning"). An "officer may question [individuals reasonably detained near the border] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *Cervantes-Flores*, 421 F.3d at 829-30. The brief questioning in the field here did not trigger *Miranda*.

Defendant claims that his field admissions were involuntary. Mot. at 44. A statement is involuntary in violation of due process if a defendant's will was overborne viewing the totality of the circumstances. *United States v. Dickerson*, 530 U.S. 433, 434 (2000). Police coercion is a "necessary predicate" to a finding of involuntariness. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); see *id.* (fact that suspect's confession was in large part due to his psychotic, schizophrenic state, and that he confessed because the "voice of God" told him he should do so, is irrelevant; confession was admissible because there was no police or governmental wrongdoing). The focus is on whether the confession was obtained

through practices "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

The circumstances here do not meet that test. Defendant was not subjected to improper police coercion. Defendant's admissions took place "in the field," that is, outdoors in open land where Defendant was briefly questioned in connection with a *Terry* stop. He was asked simple questions about his citizenship and his right to be in the United States; he and the other individual with whom he was encountered were arrested only after their field admissions. There was no police coercion or other offensive tactics used. Defendant's statements were voluntary and may be admitted at trial. To the extent the Court requires further factual support to prove the voluntariness of the statements, the United States will lay the required foundation through the arresting agent before eliciting his testimony about the field statements.

### D. Post-*Miranda* Statements

Defendant seeks to suppress the statements he made at the Border Patrol station based on a purported violation of *Miranda.* Mot. at 46. His sole claim is that the "translation that the agent used did not properly convey Mr. Hernandez's right to the assistance of counsel." *Id.* That is incorrect.

"The Supreme Court has made clear that no 'talismanic incantation' of this warning is necessary to satisfy the strictures of *Miranda*." *United States v. Connell*, 869 F.2d 1349, 1351 (9th Cir. 1989). "If a defendant has been told the substance of his constitutional rights, it is not fatal if irrelevant words or words with no independent substance are omitted." *United States v. Noti*, 731 F.2d 610, 614-15 (9th Cir. 1984).

The oral *Miranda* warning (given to Defendant in Spanish, his native language) has been translated as follows:

> All right, before we ask you any questions you must understand your rights, sir. You have the right to remain silent. Anything you say can be used against you in a court of law or in any administrative or immigration proceedings.
>
> You have the right to talk to an attorney for him to advise you before we ask you any questions, and to have him present with you during the questions. <u>If you do not have the money to employ an attorney, one can be provided to you before we ask you any questions.</u>
>
> If you decide to answer our questions now without having an attorney present, you will always have the right to stop answering whenever you like. You also have the right to stop—to—to stop answering whenever you like until you can talk to an attorney.
>
> Do you understand each one of your rights as I have read them to you, sir?

U.S. Ex. 1 at 4-5 (emphasis added). Defendant responded, "Yes," indicating that he understood his rights. *Id.* at 6. The agent then asked Defendant, "Are you willing to answer my questions without having an attorney … present, sir?" *Id.* Defendant again responded, "Yes." *Id.*

Defendant contends that this oral advisal "did not properly convey Mr. Hernandez's right to the assistance of counsel." Mot. at 46. He focuses on the language underlined above: "If you do not have the money to employ an attorney, one can be provided to you before we ask you any questions." Defendant argues that this language—particularly the use of the word "can"—"left uncertainty about whether Mr. Hernandez would be provided an attorney." *Id.* at 46-47.

Defendant makes no reference, however, to a subsequent written advisal that Defendant signed. It read as follows:

### I-214 (English)

Before we ask you any questions, you must understand your rights:

- You have the right to remain silent.
- Anything you can say can be used against you in court, or in any immigration or administrative proceeding.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.
- You also have the right to stop answering at any time until you talk to a lawyer.

Do you understand each of these rights as I have read them to you?  YES  Iniciales  YO H
Entiende usted a cada uno de sus derechos como se los he leido?
Are you willing to answer my questions without an attorney being present?  YES  Iniciales O H
Esta usted dispuesto a contestar mis preguntas sin tener a un abogado presente?

**Yes.**          **No.**

Yoliser Hernandez
Nombre/Name                                    Firma/Signature

08/22/2019  8:27 P
Date /Time                                     Agent  000048

Mot Ex. R. Defendant does not point to any defect with this written advisal. At a minimum, the two warnings combined sufficiently conveyed that Defendant "ha[d] the right to remain silent and that he ha[d] the right to consult with counsel." *Noti*, 731 F.2d at 615.

Defendant relies principally on *United States v. Connell*, 869 F.2d 1349 (9th Cir. 1989). The warnings here did not suffer the same defects as the ones in that case. The oral *Miranda* warning in *Connell* read as follows:

> You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning.

> However, you must make your own arrangements to obtain a lawyer and this will be at no expense to the Government. If you cannot afford to pay for a lawyer, one <u>may</u> be appointed to represent you.

*Id.* at 1350. A written warning then stated:

> I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. However, I understand that I must make my own arrangements to obtain a lawyer and this will be at no expense to the Government. I further understand that if I cannot afford to pay for a lawyer and want one <u>arrangements will be made for me to obtain a lawyer in accordance with the law</u>.

*Id.* at 1350-51. The Ninth Circuit held that these warnings "fell below minimum required standards" because they were "equivocal and open to misinterpretation." *Id.* at 1353. The Court explained that in the oral warning, although the defendant was informed that "he had the right to talk to an attorney before, during, and after questioning, this statement was immediately followed by a strong assertion that such an attorney could not be obtained at the Government's expense." *Id.* And the "subsequent statements regarding appointed counsel in both the oral and written warnings—that 'a lawyer *may* be appointed to represent you' (oral) and that if I want but cannot afford a lawyer 'arrangements will be made for me to obtain a lawyer *in accordance with the law*' (written)—did not clearly inform Connell that if he could not afford an attorney one would be appointed for him prior to questioning, if he so desired." *Id.* The Court explained that both of these statements led the "impression that providing an attorney, if Connell could not afford one was discretionary with the government" or based on "requirements of the law" that the defendant could not be expected to know. *Id.*

The warnings here, by contrast, do not leave the impression. There is nothing that suggests that Defendant "must make [his] own arrangements to obtain a lawyer and this will be at no expense to the Government," as there was in the oral warning in *Connell. Id.*

at 1350. It was only in this context that the Ninth Circuit found the use of the word "may" troubling. In the context of the unambiguous warning here, the use of the word "can" created no similar ambiguity. Likewise, the written warning here did not leave any impression that the right to an appointed attorney was discretionary, as it did in *Connell*. See *id.* at 1351 ("arrangements will be made for me to obtain a lawyer in accordance with the law"). The written warning was unambiguous: "If you cannot afford a lawyer, one <u>will</u> be appointed for you before any questioning if you wish." Mot. Ex. R. At a minimum, the combination of these warnings was sufficient to make explicit "the right to appointed counsel before and during questioning." *Connell*, 869 F.2d at 1353.

Defendant also claims that his statement was involuntary due to the conditions of his confinement. Mot. at 48. Defendant bases this argument on a general description of "conditions at Border Patrol stations along the U.S./Mexico border" without any declaration or other proffer with respect to the particular conditions he himself faced. *Id.* at 2. Although the "conditions of detention" is one among several factors that the Court can consider in determining if Defendant's confession was voluntary, the "voluntariness inquiry considers 'all the circumstances of the interrogation.'" *Bradford v. Davis*, 923 F.3d 599, 615-16 (9th Cir. 2019); see *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) ("The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.").

The conditions of the interview itself—as can be seen in the recording—were not coercive at all. See Mot. Ex. S; *Connelly*, 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"). Against Defendant's

generalized claims, that is sufficient to meet the government's burden of proving that the statement was voluntary. See *id.* ("the voluntariness of a confession need be established only by a preponderance of the evidence"); see also, e.g., *DeWeaver v. Runnels*, 556 F.3d 995, 1003 (9th Cir. 2009) (affirming state court's voluntariness finding observing that the defendant's "vague allegations of coercive techniques consisted only of the coercion inherent in a custodial interrogation, which is dispelled by sufficient Miranda warnings and waiver"); *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009) (district court within its discretion in concluding without an evidentiary hearing that defendant's "vague assertion" that his statements were involuntary were insufficient when weighed against the sworn affidavit of the officer and the defendant's "signed *Miranda* acknowledgement"). To the extent the Court requires further factual support to prove the voluntariness of the statements, the United States will lay the required foundation through the interviewing agent before eliciting his testimony about Defendant's statements.

## IV.   RESPONSE TO GRANT LEAVE TO FILE FURTHER MOTIONS

The United States takes no position on Defendant's anticipatory request for leave to file further motions.

### CONCLUSION

The United States respectfully requests that the Court deny Defendant's motions.

DATED: October 31, 2019                            Respectfully submitted,

                                                   ROBERT S. BREWER, JR.
                                                   United States Attorney

                                                   /s/ Nicole Ries Fox
                                                   NICOLE RIES FOX
                                                   Assistant United States Attorney

# EXHIBIT 2

**Record of Sworn Statement in Administrative Proceedings**

U.S. Department of Homeland Security

Office: IMPERIAL BEACH, CA, BORDER PATROL STATION

Event No: BRF1908000183
File No: A074 636 420

Statement by: LUIS ALONSO ARGUETA-ZAVALA

In the case of: LUIS A. ARGUETA-ZAVALA

At: BROWN FIELD, CA BORDER PATROL STATION          Date: August 22, 2019

Before: RICARDO DUGAN
BORDER PATROL AGENT          In the     SPANISH     language.
(Name and Title)

Interpreter: NONE          Interpreter employed by: NONE

I am an officer of the United States Department of Homeland Security, authorized by law to administer oaths and take testimony in connection with the enforcement of the Immigration and Nationality laws of the United States. I desire to take your sworn statement regarding YOUR ILLEGAL ENTRY INTO THE UNITED STATES

Q. Do you swear or affirm that all statements you are about to make are true and complete?
A. Yes.
Q. What is your complete and correct name?
A. Luis Alonso ARGUETA-Zavala.
Q. Have you used any other names?
A. No.
Q. When and where were you born?
A. Usulutan, Usulutan, El Salvador, on September 04, 1976.
Q. Of what country are you a citizen?
A. El Salvador.
Q. Do you have citizenship in any other country?
A. No.
Q. Of what country are your parents citizens?
A. El Salvador.
Q. Where do your parents reside?
A. My parents live in Usulutan, Usulutan, El Salvador.
Q. When, how, and where did you last enter the United States illegally?
A. We jumped a border wall near Tecate, California last Tuesday (08/22/2019) around 03:00 AM.
Q. Which City and State in the United States were you going today?
A. San Diego, California.
Q. Did you pay any one for any reason?
A. No.
Q. Were you instructed on how you had to answer the questions you were asked?
A. No.
Q. Did you ask Mexico for help or asylum?
A. Yes.
Q. Have you ever lived in the United States, if yes why did you leave?
...(CONTINUED ON I-831)

Page 1 of  2          Initials:_____          I-877 (Rev. 08/01/07)

113

SER-77

**U.S. Department of Homeland Security**             **Continuation Page for Form** _____ I877

| Alien's Name | File Number | Date |
|---|---|---|
| LUIS ALONSO ARGUETA-ZAVALA | A074 636 420<br>Event No:BRF1908000183 | August 22, 2019 |

A. Yes, I left because I needed an operation and it was too expensive in the United States. So I went back to El Salvador because the operation was cheaper. I asked immigration for a permission to leave and be operated on in El Salvador but they never responded back with an answer.

Q. Have you ever been arrested in the United States or any other country?
A. No.
Q. Do you have any applications or petitions pending with United States Citizenship and Immigration Services?
A. No.
Q. Have you ever been presented before an Immigration Judge?
A. Yes.
Q. Have you ever been removed or deported from the United States before?
A. Yes.
Q. When, and why did you leave your home country or country of last residence?
A. I left El Salvador in July 22nd.  I left El Salvador because the gangs wanted me to join them. They told me I had thirty days to join them or they would kill me, so I left.
Q. Have you been advised of your consulate rights?
A. Yes.
Q. Are you going to talk to a consulate officer?
A. No.
Q. Do you have any fear or concern about being returned to your home country?
A. Yes.
Q. Would you be harmed if you are returned to your home country?
A. Yes.
Q. Do you have any questions or is there anything else you would like to add?
A. No.

I have read (or have had read to me) the foregoing statement consisting of ___2____ pages. I affirm that the answers attributed to me herein are true and correct to the best of my knowledge and belief and that this statement is a full, true, and correct record of my questioning by the above-named officer of the Immigration and Naturalization Service. I have initialized each page of this statement (and the corrections noted on page(s).
Signature of alien:_____
Subscribed and sworn to me at:   San Diego, California on August 22, 2019.


BPA Ricardo Dugan                                    BPA Rubens Alexandre
_____                      _____
(Signature of Immigration Officer)                   (Signature of Witness)



| Signature | Title |
|---|---|
| | |

_____ 2 __ of _____ 2 __ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

114

ROBERT S. BREWER, JR.
United States Attorney
PAUL E. BENJAMIN
Assistant United States Attorney
California Bar No.: 306066
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-7579
Paul.Benjamin@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 19-MJ-23508-MSB |
| Plaintiff, | UNITED STATES' TRIAL BRIEF |
| v. | Bench Trial: October 16, 2020<br>Time: 10:00 a.m |
| OLISER HERNANDEZ-VILLALOBOS, | Honorable Michael S. Berg |
| Defendant. | |

The United States, through its counsel, hereby files its Trial Brief, which is based on the files and records of this case. Trial is set for Friday, October 16, 2020.

I

STATEMENT OF THE CASE

A.     The Charge

The defendant is charged by complaint with attempted illegal entry, in violation of 8 U.S.C. § 1325(a)(1).

B.     Trial Status

Trial is set for October 16, 2020 at 10:00 a.m. before the Honorable Michael S. Berg. The Government anticipates completing its case-in-chief that morning.

C.     Status of Counsel

The defendant is represented by Chandra Peterson and Leah Gonzales with the Federal Defenders office.

D.    <u>Custody Status</u>

Defendant was released on bond on October 1, 2019.

E.    <u>Interpreter</u>

The United States will not require an interpreter for its witnesses. Defendant has requested a Spanish interpreter.

F.    <u>Pretrial Motions</u>

Defendant has filed pretrial motions to dismiss the complaint, suppress statements, and compel discovery. (ECF No. 16.) The Court heard argument on and denied those motions on November 21, 2019. (ECF No. 28.) The Government has not filed pretrial motions but is concurrently filing motions *in limine* to admit A-file documents, and public records searches.

G.    <u>Discovery</u>

The Government has complied with its discovery obligations and produced 144 pages of discovery and two DVDs (one containing surveillance scope video and dispatch audio, the other containing the defendant's interview). The certified A-file documents are currently being prepared by USCIS; once they are available they will be produced to the defense. Copies of the documents being certified were provided October 30, 2019. To date, the defendant has not provided reciprocal discovery.

II

STATEMENT OF FACTS

1.    *The Instant Arrest*. On August 22, 2019, Border Patrol Agent David Rainey saw two people walking in a remote area through his MSC scope. BPA Luke Nirelli responded to the last place BPA Rainey had seen the pair. With the assistance of a Border Patrol helicopter, he encountered the defendant and another man hiding under a bush. BPA Nirelli conducted an immigration inspection, and the defendant told him that he was a Mexican citizen, that he did not have documents allowing him to enter or reside in the

United States legally, and that he was illegally present. BPA Nirelli then arrested the defendant.

After arrest, the defendant was read his *Miranda* rights in Spanish by BPA Juan Cadena. The defendant elected to waive his rights and speak to BPA Cadena. He confirmed that he was a Mexican citizen, as were both of his parents, and that he had no documents that would allow him to enter the United States legally. He explained that he entered the United States on August 21, 2019 by walking through the mountains near Tecate, and that he entered illegally because he had been deported. He stated that he knew that the way he crossed was illegal, that he knew he was in the United States when he was arrested, and that his goal in crossing was to go to Los Angeles to reunite with his children.

2.    *Prior Immigration History*

On October 28, 2014, the defendant was served an NTA charging him with being an alien present without admission or parole. In removal proceeding before an Immigration Judge, the defendant conceded the charge but expressed an intent to apply for asylum. The defendant filed an application for asylum in 2015. After numerous continuances at his request, the defendant failed to appear for court and was ordered removed *in absentia*. The defendant filed a motion to reopen, which was denied by the IJ as the court found he had received proper notice of the hearing and had appeared at numerous prior hearings. On November 19, 2018, the defendant was removed to Mexico pursuant to the IJ's order of removal.

III

WITNESSES

The United States presently intends to call the following witnesses during its case in chief.

1.    BPA David Rainey

2.    BPA David Cano

3.    BPA Luke Nirelli

4.    BPA Juan Cadena

5.    BPA Gabriel Gonzalez

6.    BPA Daniel Alexander

The United States reserves the right to add, omit, or substitute witnesses.

IV

EXHIBITS

The United States presently intends to offer into evidence the following:

1.    Satellite-perspective maps of the area;

2.    MSC recording of the defendant

3.    Recording of the defendant's post-*Miranda* confession and certified translation

4.    Certified documents from Defendant's A-file.

 The United States will provide a final exhibit list on the day of trial, and reserves the right to add or remove exhibits.

V

APPLICABLE LAW

A.    <u>Elements of the Offense</u>

To prove attempted entry in violation of 8 U.S.C. § 1325(a)(1), the United States must prove the following elements beyond a reasonable doubt:

1.    Defendant was an alien at the time of the offense;

2.    Defendant had the specific intent to enter the United States at a time or place other than as designated by immigration officers.

3.    Defendant had the specific intent to enter the United States free from official restraint, meaning the defendant intended to enter without being detected, apprehended, or taken into custody by government authorities so he could roam freely in the United States.

4.    Defendant did something that was a substantial step towards committing the crime and that strongly corroborated his intent to commit the offense.

The Ninth Circuit "interpret[s] the phrase a 'place other than as designated by immigration officers' in § 1325(a)(1) as referring to any place other than immigration facilities at designated ports of entry, as contemplated by [8 C.F.R.] § 235.1(a)." *United States v. Aldana*, 878 F.3d 877, 882 (9th Cir. 2017).

DATED:  October 2, 2020

Respectfully submitted,

Robert S. Brewer, Jr.
United States Attorney

*/s/ Paul E. Benjamin*
PAUL E. BENJAMIN
Assistant United States Attorney

**LEAH W. GONZALES**
California State Bar No. 311969
**CHANDRA L. PETERSON**
California State Bar No. 306935
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Leah_Gonzales@fd.org
Chandra_Peterson@fd.org

Attorneys for Defendant
OLISER HERNANDEZ

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.:  19-mj-23508-MSB |
| Plaintiff, | Hon. Michael S. Berg |
| v. | **MOTION FOR LEAVE TO FILE UNTIMELY MOTIONS** |
| OLISER HERNANDEZ, | |
| Defendant. | |

## I.    STATEMENT OF FACTS

Mr. Hernandez is charged with violation of 8 U.S.C. § 1325 and his trial is currently scheduled for October 16, 2020. It is anticipated between the parties that a further continuance will be needed due to familial emergencies the defense team and one government witness.  Much of the litigation in this case occurred fall 2019 and the COVID-19 pandemic caused litigation to continue.

In April 2020, the Supreme Court decided *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), a case relied upon by Mr. Hernandez in his additional motion arguing that the complaint must be dismissed because § 1325 is presumptively unconstitutional.  *Ramos* stands for the idea that the "*reasons* that [the state] adopted [its] peculiar rules in the first place" must be examined when determining

the constitutionality of a law. *Id.* Additionally, two district courts ruled on cases barring civil arrests by DHS, ICE, and CBP. *See Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at \*26-27 (W.D. Wash. Apr. 10, 2020); *New York v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876(JSR), 2020 WL 3067715, at \*7 (S.D.N.Y. June 10, 2020). These cases are new and present novel constitutional issues relevant to Mr. Velazquez's case.

Mr. Hernandez seeks leave to file additional motions that will address his likely civil removal arrest at his trial and the constitutionality of § 1325 in light of the Supreme Court cases from earlier this year.  The issues raised in the untimely motions are matters of first impression in this district. Counsel worked diligently to file this motion as quickly as possible once the legal issue presented was discovered. Mr. Hernandez also anticipates filing another discovery motion as discovery and investigation is ongoing, and it appears that there is newly discovered evidence that is central to such motion. *See* Dkt. 28.

## II.   ARGUMENT

The Court should grant leave to file the untimely motions because counsel acted will all due diligence while being new to the case. The motions to prohibit his civil arrest and dismissal in light of *Ramos* raises important legal and constitutional issues that must be resolved in advance of trial. Mr. Hernandez is on bond and delay to resolve the motions will not prejudice him. Further, there is no Speedy Trial Act or other rule that requires Mr. Hernandez's trial to be held before resolution of the motions. He poses no danger to the community and he has remained on bond with no issues. The government will not be overly prejudiced by a trial delay.

//     //     //

//     //     //

//     //     //

2

19-mj-23508-MSB

MOTION FOR LEAVE

### III.   CONCLUSION

The Court should grant Mr. Hernandez's leave to file these additional and untimely motions.

Respectfully submitted,

Dated:  October 9, 2020

*s/ Leah W. Gonzales*
Federal Defenders of San Diego, Inc.
Attorneys for Defendant
OLISER HERNANDEZ
Email:  Leah_Gonzales@fd.org

---

3                                    19-mj-23508-MSB
MOTION FOR LEAVE



**FILED**

Oct 09 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/ mariar        DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                    Plaintiff,<br><br>v.<br><br>OLISER HERNANDEZ,<br><br>                                    Defendant. | Case No.:  19mj23508-MSB<br><br>**ORDER REGARDING MOTION FOR LEAVE TO FILE UNTIMELY MOTIONS** |

Defendant Oliser Hernandez is charged by complaint with violating 8 U.S.C. § 1325 on August 22, 2019.  He is out of custody on bond, with trial scheduled for October 16, 2020.  This Court held a motion hearing in this case on November 21, 2019, at which time the Court informed counsel for Mr. Hernandez that the Court would only permit additional motions based on newly discovered evidence.  Current counsel for Mr. Hernandez filed her Notice of Appearance on September 16, 2020 and now seeks leave of court to file the following untimely motions:

1.      To dismiss the complaint because 8 U.S.C. § 1325 is unconstitutional under Ramos v. Louisiana, 140 S. Ct. 1390 (2020);

2.      To prohibit Mr. Cruz-Ibarra's courtroom arrest; and

3.      To stay the proceedings in the event the Court denies the motion to prohibit courtroom arrest, to allow Defendant to file an interlocutory appeal.

SER-87

Defendant argues that he should be permitted to file the untimely motions "because counsel acted with all due diligence while being new to the case" and because the motion "raises important legal and constitutional issues that must be resolved in advance of trial." Defendant cites to two new relevant cases from the Western District of Washington (April of 2020) and the Southern District of New York (June of 2020) that Defendant relies on in his motions.

The motions Mr. Hernandez has filed do not consist of newly discovered evidence—they are legal issues. To the extent they rely on new law, such cases were decided from approximately four to six months prior to these motions being filed and counsel is raising these issues for the first time seven days before the trial date. The Court finds these motions are inexcusably late and do not consist of newly discovered evidence. As such, Mr. Hernandez's motion for leave to file the aforementioned untimely motions is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 9, 2020

Honorable Michael S. Berg
United States Magistrate Judge

1  ROBERT S. BREWER, JR.
United States Attorney
2  PAUL E. BENJAMIN, CA Bar Number 306066
Assistant United States Attorney
3  United States Attorney's Office
880 Front Street, Room 6293
4  San Diego, CA 92101
(619) 546-7579
5  Paul.Benjamin@usdoj.gov
Attorneys for the United States of America
6

7              UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF CALIFORNIA
8

9  UNITED STATES OF AMERICA,           Case No.: 19-mj-23508-MSB

              Plaintiff,
10                                      UNITED STATES' RESPONSE IN
       v.                               OPPOSITION TO DEFENDANT'S
11                                      MOTIONS AT ECF 46
   OLISER HERNANDEZ,
12
              Defendant.
13

14        Defendant's motions to should be denied. First, they are untimely. This case is more

15  than a year old. In November of last year, this Court ruled that new motions would be

16  entertained only if based on newly available evidence. Just three weeks ago, the Court

17  denied Defendant's request for leave to file a separate batch of motions. ECF No. 44. Now,

18  Defendant has filed additional motions, without even seeking leave. Defendant's motions

19  all relate to material produced in initial discovery over a year ago. There is no reason that

20  these motions could not have been brought well in advance of trial, which is now less than

21  two weeks away. As such, they should be denied as untimely.

22        Even if the Court were to reach the merits of the motions, they should be denied.

23  Much of the motion to compel asks for evidence with no bearing on the current case and

24  no relevance other that a vague and conclusory allegation that it is relevant to the defense.

25  The United States has complied with its obligations under *Brady, Giglio,* and *Henthorn*.

26  Finally, there is no basis to renew the motion to dismiss. The purported "new information"

27  as to Agent Nirelli's truthfulness is a late-raised claim in another case that was never

28  litigated, never formally made to the agency, resulted in neither investigation nor

discipline, and were ultimately abandoned when that defendant pled guilty. It has no bearing on this case.

I

DEFENDANT'S MOTION SHOULD BE DENIED AS UNTIMELY

The motion at issue was filed two weeks before trial in a case that has been pending for over a year. In that time, several other motions have been litigated by the parties and this Court more than a year ago ruled that new motions would only be permitted if based on new evidence. These motions are based on the initial discovery provided, and are thus the antithesis of new evidence. Defendant provides no explanation for why his motions could not be filed for over a year. As such, his motions should be denied as untimely.

If a party does not meet a court-imposed deadline for filing pretrial motions, "the motion is untimely" and may be considered only for "good cause." Fed. R. Crim. P. 12(c)(3); Local Rule 47.1(b)(1); Chambers Rule IV (noting that applications to shorten time are "disfavored" and require a good-cause showing). To show good cause, "a party must present a legitimate explanation for his failure to raise the issue in a timely manner." *United States v. Anderson*, 472 F.3d 662, 670 (9th Cir. 2006); *see, e.g.*, *United States v. Guerrero*, 921 F.3d 895, 898 (9th Cir. 2019) (affirming denial of suppression motion because defendant did not show good cause for untimely submission); *United States v. Chanley*, 445 F. App'x 936, 938 (9th Cir. 2011) (unpublished) ("The district court properly denied Chanley's second motion to suppress as untimely."). This requirement "ensures that trials will be efficient and that criminal defendants will not be allowed to delay raising claims for tactical reasons." *United States v. Griffin*, 765 F.2d 677, 681 (7th Cir. 1985) (citing *Davis v. United States*, 411 U.S. 233, 241 (1973)). Defendant has not met that requirement here.

Defendant was arrested on August 22, 2019. ECF 1. Motions were due October 15, 2019, more than a year before the filing of the instant motions. ECF 10. On November 21, 2019, this Court ruled on a number of pending motions. Most significantly for the present motion, the Court ruled that any new motions by the defendant would only be entertained

2

if they were based on newly-discovered evidence. On October 23, 2020, more than a year after the motion filing deadline in this case and almost a year after the Court ruled that all new motions must be based on new evidence, Defendant filed the instant motion.

All of Defendant's motions relate to information in the initial discovery. The identities of the agents and the fact that they spoke to Defendant in Spanish was in the initial reports. Similarly, the identity of the other man arrested with Defendant was in initial discovery. The dispatch tapes were provided at the outset of the case. There is simply no reason for these motions to be filed more than a year after the motion filing deadline and shortly before trial is to begin. The motions should be denied as untimely. *See Anderson*, 472 F.3d at 670 (party must offer "legitimate explanation for his failure to raise the issue in a timely manner").

## II

## DEFENDANT'S MOTIONS FAIL ON THE MERITS

A.    *The Agents will be Subject to Cross-Examination on Their Spanish Proficiency*

Defendant first seeks evidence of the agents' Spanish language training and any agency records of them opting out of such training. Crucially, he does not identify any basis for this discovery other than a broad statement that it may be useful for impeachment if the agents do not speak Spanish sufficiently well. Neither agent is testifying as an expert under Federal Rule of Evidence 702, but only as to their personal interactions with Defendant. To the extent the Court requires further factual support as to their ability to conduct an immigration inspection or interview in Spanish, the United States will lay the required foundation through these agents at trial before eliciting their testimony about these statements. Defendant will have the opportunity to fully cross-examine each witness as to their ability to speak Spanish, as with any other percipient witness. As such, this motion should be denied.

//
//

3

**B.**    *Luis Argueta-Zavala's Interview was not Recorded*

Defendant next requests a video recording of Luis Argueta-Zavala's interview. It is not clear how this request is material to the defense, which is independent grounds to deny this request. But in any event undersigned counsel has inquired of the Border Patrol, and no recording of that interview has ever existed. As Mr. Argueta-Zavala was not prosecuted for any crime and was not held as a material witness for a 1324 prosecution, his interview was not recorded. Defendant's request is thus impossible to fulfill and must be denied.

**C.**    *Mr. Argueta-Zavala's Asylum Application is Confidential and Irrelevant to this Case*

Defendant seeks access to Mr. Argueta-Zavala's immigration records and asylum claim. The Government has already provided Defendant with Mr. Argueta-Zavala's sworn statement as to the facts of his entry with Defendant. To obtain discovery under Rule 16, a defendant must make a prima facie showing of materiality. *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984); *United States v. Cadet*, 727 F.2d 1453, 1468 (9th Cir.1984). Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense. *See Little*, 753 F.2d at 1445; *Cadet*, 727 F.2d at 1466–68.

There is no basis to believe that Mr. Argueta-Zavala's asylum application contains evidence favorable to the defense. Defendant makes broad conclusory statements that the evidence is material, but there is no factual basis to support such a belief. An asylum application engages with the alien's experience in his home country, not the circumstances of his entry into the United States. This is even more important given that Mr. Argueta-Zavala is from El Salvador while Defendant is from Mexico, so his application would deal with an entirely different country. The Form I-589, used to apply for asylum, merely asks for the date, place, and status of entries into the United States, not detailed descriptions of the manner of entry. Form I-589, Application for Asylum and for Withholding of Removal, available at https://www.uscis.gov/sites/default/files/document/forms/i-589.pdf

4

1      Further, the asylum application asks for highly personal and sensitive information
2 about the alien's experiences in his home country and fear of persecution, and are ordinarily
3 confidential. While the governing regulations do allow for disclosure in a criminal case,
4 *see* 8 C.F.R § 208.6, the Court should not allow such an extraordinary intrusion of privacy
5 based on mere conclusory statements and speculation. Mr. Argueta-Zalava's statements as
6 to the manner of his entry with Defendant have already been disclosed to the defense. As
7 such, this motion should be denied.

8     D.    *The Evidence Defendant Seeks is Irrelevant*

9      Defendant requests significant and irrelevant discovery on an Eduardo Verduzco and
10 a white van. Neither this individual nor this van are in any way associated with Defendant's
11 case, other than their mention over CBP dispatch radio (which necessarily captures
12 discussion of unrelated events occurring simultaneous to Defendant's event).  Defendant
13 makes conclusory allegations that the evidence would be material, without any factual
14 basis. The mere fact that these were observed on the same day as Defendant does not make
15 them material in any way to this case. Because Defendant has failed to make the requisite
16 showing of materiality, the motion should be denied.

17     E.    *The United States has Complied with its Obligations Under Giglio and*
18         *Henthorn*

19      The United States has complied with its obligation to review personnel files relating
20 to its witnesses. Defendant claims that Agent Nirelli's truthfulness is "called into question"
21 based on a prior case he was involved in. ECF 46 at 10. This is simply not true. A prior
22 defendant made unsupported claims about Agent Nirelli midway through the litigation of
23 his case. That defendant never made a formal complaint to CBP, nor was there any adverse
24 determination by the court as to Agent Nirelli's credibility or truthfulness. Nor, from a
25 review of agency files and the Government's own internal database, has there ever been a
26 finding by any DHS component or any AUSA that Agent Nirelli has been untruthful.

27      The United States does have an obligation to examine personnel files by virtue of a
28 defense demand for production of any impeachment materials in such files. *United States*

5

*v. Henthorn*, 931 F.2d 29, 31 (9th Cir. 1991).  However, "following that examination, the files need not be furnished to the defendant or the court unless they contain information that is or may be material to the defendant's case." *Id.*  Moreover, an Assistant United States Attorney may not be ordered by a district court to conduct that examination personally. *United States v. Jennings*, 960 F.2d 1488, 1491 (9th Cir.1992).  Rather, the Ninth Circuit approved a policy proposed by the Department of Justice for the appropriate agency to examine its personnel files and notify the AUSA of any potential Brady material, as long as the AUSA makes the determination whether the material should be disclosed. *Id.* at 1492 & n. 3; See also *United States v. Herring*, 83 F.3d 1120, 1122-23 (9th Cir. 1996 (holding that Jennings survives *Kyles v. Whitley*). Here, this procedure was followed and no *Brady/Giglio* material was discovered. It appears no formal complaint was ever made against Agent Nirelli, nor was there any investigation conducted or any finding by a court, agency, or prosecutor that he was untruthful. As such, the only "evidence" of untruthfulness comes from a self-interested former defendant raising new claims prior to trial in order to evade punishment and who ultimately abandoned his unsubstantiated claims and pled guilty to an indictment charging the same offense. *See United States v. Valdes*, 17-cr-00503-BAS. This is "evidence" that Defendant already possesses.  The United States has complied with its obligations under *Giglio* and *Henthorn*.

F.    *There is no Basis to Reconsider the Motion to Dismiss*

Defendant's late attempt to resurrect his motion to dismiss should be denied. As explained above, Defendant's assertion that "pretrial investigation into Agent Nirelli casts serious concerns about to his truthfulness and veracity" is simply unfounded in any objective evidence. ECF 46 at 12. No formal complaint was ever made against Agent Nirelli, nor was there any investigation or court finding questioning his credibility. The mere unsupported allegations of a disgruntled former defendant, never litigated, adjudicated, or raised with the agency, and ultimately abandoned with plea of guilty, are neither a basis for impeachment nor evidence of dishonesty. As such, there is no reason for the Court to reconsider its prior ruling on the motion to dismiss. As the Court has already

6

found, there is no reason to believe that Mr. Argueta-Zavala was deported in bad faith by the Government.

## CONCLUSION

Defendant's late motions, filed shortly before trial more than a year after the motion deadline, based on discovery long-produced, should be denied as untimely. Even if the court considers them on their merits, the motions to compel seek irrelevant or non-existent evidence. The United States has complied with its discovery obligations. Defendant's accusations against Agent Nirelli are not grounded in evidence and do not present a basis for reopening the motion to dismiss. As such, all of Defendant's motions should be denied.

DATED:  October 28, 2020                   Respectfully submitted,

                                           Robert S. Brewer, Jr.
                                           United States Attorney

                                           */s/ Paul E. Benjamin*
                                           PAUL E. BENJAMIN
                                           Assistant United States Attorney

7

SER-96

SER-97



SER-98



SER-99



SER-100

1  **Stephen J. Piotrkowski**
   California State Bar No. 339685
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California 92101-5030
   Telephone: (619) 234-8467
4  Facsimile: (619) 687-2666

5  Attorneys for
   Mr. Hernandez-Villalobos

6                      UNITED STATES DISTRICT COURT

7                  SOUTHERN DISTRICT OF CALIFORNIA

8                 (HONORABLE ANTHONY J. BATTAGLIA)

9

10  UNITED STATES OF AMERICA,              CASE NO.: 19-mj-23508-MSB-AJB

11                     Plaintiff-Appellee,  Hon. Anthony J. Battaglia
                                            Courtroom 4A
12         v.                               Date: September 15, 2023
                                            Time: 3:00 p.m.
13  OLISER HERNANDEZ-
14  VILLALOBOS,                            **Appellant's Opening Brief**

15                     Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF FACTS ........................................................................... 2

    I.     Mr. Hernandez's arrest and in-field interrogation. ...................... 2

    II.    Mr. Hernandez's discovery requests. ........................................... 3

    III.   Bench trial. ................................................................................... 4

ARGUMENT ............................................................................................... 6

    I.     Under the doctrine of *corpus delicti*, the government failed to prove that Mr. Hernandez entered at a non-designated place and that he was not a citizen. ......................................................................... 6

         A.    None of the government's cited evidence corroborates mode of entry. ................................................................................ 7

         B.    The government's cited evidence is too weak to corroborate alienage. ............................................................................. 8

    II.    Mr. Hernandez's statements, both in the field and at the border patrol station, should have been suppressed because agents did not have probable cause to effectuate an arrest. ......................... 10

    III.   The court erred in failing to suppress Mr. Hernandez's non-*Mirandized* custodial statements. .................................................. 13

    IV.   The court should have suppressed Mr. Hernandez's statements at the border patrol station because the agents gave improper *Miranda* warnings and deliberately employed a "two-step" interrogation. .............................................................................. 15

         A.    The court should have suppressed Mr. Hernandez's responses during his interrogation because the *Miranda* advisement misinformed him of his right to an attorney, and thus his waiver was not knowing. ............................................................... 16

         B.    Because the agents deliberately employed a two-step technique of interrogation, the court should have suppressed Mr. Hernandez's post-*Miranda* statements. ........................................... 17

    V.    The Court improperly denied discovery evidence to which Mr. Hernandez was entitled. .......................................................... 21

    VI.   The Court improperly forced Mr. Hernandez to choose between two rights. ................................................................................. 23

Conclusion ................................................................................................. 25

## INTRODUCTION

The Magistrate Judge found Mr. Hernandez guilty of misdemeanor attempted illegal entry in violation of 8 U.S.C. § 1325(a)(1). Mr. Hernandez challenges his conviction for six reasons. First, the district court relied only on Mr. Hernandez's statements without other independent corroboration to prove Mr. Hernandez's alienage and entry at a place other than as designated by immigration officers, violating the *corpus delicti* doctrine. Second, border patrol agents lacked the requisite probable cause to arrest Mr. Hernandez. Third, Mr. Hernandez's field statements should have been suppressed because he was in custody but not provided the requisite *Miranda* warnings. Fourth, Mr. Hernandez's statements at the border patrol station should have been suppressed in light of an inadequate *Miranda* advisal and improper use of a two-step interrogation. Fifth, the Court improperly denied certain discovery requests that would have been material to Mr. Hernandez's mode of entry, specifically related to a potential smuggler, as well as a white van in the area, which were both discussed on the dispatch tapes provided by the government. Sixth, by only agreeing to order the government provide known *Brady* and *Henthorn* material if Mr. Hernandez agreed to continue his trial, the Court forced Mr. Hernandez to choose between two constitutional rights: (1) the right to discovery under both *Brady* and *Henthorn*, and (2) the right to a speedy and public trial. For these reasons, this Court should vacate Mr. Hernandez's conviction.

## STATEMENT OF JURISDICTION

The Magistrate Judge had subject matter jurisdiction over this criminal case under 18 U.S.C. § 3401(a). The Magistrate Judge found Mr. Hernandez guilty on November 10, 2020. ECF No. 53. Mr. Hernandez filed a timely notice of appeal on November 13, 2020. ECF No. 60; see Fed. R. App. P. 58(g)(2)(B). This Court has jurisdiction to review the conviction under 18 U.S.C. § 3402.

Appellant's Opening Brief

**STATEMENT OF FACTS**

**I.    Mr. Hernandez's arrest and in-field interrogation.**

On August 22, 2019, at around 4:15 p.m. Border Patrol Agent David Rainey saw two people through his long-range mobile scope. The area where he spotted them, about two and a half miles north of the border, included small roads as well as multiple outdoor recreational sites and was about half a mile from the Otay Mountain Trailhead. *See* Exh. A, Trial Transcript at 22–45. Following his observation, agents on land and a helicopter went looking for the individuals.

Border Patrol Agent (BPA) Luke Nirelli encountered Mr. Hernandez and another man—Luis Alonso Argueta-Zavala. Exh. B, August 22, 2019, Arrest Report; Exh. C, August 22, 2019, I-213 Arrest Report for Mr. Argueta-Zavala. Agent Nirelli was guided to the two men, first with the support of Agent Rainey and then with direction from the helicopter overheard. Agent Nirelli approached Mr. Hernandez and Mr. Argueta, fully uniformed, clearly marked as law enforcement, and armed. He ordered the men out of the brush, and despite their fear of the armed man and helicopter, they immediately complied. Exh. B, *see also* Exh. D, August 22, 2019, Memorandum re: Air Support. After the men were moved, Agent Nirelli handcuffed them. All of this occurred before the agent asked any questions. Exh. B. Agent Nirelli then questioned Mr. Hernandez as to his citizenship and immigration status. *See id.*

Agents then detained Mr. Hernandez for approximately four hours at the Brownsfield Border Patrol Station before BPA Juan Cadena read him his rights. *Id.*; Exh. E, August 22, 2019, I-214 Rights Form. He read them rapidly, without pausing to see if Mr. Hernandez understood. See Exh. E; Exh. F, Video of August 22, 2019, Station Interrogation, at 2:34–3:10. At trial, the parties stipulated to the translation of Mr. Hernandez's post-arrest statement. Exh. A, at 71:2–4; Exh. G, Transcript of Post-Arrest Statement of Mr. Hernandez. Agent Cadena used a non-standard form of the Spanish-language *Miranda* advisement, translating it to say: "If you do not have the money to employ an attorney, one can be provided to you before we ask any questions,

1  if you wish.". Exh. G at 120–21. Specifically, Agent Cadena used the Spanish verb
2  "poder," as conjugated in the phrase "se le puede proporcionar," to inform Mr.
3  Hernandez of his right to be appointed an attorney if he could not afford one. *Id.*
4  "Poder" can mean either "able to" or "can"; however, "poder" does not mean "will."
5  The agent obtained a purported waiver from Mr. Hernandez and proceeded to
6  question him about the alleged offense. Exh. G. Agents then kept Mr. Hernandez at
7  the Border Patrol station overnight.

8  Mr. Argueta, Mr. Hernandez's co-arrestee, told agents of his fear of being
9  deported to El Salvador. Agents ordered Mr. Argueta to remain in Mexico pending a
10  future court date to adjudicate his asylum claim. Exh. C. It appears Mr. Argueta was
11  taken to Mexico before counsel was even appointed for Mr. Hernandez.

12  **II.   Mr. Hernandez's discovery requests.**

13  On September 5, 2019, the defense requested full discovery from the
14  government. Exh. H, September 5, 2019, Discovery Requests. On October 16, 2019,
15  Mr. Hernandez filed his first Motion to Compel Discovery. ECF No. 19. Discovery
16  was requested again, after the case had been actively litigated for more than a year, on
17  October 4, 2020, and October 19, 2020. Exh. I, October 4, 2020, Discovery Requests;
18  Exh. J, October 19, 2020, Discovery Requests. Relevant to this appeal, the October 4,
19  2020, letter requested two important pieces of information:

20  1. Discovery Related to Eduardo Verduzco. In the helicopter dispatch tape
21  provided in discovery, around 4:16 p.m., agents are heard discussing
22  someone by the name of Eduardo Verduzco (or a similar sounding name)
23  from El Cajon. Included in that discussion are statements that he has a
24  questionable crossing record, and that he was driving a 4-door Honda
25  with California plates.
26  2. Discovery Related to the "White Van Going Northbound". In the
27  dispatch tapes, unidentified agents are discussing a "white van going
28  northbound."

Exh. I. The October 19 letter focused on information related to the arresting agent, Luke Nirelli. Defense investigation had revealed that in another case in the same district in which Agent Nirelli was the arresting officer, "[his] conduct and dishonesty, specifically with untruthfulness in writing official reports, were central to a dismissal motion based on outrageous government misconduct." Exh. J.

Mr. Hernandez filed an additional motion to compel discovery on October 23, 2020, nearly three weeks before trial. ECF Nos. 46, 53. This second motion to compel included all three items from the October 4 and October 19 discovery letters and related to Agent Nirelli's conduct in the other case, stating:

> While there were other issues against Agent Nirelli in that specific case (i.e., beating a defendant who was lying face down on the ground following arrest commands), the underlying concern is that Agent Nirelli wrote a false arrest report, and also adopted false reports of fellow agents that day. Agent Nirelli is the only anticipated government witness who is able to testify about the initial contact with Mr. Hernandez. The only other person who was there, Mr. Argueta, the government removed from the country.

The final motion to compel also included a request for discovery "related to Mr. Argueta's entry on August 22, 2019, that is in possession of [the] government via immigration authorities[, which] was requested on October 4, 2020." ECF No. 46. The defense argued, "it is likely that [Mr. Argueta] provided information about [the] August 22, 2019, entry, which would have been held to the legal standard of penalty of perjury and the self-imposed standard of him fighting for his life." *Id.* This evidence was relevant to both Mr. Argueta's and Mr. Hernandez's mode of entry.

**III.   Bench trial.**

The case proceeded to a bench trial before Judge Berg on November 10, 2020, without a response from the government or Judge Berg to the defense's final motion from October 23. Before proceeding to the government's case-in-chief, Judge Berg turned to the outstanding discovery requests. Regarding Mr. Argueta's A-File, Judge Berg indicated that he would compel its production, but would require Mr. Hernandez to continue the trial. The Court stated, "I'm willing to [rule in your favor], but if you're

Appellant's Opening Brief

1  not wanting me to, then either, A, we move forward and you withdraw that request,
2  or B, we put it over." Exh. A at 8:1–4. The request was withdrawn. The Court made a
3  similar "ruling" when discussing Agent Nirelli. On top of the request related to the
4  Agent's personnel file, the government had also emailed defense counsel the night
5  before trial identifying Agent Nirelli as part of the "I'm 10-15" Facebook group. The
6  Court said it would be willing to review the personnel file of the Agent in camera, but
7  again, "That's going to require a continuance." *Id.* at 15:19–20. Having waited over a
8  year for trial, Mr. Hernandez agreed to proceed.

9      On a final point related to discovery, Judge Berg refused to order any discovery
10  related to Eduardo Verduzco or the white van discussed on the dispatch audio tapes.
11  Even though this discovery could have supported the theory that Mr. Hernandez was
12  not guilty of § 1325(a)(1) because he was driven through a port of entry, rather than
13  crossing through the desert, the judge held that both items were irrelevant. *Id.* at 9–10.

14      At trial, the government called: (1) BPA David Rainey, who conducted mobile
15  surveillance of Mr. Hernandez in the field; (2) BPA Luke Nirelli, who arrested Mr.
16  Hernandez; and, (3) BPA Daniel Alexander, who reviewed Mr. Hernandez's alleged
17  A-File and ran a database search of his name. *See* Exh. A.

18      The government's first witness, Agent David Rainey, testified that on the date
19  of arrest, at around 4:15 p.m., he was operating a mobile surveillance capability truck
20  in the Brownfield Station area of responsibility. *Id.* at 24:19–25. He saw two individuals
21  in the 48-Saddle area and helped to guide agents and a helicopter to that location. *Id.*
22  at 28–29. The agent noted the 48-Saddle area was 2.5 miles north of the border and
23  that there are "only a couple of spots where [he] can actually see the physical border
24  fence," and he did not see them enter the United States. *Id.* at 31:15–20, 32:13–14. He
25  also testified to the fact that there were both trails in the area and that the individuals
26  he saw through the scope had backpacks. *Id.* at 33, 37, 39–40.

27      The government's second witness was BPA Luke Nirelli. He testified that on
28  the date of arrest, he was also working in the Brownfield area of responsibility,

1    patrolling in his border patrol uniform. *Id.* at 49:13–20. He testified that after Agent

2    Rainey guided him to the area, the helicopter overhead directed him to Mr. Hernandez

3    and Mr. Argueta. *Id.* at 56–57. The location was not only 2.5 miles from the border

4    but the fence that divided that area from Mexico was covered in barbed wire. *Id.* at

5    52:1–4. Agent Nirelli then said that when he approached the two men, he was wearing

6    his full uniform, was armed, had a radio playing dispatch in English, and there was a

7    loud helicopter clearly marked as law enforcement overhead. *Id.* at 62–63. Agent Nirelli

8    confirmed that he did not see the two men enter the United States but rather

9    encountered them 2.5 miles north of the border, in an area with several hiking trails.

10    *Id.* at 64–65. He also added that he has seen undocumented people enter the United

11    States in a variety of ways, including through the hills and mountains, over the fence

12    or wall, and concealed in a vehicle through the port of entry. *Id.* at 65:11–24. Finally,

13    Agent Nirelli testified that he conducted his immigration inspection after he had

14    moved the two men from where they were initially encountered and they were

15    handcuffed, and that Mr. Hernandez would not have been free to leave. *Id.* at 69–70.

16        The government's third witness, Agent Alexander, testified that according to

17    Mr. Hernandez's alleged A-File, as well as the Central Index Systems (C.I.S.) and

18    Claims Databases, there were no indications that Mr. Hernandez was legally present

19    in the United States. *Id.* at 74–77. Importantly, Agent Alexander never testified that he

20    searched Mr. Hernandez's real name, including his last surname, Villalobos.

21        After both sides rested their case, defense counsel renewed her objection

22    regarding the lack of probable cause to arrest Mr. Hernandez, which the court denied.

23    *Id.* at 82–85. Following closing arguments from both the defense and the government,

24    the court found Mr. Hernandez guilty of 8 U.S.C. § 1325(a)(1). This appeal follows.

### ARGUMENT

**I.   Under the doctrine of *corpus delicti*, the government failed to prove that Mr. Hernandez entered at a non-designated place and that he was not a citizen.**

28    As the Supreme Court explained a half-century ago, "a conviction must rest

1    upon firmer ground than the uncorroborated admission or confession of the accused."
2    *Wong Sun v. United States*, 371 U.S. 471, 489 (1963). Known as the rule of "*corpus delicti*,"
3    or "body of the crime," this doctrine requires prosecutors to present more than just
4    an accused's confession to secure a conviction—they must present corroborating
5    evidence. *Corpus Delicti*, BLACK'S LAW DICTIONARY (11th ed. 2019). One reason for
6    this corroboration rule is "the high incidence of false confessions and the resulting
7    need to prevent errors in convictions based upon untrue confessions alone." *United*
8    *States v. Lopez-Alvarez*, 970 F.2d 583, 589 (9th Cir. 1992). Another is to "preserve a
9    robust criminal justice system premised on 'extrinsic evidence independently secured
10    through skillful investigation,' rather than one that relies heavily on
11    confessions." *United States v. Gadson*, 763 F.3d 1189, 1218 (9th Cir. 2014) (quoting
12    *Lopez-Alvarez*, 970 F.2d at 589 n.5). In other words, to obtain a conviction, prosecutors
13    must do more than simply rest on a person's confession: They must present the results
14    of at least *some* actual investigation.

15    To comply with this *corpus delicti* rule, the government must satisfy a two-
16    pronged test. First, it must introduce "sufficient evidence to establish that the criminal
17    conduct at the core of the offense has occurred." *Lopez-Alvarez*, 970 F.2d at 592.
18    Second, it must introduce evidence "tending to establish the trustworthiness of the
19    admissions, unless that confession is, by virtue of special circumstances, inherently
20    reliable." *Id.* "Only when both these prongs are satisfied" is the *corpus delicti* requirement
21    met. *Lopez-Alvarez*, 970 F.2d at 592.

22    Here, the government relied exclusively on Mr. Hernandez's statements to
23    satisfy the offense's mode-of-entry and alienage elements.[1] Under the *Lopez-Alvarez*
24    standard, the facts presented at trial are insufficient to satisfy *corpus delicti*.

25    **A. None of the government's cited evidence corroborates mode of entry.**
26    As an initial matter, the government did not adequately corroborate mode of

27
28

---

[1] This is particularly problematic in light of the fact that the Court should have suppressed both Mr. Hernandez's field statements, as well as his statements made at the border patrol station.

1   entry. "In order to convict a defendant of a violation of § 1325(a)(1), the government

2   must prove beyond a reasonable doubt that the individual was an 'alien who . . .

3   enter[ed] or attempt[ed] to enter the United States at any time or place other than as

4   designated by immigration officers.'" *United States v. Aldana*, 878 F.3d 877, 880 (9th

5   Cir. 2017) (quoting 8 U.S.C. § 1325(a)(1)). Whereas a violation of § 1325(a)(2) is

6   predicated upon an individual eluding inspection "at a designated port of entry open

7   for inspection," (a)(1) "covers conduct occurring at any time or place other than a

8   designated port of entry when it is open for inspection." *United States v. Corrales-*

9   *Vazquez*, 931 F.3d 944, 953 (9th Cir. 2019) (internal quotation marks omitted).

10       Mr. Hernandez was charged with violating § 1325(a)(1), but the government

11   failed to present any evidence beyond his own statements that he entered the United

12   States at any time or place other than as designated by immigration officers. Beyond

13   Mr. Hernandez's statements, the only information presented was Mr. Hernandez's

14   apprehension location. Exh. A at 80:18–20 ("[T]he agent has encountered numerous

15   people in this area who have entered illegally from the [border] two-and-a-half miles

16   to the south."). In fact, Agent Rainey testified that from his location more than 2.5

17   miles north of the border, there are "only a couple of spots where [he] can actually see

18   the physical border fence," and he did not see Mr. Hernandez enter the United States.

19   *Id.* at 31:15–20, 32:13–14. Thus, there was no evidence—apart from Mr. Hernandez's

20   statement—from which a factfinder could infer that Mr. Hernandez hopped the

21   border fence rather than being smuggled through a port.

22       **B. The government's cited evidence is too weak to corroborate alienage.**

23       The government also failed to corroborate Mr. Hernandez's admissions

24   concerning alienage. Alienage is a critical element of the offense because if a U.S.

25   citizen were to enter the country at a non-designated place, the "criminal conduct at

26   the core of the offense" has not occurred. *Lopez-Alvarez*, 970 F.2d at 592. To determine

27   whether a crime occurred (and thus satisfy the *corpus delicti* rule), courts must consider

28   *what types* of evidence would sufficiently corroborate an admission of alienage.

1      The government may present direct evidence that someone is not a U.S. citizen,

2 such as a birth certificate or documents from a prior deportation. But when the

3 government's primary evidence of alienage is the defendant's own confession, it must

4 present "some independent corroborating evidence in order to serve as the basis for a

5 conviction." *United States v. Hernandez*, 105 F.3d 1330, 1332 (9th Cir. 1997) (quotations

6 omitted). In *Hernandez*, the Ninth Circuit found that three things had combined to

7 corroborate the defendant's admission of alienage. The "strongest piece of evidence"

8 was the record of the defendant's deportation from the United States. *Id.* at 1333. The

9 Ninth Circuit also cited the fact that the defendant made two "close in time"

10 admissions of alienage. *Id.* at 1332. Finally, the Ninth Circuit looked to the fact that

11 "Hernandez entered the United States by scaling the border fence rather than via an

12 established border checkpoint." *Id.* at 1333. The Ninth Circuit strongly qualified this

13 third fact, cautioning that "we do not hold that the mode of a defendant's entry is

14 sufficient corroboration of an admission that the defendant is an alien." *Id.*

15      At least three other judges in this district have held that similar evidence to that

16 found in this case is not even sufficient to corroborate an *unequivocal* admission of

17 alienage—let alone establish alienage by itself. For instance, in *United States v.*

18 *Mazariegos-Ramirez*, Dkt. No. 28, 18-mj-22276-WQH (S.D. Cal. March 19, 2019), Judge

19 Hayes acquitted a defendant of § 1325 after holding that an arresting agent's testimony

20 that he located an individual hiding in brush close to the international border was not

21 sufficient to corroborate the individual's admission of alienage. *See United States v.*

22 *Mazariegos-Ramirez*, Dkt. No. 25 at 2, 18-mj22276-WQH (S.D. Cal. March 12, 2019).

23 Similarly, Judge Major held that an agent's mere testimony that he encountered three

24 people hiding in the brush was not sufficient corroboration of his statement that he

25 was a citizen of Mexico with no documents "to stay in the United States legally." *United*

26 *States v. Eusebio Montanez-Acuna*, Dkt. No. 34, 19-mj-20703- BLM (S.D. Cal. April 10,

27 2019). Finally, Judge Curiel acquitted a defendant whom agents found hiding in the

28 brush a mere 150 yards north of the international border. *See United States v. Raul*

1 *Gonzalez-Armenta*, Dkt. No. 37, 18-cr-5496-GPC (S.D. Cal. Sept. 19, 2019). He did so

2 even though the defendant *twice* admitted alienage—once in the field and once in a

3 video-taped post-arrest statement. *See id.*

4     Here, the court's decision was out of step with other judges in this district, who

5 have found that the type of "mode of entry" evidence submitted in Mr. Hernandez's

6 case was not even sufficient to corroborate an *unequivocal* admission of alienage. The

7 government offered no direct evidence, such as a birth certificate or prior deportation

8 order, and the only evidence presented beyond Mr. Hernandez's statements was

9 generalized evidence about the location where he was found. As the government stated

10 in closing, the only corroborating information was that "[a]lthough, there are hiking

11 trails, . . . the fact that the defendant is found in the brush in an area where illegal aliens

12 commonly enter and hiding from border patrol corroborates" his illegally obtained

13 confessions. *Id.* at 80:14–20. This is nearly identical to the evidence found to be

14 insufficient by Judges Hayes, Major, and Curiel, and in at least Judge Curiel's case, the

15 individuals were found appreciably closer to the border than Mr. Hernandez.

16     The government presented no evidence of any previous deportation. In fact,

17 the A-File custodian's search of Mr. Hernandez's alleged A-file, as well as the

18 databases, fell far short of corroboration because the custodian failed to even search

19 for his full, correct name (Oliser Hernandez-Villalobos). *Id.* at 76:13–15. And, critically,

20 there is no evidence about Mr. Hernandez's mode of entry. Mr. Hernandez was

21 outdoors in an area 2.5 miles from the border and surrounded by several hiking trails.

22 There is no physical evidence that he had crossed the border.

23     The government did not present extrinsic, independent, reliable evidence of Mr.

24 Hernandez's alienage or mode of entry. Thus, the government failed to meet its

25 burden, and his conviction should be vacated.

26 **II.   Mr. Hernandez's statements, both in the field and at the border patrol
27 station, should have been suppressed because agents did not have
       probable cause to effectuate an arrest.**

28 The Fourth Amendment's prohibition of unreasonable searches and seizures

1   extends to seizures of people. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

2   Although Agent Nirelli may have had reasonable suspicion to stop Mr. Hernandez, his

3   actions rose beyond a mere stop to an actual seizure or arrest of Mr. Hernandez

4   without probable cause.

5        "A seizure of the person within the meaning of the Fourth and Fourteenth

6   Amendments occurs when, 'taking into account all of the circumstances surrounding

7   the encounter, the police conduct would 'have communicated to a reasonable person

8   that he was not at liberty to ignore the police presence and go about his business.'"

9   *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437

10   (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988))). The Supreme Court,

11   in articulating this rule, provided examples of some factors that could cause law

12   enforcement contact with an individual to escalate to a seizure under the Fourth

13   Amendment:

> Examples of circumstances that might indicate a seizure, even where the
> person did not attempt to leave, would be the threatening presence of
> several officers, the display of a weapon by an officer, some physical
> touching of the person of the citizen, or the use of language or tone of
> voice indicating that compliance with the officer's request might be
> compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

19        Here, Agent Nirelli was in full uniform and armed. Exh. A at 62–63. There was

20   an official helicopter overhead and another officer observing through a long-distance

21   mobile scope, seemingly surrounding Mr. Hernandez and Mr. Argueta. *Id.* Agent

22   Nirelli moved and physically restrained both men prior to asking them any questions.

23   Exh. B. Not only was this in the middle of the day but the arrest location was more

24   than 2.5 miles from the border, meaning there was no risk the two men would abscond.

25   *See* Exh. B. Agent Nirelli was close to a road and there was no indication that either

26   Mr. Hernandez or Mr. Argueta presented any danger. Agent Nirelli's actions, including

27   handcuffing Mr. Hernandez, as well as the helicopter overheard, certainly "would have

28   communicated to a reasonable person that he was not at liberty to ignore the police

1  presence and go about his business." *Kaupp*, 538 U.S. at 629. Agent Nirelli's own words

2  indicate that Mr. Hernandez's belief that he was not free to leave were, in fact, true.

3  Exh. A at 70:6–9 (stating that Mr. Hernandez would not have been free to leave, even

4  before he asked any immigration inspection questions).

5      Indeed, whether the particular officer believes his actions are merely

6  investigative or not, a *de facto* seizure or arrest requires probable cause:

7  > *Terry* and its progeny nevertheless created only limited exceptions to the
8  > general rule that seizures of the person require probable cause to arrest.
9  > Detentions may be "investigative" yet violative of the Fourth Amendment
10 > absent probable cause. In the name of investigating a person who is no
11 > more than suspected of criminal activity, the police may not carry out a full
12 > search of the person or of his automobile or other effects. Nor may the
13 > police seek to verify their suspicions by means that approach the conditions
14 > of arrest.

*Florida v. Royer*, 460 U.S. 491, 499 (1983). "Probable cause exists where the facts

and circumstances within their (the officers') knowledge and of which they had

reasonably trustworthy information (are) sufficient in themselves to warrant a man of

reasonable caution in the belief that an offense has been or is being committed." *United

States v. Diaz*, 491 F.3d 1074, 1077 (9th Cir. 2007) (quoting *Brinegar v. United States*, 338

U.S. 160, 175–76 (1949)) (internal quotation marks omitted).

18     Here, at the time Agent Nirelli arrested Mr. Hernandez, he knew only that Mr.

19 Hernandez was one of two men in an area with various outdoor recreational

20 landmarks. Agent Nirelli claimed that the area is used to further illegal entries into the

21 United States, offering that "it's a commonly used route of travel from the border in

22 this area," with no other justification. Exh. A at 52:20–21. These facts alone would

23 allow agents to arrest almost anyone who happens to be in this public area, or

24 potentially who fears police. Although the two men were hiding in the brush, this was

25 understandable in light of the aggressive approach of an armed and uniformed officer,

26 as well as a clearly marked law enforcement helicopter overhead. *See United States v.

27 Brown*, 925 F.3d 1150, 1156–57 (2019) ("[I]nnocent people may reasonably flee from

12

**19-mj-23508-MSB-AJB**

the police . . . . [R]acial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight . . . ."). These sparse facts certainly are not enough to "warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Diaz*, 491 F.3d at 1077.

The court should thus have found that Agent Nirelli's arrest of Mr. Hernandez violated the Fourth Amendment and suppressed all fruits from the stop and arrest.

**III.   The court erred in failing to suppress Mr. Hernandez's non-*Mirandized* custodial statements.**

At a minimum, Mr. Hernandez's field statements should have been suppressed because he was in custody at the time of the statement and was not provided the proper *Miranda* warnings. Whether a defendant was constitutionally entitled to a *Miranda* warning is an issue of law that courts review de novo. *United States v. Galindo-Gallegos*, 244 F.3d 728, 730 (9th Cir. 2001). Whether a person is "in custody" for purposes of *Miranda* is a mixed question of law and fact that courts also review de novo. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).

When Agent Nirelli approached Mr. Hernandez, he was more than 2.5 miles from the border, while a loud helicopter surveilled overhead. Exh. A at 62–63. Agent Nirelli immediately moved and handcuffed Mr. Hernandez, and only afterwards did Agent Nirelli begin his questioning. Mr. Hernandez remained handcuffed during the interrogation, and in Agent Nirelli's own words, he was not free to leave. *Id.* at 70:6–9. At no point was Mr. Hernandez given a *Miranda* warning. A *Miranda* advisement is required of in-custody individuals when incriminating questions are asked. *United States v. Booth*, 669 F.2d 1231, 1237–39 (9th Cir. 1981). Incriminating questions can include questions "seeking 'objective' or 'neutral' information." *Id.* at 1238. Officer Nirelli's questions to Mr. Hernandez focused on Mr. Hernandez's alienage, legal status, and method of entry. Exh. A at 60–61. Accordingly, the questions were likely to elicit incriminating responses. Because Mr. Hernandez was "in custody" for purposes of *Miranda*, the failure to give this warning rendered his statements inadmissible.

Appellant's Opening Brief

1    "The touchstone for *Miranda* warnings is whether the suspect is in custody when
2    interrogated." *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013). To determine
3    whether an individual was "in custody," the key question is "whether a reasonable
4    person in the circumstances would have believed he could freely walk away from the
5    interrogators." *Id. See also Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (inquiry is
6    whether a reasonable person would have felt "at liberty to terminate the interrogation
7    and leave"); *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (inquiry
8    is whether a reasonable person would not feel "free to leave after brief questioning—
9    i.e., that indefinite custodial detention is inevitable"). Factors relevant to this inquiry
10   include: (1) the language used to summon the individual; (2) the extent to which the
11   defendant is confronted with evidence of guilt; (3) the physical surroundings of the
12   interrogation; (4) the duration of the detention; and (5) the degree of pressure applied
13   to detain the individual. *Kim*, 292 F.3d at 974. Other factors may also be "pertinent to,
14   and even dispositive of," the ultimate determination. *Id.*; *see also United States v. Robertson*,
15   833 F.2d 777, 780 (9th Cir. 1987) ("Whether an arrest has occurred depends on all the
16   surrounding circumstances, including the extent to which liberty of movement is
17   curtailed and the type of force or authority employed.").

18   Here, clearly "indefinite custodial detention [wa]s inevitable." *Id.* An important
19   piece of evidence is Agent Nirelli's *own words*. Agent Nirelli testified that Mr. Hernandez
20   was not free to leave. When asked: "Agent Nirelli, before you started your immigration
21   inspection, if [Mr. Hernandez] had asked to leave, would he have been able to leave?"
22   *Id.* at 70:6–8. He answered, "No, ma'am." *Id.* at 70:9.

23   Additional factors bearing on custody include that Agent Nirelli moved and
24   handcuffed Mr. Hernandez before asking him any questions. This high "degree of
25   pressure applied to detain" Mr. Hernandez conveyed he was not free to leave. *Kim*,
26   292 F.3d at 974–76. In the words of the Ninth Circuit, "[w]hen law enforcement agents
27   restrain the ability of the suspect to move—particularly through physical restraints, but
28   also through threats or intimidation—a suspect may reasonably feel he is subject to

1   police domination[.]" *United States v. Craighead*, 539 F.3d 1073, 1085 (9th Cir. 2008); *see*
2   *also, e.g., United States v. Cavazos,* 668 F.3d 190, 194 (5th Cir. 2012) (handcuffing of a
3   suspect contributes to finding of custody); *United States v. Revels*, 510 F.3d 1269, 1276
4   (10th Cir. 2007) (same). More broadly, the handcuffing aligns with *Kim*'s "degree of
5   pressure" factor, as the physical and psychological implications of handcuffing are
6   clear: The defendant is not free to leave. Viewed in its entirety, the duration of the
7   detention exceeded what was necessary for Agent Nirelli to ask Mr. Hernandez about
8   his citizenship. *Kim*, 292 F.3d at 974. If this had been a mere investigative stop under
9   *Terry v. Ohio*, 392 U.S. 1 (1968), it would have "last[ed] no longer than is necessary to
10  effectuate the purpose of the stop"—i.e., the amount of time it took Agent Nirelli to
11  ask Mr. Hernandez about his immigration status. *Florida v. Royer*, 460 U.S. 491, 500
12  (1983). Instead of questioning Mr. Hernandez where he found him, Agent Nirelli
13  prolonged the stop by taking the time to move Mr. Hernandez from his original
14  location and then handcuff him, unlawfully extending the detention's duration. Every
15  detail of this encounter indicated that Mr. Hernandez was being taken into custody.
16  No reasonable person stopped by Border Patrol under such classic illegal-entry
17  circumstances—followed by an arrest that bore all the hallmarks of being taken into
18  custody—would *ever* believe they were "free to leave after brief questioning." *Id.*

19      Thus, as Mr. Hernandez was in custody, his motion to suppress should have
20  been granted.

21  **IV.    The court should have suppressed Mr. Hernandez's statements at the
22          border patrol station because the agents gave improper *Miranda*
        warnings and deliberately employed a "two-step" interrogation.**

23      *Miranda v. Arizona*, 384 U.S. 436 (1966), requires that a suspect be informed of
24  his constitutional rights before being interrogated. This also applies when the suspect
25  is in custody at a law enforcement center of operations. *Id.*. at 477. This requirement
26  encompasses otherwise routine booking questions that are reasonably likely to
27  produce incriminating responses. *United States v. Williams*, 842 F.3d 1143, 1146 (9th Cir.
28  2016). The *Miranda* advisement must be adequate and delivered in the detainee's native

1  language. *United States v. Connell,* 869 F.2d 1349, 1352–53 (9th Cir. 1989). Further,
2  agents may not use a "forbidden two-step technique" to undermine the warnings'
3  efficacy. *Reyes v. Lewis*, 833 F.3d 1001, 1028 (9th Cir. 2016) (en banc).

4      These prohibitions were violated by the Border Patrol agents' questioning of
5  Mr. Hernandez. Because no facts are contested, "[w]hether [a defendant] was given
6  adequate *Miranda* warnings is a question of law that is reviewed *de novo* by the appellate
7  court." *Connell*, 869 F.2d at 1351. Accordingly, the court should have suppressed Mr.
8  Hernandez's statements at the Border Patrol station.

9      **A. The court should have suppressed Mr. Hernandez's responses during**
10  **his interrogation because the *Miranda* advisement misinformed him**
    **of his right to an attorney, and thus his waiver was not knowing.**

11      Due to an incorrect Spanish-language interpretation, Mr. Hernandez was
12  misadvised of his *Miranda* rights, and therefore his waiver of his rights cannot be
13  considered knowing. As the Ninth Circuit made clear in *Connell*, an officer's oral
14  advisement to a detained individual that "'a lawyer *may* be appointed to represent
15  you' . . . d[oes] not clearly inform [the detainee] that if he could not afford an attorney
16  one would be appointed for him prior to questioning, if he so desired." *Id.* at 1353.
17  The Ninth Circuit emphasized, "[t]he oral warning, using the word 'may,' leaves the
18  impression that providing an attorney, if [the detainee] could not afford one, was
19  discretionary with the government." *Id.* More broadly, the Ninth Circuit underscored
20  that "what *Miranda* requires is meaningful advice to the unlettered and unlearned in
21  language which [they] can comprehend and on which [they] can knowingly act." *Id.* at
22  1352 (internal quotation marks omitted).

23      Likewise, in *United States v. Perez-Lopez*, the detainee, "a 39-year-old Mexican
24  with a third-grade education who speaks very little English," was told in Spanish that
25  "[i]n case you don't have enough money or funds, you have the right to solicit the
26  Court for an attorney." 348 F.3d 839, 842 (9th Cir. 2003). The Ninth Circuit reversed
27  the district court's holding of this *Miranda* advisal as sufficient: "We have underscored
28  [in the *Miranda* context] that thoroughness and clarity are especially important when

communicating with uneducated defendants" *Id.* at 848. Under the Ninth Circuit's analysis, "Perez-Lopez's warning was constitutionally infirm because it did not convey to him the government's obligation to appoint an attorney for indigent accused." *Id.* The advisal "implies the possibility of rejection" and therefore was insufficient. *Id.* Thus, the Ninth Circuit reversed and ordered the statement suppressed. *Id.* at 849.

In this case, a similarly ambiguous Spanish-language oral *Miranda* advisement to a Mexican national regarding his ability to receive a lawyer occurred. Agent Cadena used the verb "poder," meaning, "able to" or "can," when describing in Spanish to Mr. Hernandez his ability to obtain a lawyer. Exh. G at 120–21. "Poder" does not mean "will." *Compare* Exh. G at 121 (Agent Cadena informing Mr. Hernandez "se le puede proporcionar" [you can/are able to be given] a lawyer), *with* Resolution 110: *Miranda*, American Bar Association (Apr. 3, 2019), https://www.americanbar.org/groups/diversity/commission_on_hispanic_legal_rig hts_responsibilities/resolution-110/ (standardizing the Spanish-language *Miranda* warning to inform defendants that an attorney "se le proverá" ["will be appointed"] if they cannot afford to hire one). Thus, what Mr. Hernandez would have understood from the Spanish-language *Miranda* advisement is that he was *possibly able to* or *could* be appointed a lawyer, not that he *would* be appointed one if he so requested. In other words, it "implie[d] the possibility of rejection" of his request for an attorney. *Perez-Lopez*, 348 F.3d at 848. "[U]nlearned" in the legal regime in which he found himself, Mr. Hernandez would not have understood his absolute right to a free attorney before responding to Agent Cadena's questions. *Connell*, 869 F.2d at 1353.

As in *Connell* and *Perez-Lopez*, Mr. Hernandez's waiver of his rights cannot be considered knowing. His post-*Miranda* statements should have been suppressed.

**B. Because the agents deliberately employed a two-step technique of interrogation, the court should have suppressed Mr. Hernandez's post-*Miranda* statements.**

Mr. Hernandez's post-*Miranda* statements were also not admissible because the Border Patrol agents used the "forbidden two-step technique" by waiting to give

1    *Miranda* warnings until after Mr. Hernandez had already provided evidence of his guilt.

2    *Reyes*, 833 F.3d at 1028 (discussing *Missouri v. Seibert*, 542 U.S. 600, 611 (2004)).

> 1. Courts must suppress statements deliberately elicited through a "two-step technique" unless the interrogator took curative measures.

5    In *Missouri v. Seibert*, the Supreme Court analyzed the admissibility of statements

6    made in response to a "two-step technique" of interrogation. 542 U.S. at 621

7    (Kennedy, J., concurring). Under this technique, officers would "withhold *Miranda*

8    warnings" in order to "question first, then give the warnings, and then repeat the

9    question" until the suspect gave the same answer. *Id.* at 605–06. The purpose was to

10   "render *Miranda* warnings ineffective by waiting for a particularly opportune time to

11   give them, after the suspect has already confessed." *Id.* at 611. After all, "with one

12   confession in hand before the warnings, the interrogator can count on getting its

13   duplicate, with trifling additional trouble." *Id.* at 613.

14   But a plurality held that use of this two-step technique could render *Miranda*

15   warnings unknowing and unintelligent. For instance, if a person were advised of his

16   right to remain silent "only in the aftermath of interrogation and just after making a

17   confession," he would "hardly think he had a genuine right to remain silent, let alone

18   persist in so believing once the police began to lead him over the same ground again."

19   *Seibert,* 542 U.S. at 613. After all, "telling a suspect that 'anything you say can and will

20   be used against you'" after the suspect has just confessed could indicate that "what he

21   has just said will be used, with subsequent silence being of no avail." *Id.* Thus,

22   when *Miranda* warnings are "inserted in the midst of coordinated and continuing

23   interrogation," they are likely to "mislead and deprive a defendant of knowledge

24   essential to his ability to understand the nature of his rights and the consequences of

25   abandoning them." *Id.* at 613–14 (internal quotation marks and alterations omitted).

26   Concurring, Justice Kennedy agreed that when an officer "uses this *deliberate*,

27   two-step strategy, predicated upon violating *Miranda* during an extended interview," a

28   suspect's post-*Miranda* statements "must be excluded absent specific, curative steps."

     **19-mj-23508-MSB-AJB**

1  *Id.* at 621. Because *Seibert* depended on Justice Kennedy's concurring opinion, the

2  Ninth Circuit has recognized that suppression results "where law enforcement

3  officers *deliberately* employ a two-step interrogation to obtain a confession and where

4  separations of time and circumstance and additional curative warnings are absent or

5  fail to apprise a *reasonable person* in the suspect's shoes of his rights." *United States v.*

6  *Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006) (emphasis in original).

7       Consequently, if an officer employs the two-step technique, courts must first

8  determine if it was deliberate. *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th

9  Cir. 2007). If not, the statements are admissible unless they were involuntary. *Id.* If the

10  officer acted deliberately, the court must suppress the post-*Miranda* statements "unless

11  the interrogators take curative measures to apprise the defendant of his rights." *Id.*

12       2.  The Border Patrol agents used the "two-step technique" deliberately.

13       Courts may consider evidence that is "either objective or subjective." *Reyes*, 833

14  F.3d at 1030. Subjective evidence, such as an officer's testimony that he intended to

15  evade *Miranda*, will rarely be "candidly admitted." *Id.* (internal quotation marks

16  omitted). Thus, subjective evidence is not dispositive, and "in most instances the

17  inquiry will rely heavily, if not entirely, upon objective evidence." *Id.*

18       The Ninth Circuit has collected a "nonexhaustive" list of "objective evidence

19  of deliberateness." *Id.* This list includes "(1) the completeness and detail of the

20  prewarning interrogation, (2) the overlapping content of the two rounds of

21  interrogation, (3) the timing and circumstances of both interrogations, (4) the

22  continuity of police personnel, [and] (5) the extent to which the interrogator's

23  questions treated the second round of interrogation as continuous with the first[.]"

24  *Williams*, 435 F.3d at 1160.

25       Here, Mr. Hernandez was questioned by Agent Nirelli after having been placed

26  in handcuffs, but before being read his *Miranda* rights. The questions asked to Mr.

27  Hernandez included his nationality, citizenship, and time of entry to the United States.

28  Ex. A at 60–61. These questions were likely to elicit an incriminating response, as they

1   related directly to facts at issue in a possible prosecution of Mr. Hernandez for a

2   violation of 8 U.S.C. § 1325. The Border Patrol agents knew as much because of the

3   frequency with which they process and refer individuals for prosecution on status-

4   based offenses. *See* Exh. A at 47 (Agent Nirelli testified that he has conducted

5   "thousands" of inspections). As the Ninth Circuit has held, "when there is reason to

6   suspect that a defendant is in the country illegally, questions regarding citizenship do

7   not fall under the booking exception—even if they are biographical—because a

8   response is reasonably likely to be incriminating." *Williams*, 842 F.3d at 1147

9   (citing *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1047 (9th Cir. 1990)).

10       The pre-*Miranda* questioning of Mr. Hernandez answered the two central

11   elements necessary for a conviction under 8 U.S.C. § 1325(a)(1): alienage and

12   circumstances of attempted entry. Mr. Hernandez's responses, as reported to Agent

13   Cadena prior to the second interrogation, were sufficiently complete so as to inform

14   Agent Cadena all he needed to know regarding these two central elements of a § 1325

15   charge before his post-*Miranda* interrogation of Mr. Hernandez began.

16       Moreover, the content of the two rounds of interrogation fully overlapped.

17   Agent Cadena already knew Mr. Hernandez's nationality, citizenship, and

18   circumstances of entry before the *Miranda* warnings, and he proceeded to again ask all

19   of these questions after he read Mr. Hernandez his rights.

20       Similarly, the two interrogations occurred close in time by collaborating agents.

21   Agent Nirelli asked Mr. Hernandez questions just after 4:15 p.m. Exh. A, 49: 21–23.

22   These same questions were asked by Agent Cadena at about 8:22 p.m. Exh. G at 117.

23   The collaboration of the law enforcement personnel involved would have been clear

24   to Mr. Hernandez. When placed in handcuffs, a Border Patrol agent asked him

25   questions about his nationality, citizenship, and attempted entry. Shortly thereafter,

26   Mr. Hernandez was asked the same questions by Border Patrol Agent Cadena.

27       Finally, Agent Cadena made no attempt to clarify to Mr. Hernandez that his

28   current questioning was not continuous with the previous questioning of Mr.

Appellant's Opening Brief

1   Hernandez. He made no indication to Mr. Hernandez that his previous answers were
2   not under consideration or other similar clarification so that Mr. Hernandez could
3   understand that his pre-*Miranda* statements could not be used against him.

　　　　3.   Agent Cadena did not take "curative measures."

5   　　If an officer employs the two-step technique, the Court next determines
6   whether the officer "took any curative measures to ensure that a reasonable person in
7   the suspect's situation would understand the import and effect of the *Miranda* warning
8   and of the *Miranda* waiver." *Williams*, 435 F.3d at 1162 n.16 (internal quotation marks
9   omitted). Such curative measures may include "a substantial break in time and
10   circumstances between the pre-warning statement and the *Miranda* warning," or "an
11   additional warning that explains the likely inadmissibility of the pre-warning custodial
12   statement." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).

13   　　No curative measures are present here. Agent Cadena incorrectly read Mr.
14   Hernandez his *Miranda* rights and then interrogated him close in time. Agent Cadena
15   communicated nothing regarding the likely inadmissibility of the statements Mr.
16   Hernandez made prior to the *Miranda* warning. More broadly, there is no evidence of
17   any government actions making Mr. Hernandez aware that his responses to the
18   impermissibly broad booking questions could not be used against him.

19   　　Thus, *Seibert* bars admission of Mr. Hernandez's post-*Miranda* statements.

20   **V.    The Court improperly denied discovery evidence to which Mr.
21   　　　　Hernandez was entitled.**

22   　　Under *Brady v. Maryland* and its progeny, the government is required to disclose
23   "evidence favorable to an accused upon request . . . where the evidence is material
24   either to guilt or to punishment." 373 U.S. 83, 87 (1969). To do otherwise would
25   violate the accused's due process rights. Favorable evidence is "any evidence" that
26   "tend[s] to call the government's case into doubt" including "both exculpatory and
27   impeachment material that is relevant to either guilt or punishment." *Milke v. Ryan*,
28   711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

1   Failure to disclose violates due process "irrespective of the good faith or bad faith of
2   the prosecution." *Strickler*, 527 U.S. at 280 (quoting *Brady*, 373 U.S. at 87).

3   When considering requiring disclosure, courts must determine if the requested
4   evidence is material, relevant, or otherwise helpful to the defense, and if the
5   government has the evidence in its possession. *United States v. Cano*, 934 F.3d 1002,
6   1022 (9th Cir. 2019) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).
7   Importantly, possession is not limited to a prosecutor's personal knowledge because
8   prosecutors' "unique position to obtain information known to other agents of the
9   government" obliges them to "disclos[e] what [they] do not know but could have
10  learned." *Browning v. Baker*, 875 F.3d 444, 460 (9th Cir. 2017), cert. denied, 138 S. Ct.
11  2608 (2018); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc); *United States*
12  *v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989); *see also Kyles v. Whitley*, 514 U.S. 419, 437
13  (1995) (describing the prosecutor's "duty to learn of any favorable evidence known to
14  [those] acting on the government's behalf"). This requirement extends to information
15  held by other executive branch agencies. *See United States v. Santiago*, 46 F.3d 885, 893
16  (9th Cir. 1995); *United States v. Jennings*, 960 F.2d 1488, 1490–91 (9th Cir. 1992).

17  Here, the Court's refusal to order the government to turn over information
18  regarding Eduardo Verduzco or the white van traveling northbound in the vicinity to
19  Mr. Hernandez's arrest violated Mr. Hernandez's due process rights, as such
20  information was material and favorable to Mr. Hernandez's defense.

21  In the helicopter dispatch provided in pre-trial discovery, around 4:16 p.m.,
22  agents are heard discussing someone by the name of Eduardo Verduzco (or a similar
23  sounding name) from El Cajon. This was within minutes of Agent Nirelli's approach
24  of Mr. Hernandez. Included in that discussion are statements that Mr. Verduzco has a
25  questionable crossing record and that he was driving a 4-door Honda with California
26  plates. This discussion indicates that the agents suspected Mr. Verduzco of violating 8
27  U.S.C. § 1324, likely by driving undocumented people through a port of entry.
28  On its face, this information would be both relevant and exculpatory. Given the

1   limited area these agents would have been working, in addition to the limited time

2   frame, discovery related to this suspected smuggler would have spoken directly to Mr.

3   Hernandez's mode of entry. Had Mr. Verduzco smuggled Mr. Hernandez in a vehicle

4   through a port of entry, Mr. Hernandez could not have been convicted of § 1325(a)(1).

5   *United States v. Corrales-Vazquez*, 931 F.3d 944, 953 (9th Cir. 2019) (explaining that

6   1325(a)(1) requires that the conduct take place somewhere other than a port of entry).

7        The court denied the request for this discovery as irrelevant. This is not only

8   incorrect based on the above, but is considerably troubling in light of the testimony

9   proffered by the government at trial. Not only did the government fail to provide the

10   requisite evidence to prove Mr. Hernandez's mode of entry, but the testimony it *did*

11   rely on was that agents often encountered people who had entered illegally in this area.

12   Exh. A at 80–81. The government was attempting to have its cake and eat it too by

13   claiming that evidence of illegal activity in that area was *relevant* to show that

14   undocumented people often cross there, but that evidence of a person with an unusual

15   crossing pattern in a car *in the same area* was irrelevant. The government asked the judge

16   to look to the area for inculpatory purposes related to mode-of-entry and alienage but

17   to ignore evidence of vehicle-based smuggling in the area that was exculpatory.[2]

18        The same can be said for discovery related to the "white van going northbound"

19   discussed by agents in the dispatch tapes. For all the reasons stated above, including

20   the limited area these agents worked that day, in addition to the limited time frame,

21   discovery related to this van was material and exculpatory as to mode of entry.

22        As a result, Mr. Hernandez's conviction should be reversed.

23   **VI.**   **The Court improperly forced Mr. Hernandez to choose between two**
24         **rights.**

25        Courts have long found it "intolerable that one constitutional right should have

26

27   [2] The government also took this position while arguing the legally irrelevant point that Mr. Hernandez could
not have entered *lawfully* through a port of entry based on Agent Alexander's database search. *Id.* at 81:11–14.

28   But if Mr. Hernandez had entered illegally through a designated port of entry with the help of the man with
questionable crossing history, he would be innocent of § 1325(a)(1).

23

**19-mj-23508-MSB-AJB**

Appellant's Opening Brief

1   to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377,

2   394 (1968); *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 808 (1977) (rejecting a law

3   that required an officer of a political party to either waive his right against self-

4   incrimination and testify in response to a subpoena or else be barred from political

5   office, thereby forgoing his First Amendment right to "participate in private, voluntary

6   political associations."). In *Simmons*, which held that a defendant could not be forced

7   to choose between "either [] giv[ing] up what he believed, with advice of counsel, to

8   be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment

9   privilege against self-incrimination," *id.*, the Supreme Court rejected the lower court's

10  conclusion that the defendant's "voluntary" choice to obtain the "benefit" of testifying

11  waived his right against self-incrimination. *Id.* at 393–94.

12       The Supreme Court has not limited this analysis to constitutional rights, also

13  refusing to find waiver when the "coerced choice" is between a constitutional right

14  and a nonconstitutional right or other serious hardship. *Garrity v. New Jersey*, 385 U.S.

15  493 (1967). The Court has also held that a defendant could not be forced to choose

16  between trial or avoiding a death penalty charge, holding that "the option to either risk

17  one's life or exercise the right to a trial by jury was not a valid 'choice'—the law

18  'impose[d] an impermissible burden upon the exercise of a constitutional right.'" *United

19  States v. Jackson*, 390 U.S. 570, 581–83 (1968)). Relevant to the matter at hand, in *Hunt

20  v. Mitchell*, the Court held that "[w]hile [the defendant's] statutory right to a speedy trial

21  under Ohio law may not equate precisely to his constitutional right to a speedy trial

22  under the Sixth Amendment, the element of coerced choice decried by the Court in

23  *Simmons* is nevertheless present here." 261 F.3d 575, 584 (6th Cir. 2001).

24       Here, Mr. Hernandez requested all *Brady*, *Henthorn*, and *Giglio* discovery more

25  than a year before trial. He again requested discovery related to Agent Nirelli's conduct

26  and dishonesty in another case through a discovery letter on October 19, 2020, exh. J,

27  as well as in an October 23, 2020, motion to compel. ECF. No. 46. The motion to

28  compel also included a request as to Mr. Argueta's A-File, which would have provided

1  insight into Mr. Hernandez's mode of entry. These requests were made nearly three

2  weeks before trial. *See* ECF No. 53. On the day of trial, the Court stated that it would

3  be happy to order the disclosure of this evidence, but only if Mr. Hernandez agreed to

4  continue his trial. Exh A, at 8:1–4; 15:19–20.

5       Similar to *Hunt v. Mitchell*, the court forced Mr. Hernandez to choose between

6  a speedy trial, as laid out in the Sixth Amendment and the Speedy Trial Act, and his

7  right to *Brady* evidence, as protected by the Fifth Amendment's due process clause.

8  The judge knew he was forcing Mr. Hernandez into this choice, saying, "I'm happy to

9  [order production], but again, that's going to require a continuance which you don't

10  seem to want to do. So you're sort of in a tough position here. And I understand why

11  you don't want to continue it. I mean, it's very obvious." Exh. A at 15:19–22. In forcing

12  him to make this choice, Mr. Hernandez was required to give up his constitutionally

13  guaranteed right to discovery in favor of the "benefit" of a speedy trial. *Contra Simmons*

14  *v. United States*, 390 U.S. 377, 393–94 (1968). This choice is not allowed.

15       The government's failure to promptly turn over constitutionally guaranteed

16  discovery, and the magistrate judge's delay in responding to the motion to compel,

17  instead waiting for the day of trial to address the requests, forced Mr. Hernandez to

18  give up his right to exculpatory evidence in favor of the "benefit" of exercising his

19  right to a speedy trial. Putting Mr. Hernandez to the choice of waiving one right or the

20  other, as occurred here, is "intolerable." *Id.* at 394.

21                              **Conclusion**

22       For the aforementioned reasons, Mr. Hernandez's conviction should be

23  vacated.

24                              Respectfully submitted,

25  Dated: June 16, 2023        *s/ Stephen J. Piotrkowski*

26                              Stephen J. Piotrkowski
                                Federal Defenders of San Diego, Inc.

27                              Attorneys Mr. Hernandez-Villalobos
                                Email: Stephen_Piotrkowski@fd.org

28

RANDY GROSSMAN
United States Attorney
PAUL E. BENJAMIN
California Bar No. 306066
Assistant U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: 619-546-7579
Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  19-MJ-23508-MSB-AJB |
| Plaintiff, | **UNITED STATES' REPLY BRIEF** |
| v. | |
| OLISER HERNANDEZ-VILLALOBOS, | **The Honorable Anthony J. Battaglia** |
| Defendant. | |

The United States hereby submits its Reply Brief. The magistrate judge gave careful consideration to all the evidence in the case and applied the law appropriately. Appellant's claimed errors are unsupported in the factual record and contrary to controlling law. The court should therefore affirm the magistrate judge's decision.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

On August 22, 2019, Border Patrol Agent Luke Nirelli, a 13-year veteran Border Patrol agent, was on duty in the Brown Field Border Patrol Station's area of responsibility. Around 4:16 p.m., a scope operator notified agents that he had observed a group of individuals in an area known as the "48 Saddle." Transcript of Trial (Tr.) at

28. The area is approximately eight miles west of the Tecate, California Port of Entry and approximately two and a half miles north of the U.S.- Mexico border. *Id.* at 51. The area is remote and "pretty much barren." *Id.* at 53. While the area is near hiking trails, the individuals were cutting through the brush over rugged terrain, rather than using trails. *Id.* at 29. The area is routinely used by aliens entering illegally from Mexico, because there is a break in border fence due south. *Id.* at 52. However, in Agent Nirelli's experience, it is uncommon to see United States citizens or residents in the area; he testified at trial that "we don't encounter a lot of civilians hiking in this area at all." *Id.* at 56. Based on his 13 years in Border Patrol and "thousands" of immigration inspections, Agent Nirelli was familiar with the ways in which an alien could be smuggled through a port of entry in a car. *Id.* at 67. However, he had never heard of an alien being so smuggled and then dropped off in a remote location, nor had any of the thousands of aliens he had spoken to told him they had been driven through the port of entry and then dropped off in the area at issue in this case. *Id.* at 58.

Agent Nirelli responded to the last place the scope operator had seen people and searched for the group. Tr. at 56-57. He discovered Appellant and another man "hiding in a pretty large bush, inside the bush." *Id.* at 57. Agent Nirelli had never in 13 years found someone who was lawfully present in the United States hiding in a bush. *Id.* at 58. Agent Nirelli ordered the men out of the bush, handcuffed them, secured the area, and checked that no one else was around. *Id.* at 69. Within minutes of first encountering Appellant, Agent Nirelli conducted an immigration inspection. *Id.* He asked Appellant where he was from, if he had any documents to be in the United States legally, and if he had entered illegally. *Id.* at 60-61. Appellant answered that he was from Mexico, that he did not have any such documents, and that he had entered illegally. *Id.*

Appellant was arrested for illegal entry. Back at the station, another agent read Appellant his *Miranda* rights. App. Exh. G (transcription and translation of recorded interview). Appellant indicated that he understood those rights and did not ask any questions. *Id.* Appellant then signed and initialed a form indicating that he understood

those rights and wished to answer questions without an attorney. Ex. A (originally filed as Defense Exhibit R to the Motion to Suppress). The interview was recorded. See App. Exh. G. Appellant stated that he is a citizen of Mexico. App. Exh G at 7 (by transcript numbering). He admitted that he had illegally entered the United States the day before, on August 21, 2019, by walking through the mountains. *Id.* at 9-10.

Appellant made his initial appearance before Magistrate Judge Berg the next day. ECF 3. On September 4, 2019, he requested a trial date, and a status was set for September 17, 2019. ECF 9. On that date, the magistrate set a deadline for motions of October 15, 2019, with responses due a week later. ECF 10. Defendant filed numerous motions on October 16, 2019, to which the United States responded on October 31 (after the magistrate judge extended the filing deadline for a reply). ECF 16, 21, 22. Judge Berg ruled on the motions on November 21, 2019, and trial was set for February 21, 2020. ECF 28.

After several continuances, trial was set for November 9, 2020. ECF 43. On October 23, 2020, Appellant filed a motion to compel evidence and dismiss charges. The motion was heard on the day of trial, at which time some of Appellant's discovery motions were denied and the motion to dismiss was denied. ECF 52; Tr. at 5-21. Given the extremely late filing of the discovery motion, Judge Berg indicated that, though he would entertain argument and consider granting some of it, doing so would require a continuance of the bench trial. Appellant then withdrew those motions. *Id.* The bench trial was conducted, and Judge Berg found Appellant guilty and sentenced him to time served. ECF 53.

## II

## ANALYSIS

### I.   Sufficient Evidence Corroborated Appellant's Confession

Appellant first attacks his conviction on the grounds that there was not sufficient evidence to corroborate his confession. Because the confession was inherently reliable

and was adequately corroborated by other independent evidence, the magistrate judge did not err in finding sufficient evidence to convict Appellant.

"The *corpus delicti* doctrine requires that a conviction must rest on more than a defendant's uncorroborated confession." *United States v. Niebla-Torres*, 847 F.3d 1049, 1054 (9th Cir. 2017). [T]he *corpus deliciti* [sic] rule does not require the government to introduce evidence that would be independently sufficient to convict the defendant in the absence of the confession. Rather, it requires evidence sufficient to corroborate the defendant's confession." *United States v. Valdez-Novoa*, 780 F.3d 906, 923 (9th Cir. 2015).

The Ninth Circuit has developed a two-part test: "First, the government 'must introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred. Second, it must introduce independent evidence tending to establish the trustworthiness of the admissions, unless the confession is, by virtue of special circumstances, inherently reliable.'" *Niebla-Torres*, 847 F. 3d at 1056 (citing *United States v. Lopez–Alvarez*, 970 F.2d 583, 590-92 (9th Cir. 1992). A confession is that is recorded, voluntary, and made after the defendant is read his *Miranda* rights is "inherently reliable" and thus meets the second prong. *Valdez-Novoa*, 780 F. 3d at 925. Because Appellant's post-*Miranda* confession was fully recorded, made after he was read his rights, and voluntary, the second prong is met in this case.

As to the first prong, ample corroborating evidence was provided. Appellant was discovered in a remote area commonly used by aliens entering the United States unlawfully to make their way north. Tr. at 52. While there are hiking trails nearby, the arresting agent testified that in his 13 years working as a Border Patrol agent in the area "[w]e don't encounter a lot of civilians hiking in this area at all." *Id.* at 55, lines 2-3. The agent further testified that the trails were commonly used by aliens entering illegally and not by local citizen hikers. *Id.* at 65. The scope operator testified that Appellant was not on any hiking trail when he was first observed, nor was there a trail that led to where he was. *Id.* at 43-45. Appellant was hiding from Border Patrol in the

bushes; the arresting agent testified that he had never encountered United States citizens or lawfully admitted aliens hiding from Border Patrol in bushes. *Id.* at 58. He also testified that he had never heard of aliens being smuggled across the border in a vehicle and then dropped off in the area where Appellant was apprehended or in a remote area near the border, and that he had never spoken to an alien who claimed that such a thing had happened in his 13 years of experience and thousands of immigration inspections. *Id.* at 68. A search of government databases showed that Appellant did not have permission to enter or reside in the United States. *Id.* at 75. Finally, Appellant's in-field statement (in which he stated he was a Mexican citizen who had illegally entered the United States) and his post-arrest statement (in which he admitted that he was a Mexican citizen who entered the United States illegally through the mountains) where made to separate agents at separate times and corroborate each other.

Appellant's argument rests on two flawed premises. First, he argues that "there was no evidence—apart from Mr. Hernandez's statement—from which a factfinder could infer that Mr. Hernandez hopped the border fence rather than being smuggled through a port," because no government agent actually saw him enter. App. Brief at 8. Appellant appears to claim that he cannot be convicted absent direct evidence of his mode of entry. This is plainly wrong. First, Appellant was not charged with *completed* illegal entry, but with *attempted* illegal entry; as such, the United States was not required to prove how he entered at all. Secondly, any point may be proven by direct or circumstantial evidence, and "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." 9th Circuit Criminal Jury Instruction 1.5.

The circumstantial evidence of Appellant's mode of entry more than corroborated his statements. He was found near the border in a remote area commonly used by aliens who had illegally crossed the border. When he was observed, he was moving further into the United States through the brush and across dense terrain. While it is physically possible that, as Appellant argues, someone could cross the border at a port of entry in

a car and be dropped off in the area, Agent Nirelli testified that he had never heard of that happening in this area or remote areas in general, based on his 13 years of experience and thousands of immigration inspections. Nor would such a course of conduct be at all logical. No rational smuggler would take the risk of smuggling aliens through the port on entry only to, once they were successfully in the United States, drive out to a remote area (during which time they could once again be detected by Border Patrol) and drop the aliens off in that remote area (where they could be intercepted by Border Patrol and would need to be picked up again). The United States was not required to establish that it was physically impossible that Appellant had entered in a manner inconsistent with his confession, but merely that other evidence corroborated that confession. In this case, the circumstantial evidence was more than sufficient to corroborate Appellant's confession.

The same is true of Appellant's alienage. Appellant was found in a remote area where, as Agent Nirelli testified, aliens commonly entered the United States and United States citizen hikers were rare. Unlike a normal hiker, he was traveling through the brush and over rough terrain, not on hiking trails. And unlike a normal hiker (indeed, unlike any lawfully present hiker Agent Nirelli had ever seen in 13 years), he was hiding from Border Patrol in a bush. There was simply no logical reason for Appellant to act as he did if he was not an alien. As such, the evidence amply corroborated his confession.

Appellant claims that records of prior deportations are required to prove alienage. He cites no case law for this proposition, and the Government is aware of none. Additionally, the records of prior deportations were not admitted because Appellant objected to their admission on the grounds that they were irrelevant to the charged conduct. *See* ECF 40; *see also* Tr. at 20-21. Appellant cannot have it both ways. Having successfully convinced the magistrate judge that deportation documents were irrelevant to alienage, he cannot now claim that alienage cannot be established without deportation documents.

Appellant finally claims that the magistrate's finding of alienage was "out of step with judges in this district" because three judges acquitted 1325 defendants. App. Brief at 9-10. This is incorrect for several reasons. First, it ignores the host of other 1325 defendants who *have* been convicted in this district. Second, none of those cases are factually apposite. In all three cases, agents testified simply as to where they found the respective defendants, whether they were hiding, and their field admissions. Unlike in the present case, they did not testify as to whether they had encountered United States citizens in the area. Unlike in the present case, in two cases no testimony was presented that the area was commonly used by aliens crossing illegally; in the only case that had such testimony, the agent testified merely that the area "was frequented" by aliens, not how commonly it was so used. *United States v. Gonzalez-Armenta*, 18-CR-5496-GPC, ECF 34 at 40. And most importantly, the agents did not testify as whether those defendants' behavior was consistent or inconsistent with being a United States citizen, while Agent Nirelli testified that he had never in 13 years as a Border Patrol agent encountered United States citizens hiding in a bush. In short, the Government in this case provided precisely the kind of evidence that was lacking in the three cases Appellant cites, and the magistrate judge rightfully considered it in convicting him.

Because sufficient independent evidence corroborated Appellant's confessions, the magistrate did not err in convicting him

## II.    The Initial Detention was not an Arrest

Appellant next claims that Agent Nirelli improperly arrested him without probable cause. He claims that because he was not free to leave, he was under arrest, and thus that probable cause was required. This argument fails because is rests on a fundamental misunderstanding of the Fourth Amendment. Not every person who is seized is arrested, and an agent needs only reasonable suspicion to detain a suspect for further investigation.

Agent Nirelli approached Appellant, ordered him out of a bush, and handcuffed him before conducting an immigration inspection. Appellant argues that "[n]o

reasonable person stopped by Border Patrol under such classic illegal-entry circumstances—followed by an arrest that bore all the hallmarks of being taken into custody—would ever believe they were free to leave after brief questioning," and so any such "classic" stop is a custodial arrest requiring *Miranda* warnings. App. Brief at 15 (internal citations omitted). This is directly opposite to Ninth Circuit precedent. "[T]he Ninth Circuit has repeatedly held that brief questioning near the border is a non-custodial Terry stop that does not trigger Miranda." *United States v. Gutierrez-Salinas*, 640 Fed. App'x 690 (9th Cir. 2016) (citing *United States v. Medina-Villa*, 567 F.3d 507, 519-20 (9th Cir. 2009)); *see also United States v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001) (field interview is "ordinarily a Terry stop, not custodial questioning").

For example, in *Galindo-Gallegos*, 244 F.3d 728, two Border Patrol officers apprehended a group of 15 to 20 individuals running from the border in an isolated location, told them to sit on the ground, and asked them questions regarding their citizenship and immigration status. The individuals were not "free to leave," and the questions posed to them "were a necessary predicate to letting anyone go free." Id. at 730. The Court upheld the denial of the defendant's motion to dismiss, holding "this is ordinarily a Terry stop, not custodial questioning." Id. at 732.

Similarly, in *United States v. Cervantes-Flores*, 421 F.3d 825, 829-30 (9th Cir. 2005), *overruled in part on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), a Border Patrol agent conducted a *Terry* stop of the defendant about 40 miles north of the border and asked him his place of birth, his citizenship, whether he had immigration documents allowing him to be in the United States, and how he had crossed the border. No Miranda warnings were given. Nonetheless, the statements were admissible. Id. at 830. The Court concluded that because there was a basis for the *Terry* stop, the agent could ask "questions 'reasonably related in scope to the justification for their initiation.'" *Id.* (quoting *Terry*, 392 U.S. at 29). The Court recognized that an "officer may question [individuals reasonably detained near the border] about their citizenship and immigration status, and he may ask them to explain suspicious

circumstances, but any further detention or search must be based on consent or probable cause." *Id.* (alteration in original) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975)).

In *Medina-Villa*, the Ninth Circuit found the defendant was "not in custody and was not entitled to *Miranda* warnings" "[e]ven though the border patrol agent prevented Medina from leaving the parking lot by blocking his car, *approach[ed] [the car] with his gun drawn*, and interrogat[ed] him about his citizenship and immigration status[.]" *United States v. Medina-Villa*, 567 F.3d 507, 520 (9th Cir. 2009) (emphasis added).

This case, as Appellant himself states, is a classic immigration stop. The agent observed Appellant hiding in a bush in a remote area, ordered him out, handcuffed him, and asked him three immigration questions. As Agent Nirelli testified, he conducted the immigration inspection as soon as he got Appellant out of the bush and secured the area, within minutes of encountering Appellant. Tr. at 69. As this is a classic immigration stop, the law is clear: it was a detention requiring reasonable suspicion, not an arrest requiring probable cause.

Appellant argues that the stop was converted into a custodial arrest because Agent Nirelli ordered him out of the bush and handcuffed him. Not so. A law enforcement officer can take reasonable steps to secure the scene and ensure his safety during an investigatory detention, such as ordering a person out of their car. *See, e.g.*, *United States v. Miles*, 247 F.3d 1009, 1015 (9th Cir. 2001) ("Under the circumstances here, the officers' conduct did not exceed the scope of a *Terry* stop when they ordered Miles to his knees at gunpoint and handcuffed him behind his back."); *United States v. Bautista*, 684 F.2d 1286, 1292 (9th Cir. 1982) ("Strong but reasonable measures to insure the safety of the officer or the public can be taken without necessarily compelling a finding that the suspect was in custody."); *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). "What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* at 111. The same concerns exist with people hiding in bushes; just like someone in a car, Agent Nirelli could not know

whether Appellant and the other man were armed or whether they would attack him as he was distracted. If anything, the risk was significantly greater than in a traffic stop; Agent Nirelli did not know whether there were other people hiding nearby in the rough terrain, and he was more isolated in a remote area than an officer conducting a stop on a busy road. As such, it was not unreasonable of him to order Appellant and the other man out of the bush and take brief steps to ensure his safety before asking questions, and his doing so did not convert the stop into an arrest.

This leaves only the question of whether there was reasonable suspicion to detain Appellant. As the Ninth Circuit has explained, "[a]ny number of factors may be taken into account in deciding whether there is reasonable suspicion to stop [someone] in the border area." *Cervantes-Flores*, 421 F.3d at 830 *overruled on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Relevant behavior includes "obvious attempts to evade officers," id., including "hiding in the brush." *United States v. Ramos*, 397 F. App'x 314 (9th Cir. 2010) ("Border Patrol agents had reasonable suspicion to believe that Ramos was in the country illegally" where "Ramos was found hiding in the brush with five other individuals approximately eight miles north of the Mexican border, in an area well-known to be a border-crossing route.").

This case closely tracks *Ramos*. Like the *Ramos* defendant, Appellant was found hiding in a bush with other people near the border. Indeed, the *Ramos* defendant was over three times as far from the border (eight miles as opposed to two and a half). And like the Ramos defendant, Appellant was in an area known to be used by aliens entering the country illegally. As the agents testified, Appellant was not on any hiking trail, and was in an area commonly used by aliens entering illegally and rarely frequented by American citizens. As such, Agent Nirelli had reasonable suspicion to detain Appellant.

**III.  The Court Properly Admitted Appellant's In-Field Statements**

Appellant argues that his in-field statements should have been suppressed because he was not given *Miranda* warnings. This argument fails because, as discussed above, Appellant was not in custody. As such, *Miranda* warnings were not required. As

the Ninth Circuit ruled in *Cervantes-Flores*, Agent Nirelli could lawfully ask Appellant immigration-related questions during the investigatory detention. The evidence is that Agent Nirelli did just that, asking only three questions: where Appellant was from (Mexico), whether he had any immigration documents that would allow him to legally be in the United States (no), and whether he had entered illegally (yes). Tr. at 60-61. All three questions clearly relate to Appellant's immigration status, and so were appropriate for the investigatory detention.

Nor was the investigatory detention inappropriately extended. Agent Nirelli testified that he questioned Appellant as soon as he had secured the area and ensured there were no other suspects around. He asked the immigration inspection questions within minutes of first encountering Appellant. As discussed above, such steps to ensure officer safety are part and parcel of an investigatory stop, not extraneous extensions. As such, the stop was not unlawfully extended prior to questioning.

Because Appellant was not in custody and was asked only questions within the appropriate scope of an immigration detention, the magistrate correctly admitted his responses to the in-field immigration inspection.

### IV.   The Court Properly Admitted the Mirandized Confession

Appellant next claims that the Mirandized confession should have been excluded because he was incorrectly advised of his *Miranda* rights and because agents employed an improper two-step interrogation. Neither is correct.

*A. The Miranda advisal was not incorrect or misleading*

"The Supreme Court has made clear that no 'talismanic incantation' of this warning is necessary to satisfy the strictures of *Miranda*." *United States v. Connell*, 869 F.2d 1349, 1351 (9th Cir. 1989). "If a defendant has been told the substance of his constitutional rights, it is not fatal if irrelevant words or words with no independent substance are omitted." *United States v. Noti*, 731 F.2d 610, 614-15 (9th Cir. 1984).

As an initial matter, Appellant's argument encourages the Court to take an opposite approach. He says that the *Miranda* warning was ineffective because Agent

Cadena used a Spanish word meaning that an attorney "can" be appointed, rather than using the precise formulation that a 2019 American Bar Association resolution suggests. App. Brief at 17. This is inconsistent with Ninth Circuit precedent. As *Connell* made clear, *Miranda* does not require officers to use a specific verbatim phrasing from case law, let alone a phrasing recommended by an outside group with no legal authority. As such, the fact that Agent Cadena did not read from the American Bar Association resolution is irrelevant.

The rest of Appellant's argument fares no better. He relies principally on *Connell*, 869 F.2d 1349, but his argument misses the main thrust of the *Connell* opinion. The oral Miranda warning in Connell read as follows:

> You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. However, you must make your own arrangements to obtain a lawyer and this will be at no expense to the Government. If you cannot afford to pay for a lawyer, one *may* be appointed to represent you.

*Id.* at 1350 (emphasis in original). A written warning then stated:

> I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. However, I understand that I must make my own arrangements to obtain a lawyer and this will be at no expense to the Government. I further understand that if I cannot afford to pay for a lawyer and want one *arrangements will be made for me to obtain a lawyer in accordance with the law.*

*Id.* at 1350-51 (emphasis in original). The Ninth Circuit held that these warnings "fell below minimum required standards" because they were "equivocal and open to misinterpretation." *Id.* at 1353. The Court explained that in the oral warning, although the defendant was informed that "he had the right to talk to an attorney before, during, and after questioning, this statement was immediately followed by a strong assertion that such an attorney could not be obtained at the Government's expense." *Id.* And the "subsequent statements regarding appointed counsel in both the oral and written warnings—that 'a lawyer *may* be appointed to represent you' (oral) and that if I want

but cannot afford a lawyer 'arrangements will be made for me to obtain a lawyer *in accordance with the law*' (written)—did not clearly inform Connell that if he could not afford an attorney one would be appointed for him prior to questioning, if he so desired." *Id.* The Court explained that both of these statements led the "impression that providing an attorney, if Connell could not afford one was discretionary with the government" or based on "requirements of the law" that the defendant could not be expected to know. *Id.*

The warnings here, by contrast, do not leave the impression. There is nothing that suggests that Appellant "must make [his] own arrangements to obtain a lawyer and this will be at no expense to the Government," as there was in the oral warning in *Connell*. *Id.* at 1350. It was only in this context that the Ninth Circuit found the use of the word "may" troubling. In the context of the unambiguous warning here, the use of the word "can" created no similar ambiguity. Likewise, the written warning here did not leave any impression that the right to an appointed attorney was discretionary, as it did in Connell. *See id.* at 1351 ("arrangements will be made for me to obtain a lawyer in accordance with the law"). At a minimum, the combination of these warnings was sufficient to make explicit "the right to appointed counsel before and during questioning." *Connell*, 869 F.2d at 1353.

Appellant's reliance on *United States v. Perez-Lopez*, 348 F.3d 839, fares no better. There, the defendant was advised that "you have the right to solicit the court for an attorney if you have no funds." *Id.* at 847. The Ninth Circuit found this to be an incorrect advisal. "In this case Perez–Lopez's warning was constitutionally infirm because it did not convey to him the government's obligation to appoint an attorney for indigent accused. To be required to "solicit" the court, in the words of Torres's warning, implies the possibility of rejection." *Id.* at 848. This troubling language is entirely different from the warning provided in this case. Agent Cadena did not tell Appellant that he could petition the court for an attorney, he told him that an attorney can be appointed for him. Unlike in *Perez-Lopez*, the Miranda advisal did not indicate that

Appellant had the right to request or solicit an attorney; it indicated that one could be provided. There is nothing in Agent Cadena's advisal that states or even implies that an attorney might not be provided.

Appellant cites no case that holds that telling a suspect that an attorney "can" be provided, rather than "will" be provided, without other errors, is an incorrect and misleading *Miranda* advisal. Nor is the Government aware of any.[1] This is unsurprising. Numerous cases have held that it is the substance, not the form, for the *Miranda* warnings that matters. "Can" and "will" are close synonyms, routinely used interchangeably in ordinary conversation (as an example, no one hearing a cashier announce "I can help the next customer" would think that there is any doubt as to whether the next customer will be helped). Nor did Appellant indicate that he personally had any difficulty understanding Agent Cadena; he asked no questions, expressed no uncertainty as to his rights, and promptly stated both that he understood his rights and that he was willing to answer questions without an attorney present. App. Exh. G at 6.

The *Miranda* advisal, though not quoted verbatim from *Miranda* itself, made clear that an attorney would be provided if Appellant wanted one. As such, it was sufficient. Appellant's motion to suppress his statement was thus properly denied.

### B.  There was no improper two-step interrogation

Appellant also argues that agents employed an improper two-step interrogation. This contention has no merit, both because Appellant was not in custody during the first questioning and because there was no deliberate two-step interrogation. "A two-step interrogation involves eliciting an unwarned confession, administering the Miranda warnings and obtaining a waiver of Miranda rights, and then eliciting a repeated confession." *United States v. Narvaez-Gomez*, 489 F. 3d 970, 973-74 (9th Cir. 2007). "When an interrogator uses this deliberate, two-step strategy, predicated upon violating

---

[1] Although not binding on this court, Judge Lorenz found the use of "can" as opposed to "will" in a Spanish *Miranda* advisal to be sufficient. *United States v. Cabrera-Alejandre*, 2007 WL 935599 (S.D.C.A. 2007). Similarly, the Fourth Circuit has upheld a *Miranda* advisal that used the formulation "one can be provided for you," although the use of "can" as opposed to "will" was not the focus of the defendant's challenge. *United States v. Nash*, 739 Fed.Appx. 762 (4th Cir. 2018).

*Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Missouri v. Seibert*, 542 U.S. 600, 621.

At the outset, the two-step interrogation doctrine is irrelevant to this case because Appellant was not in custody for the field immigration inspection. There can only be a two-step interrogation if the officer conducting the first questioning deliberately violates *Miranda* by questioning an in-custody defendant without informing him of his rights. *Seibert*, 542 U.S. at 621. If a defendant is not in custody, there is no need to give *Miranda* warnings, and thus no violation to begin with. Because, as discussed above, Appellant was not in custody for the immigration inspection, Agent Nirelli was not required to read him the *Miranda* warnings and there could be no two-step interrogation.

Even if the court were to reach the two-step interrogation issue, Appellant's argument fails because there is no indication of a deliberate intention to violate his *Miranda* rights. In determining whether mid-stream *Miranda* warnings suffice, "the court must address (1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken." *United States v. Williams*, 435 F. 3d 1148, 1160.

*Narvaez-Gomez*, 489 F. 3d 970, is particularly apposite to this case. There, the defendant was stopped for smoking in a park and admitted to not having immigration documents. He was arrested by Border Patrol. The arresting agent put him in the back of her car and asked him, without *Miranda* warnings, "whether he had ever been arrested by Border Patrol and whether he had ever been deported." *Id.* at 973. Approximately four hours later, a different Border Patrol agent interviewed the defendant. He read the defendant his *Miranda* rights, and then conducted a full interview. *Id.*

The Ninth Circuit upheld the denial of a motion to suppress the post-*Miranda* statement, finding that "[t]he court properly considered the objective and subjective evidence of deliberateness including the informal setting and brief nature of Badousek's prewarning interrogation, Hopkins' involvement only during the post–warning interrogation, and the lack of any reference to the prewarning statements during the more comprehensive post–warning interrogation. The change in setting and time span of approximately four hours between statements also indicate a lack of deliberateness." *Id.* at 974.

This case is on all fours with *Narvaez-Gomez*. As in that case, the first questioning occurred in an "informal setting" (out in the field), while the second occurred at a border patrol station. The initial questioning was also "brief [in] nature," consisting of only three questions, as compared to "the more comprehensive post–warning interrogation," which went into much greater detail about Appellant's personal history and citizenship and the offense at issue. As with the interviewing agent in *Narvaez-Gomez*, Agent Cadena was "involve[d] only during the post–warning interrogation," and Agent Nirelli was not present for the later interview. Finally, both cases involve the same "change in setting" and the same "time span of approximately four hours between statements." *See* App. Brief at 2. ("Agents then detained Mr. Hernandez for approximately four hours at the Browsnfield [sic] Border Patrol Station before BPA Juan Cadena read him his rights.") In short, the Ninth Circuit has examined, in a precedential case, a factual circumstance virtually identical to the one here except that that defendant had been formally arrested before the first questioning and found that there was no improper two-step interrogation. *Narvaez-Gomez* controls, and the Court should thus find that there was no improper two-step interrogation.

Because Appellant was adequately advised of his *Miranda* rights and there was no improper two-step interrogation, the magistrate judge correctly admitted his confession at trial.

//

### V.     The Court Correctly Denied Irrelevant Discovery

Appellant next argues that the magistrate judge erred in not ordering discovery on an "Eduardo Verduzco" and a white van. He argues that the information should have been disclosed under *Brady* and that the failure to disclose them violated due process. Because the evidence was not relevant, let alone material, and was not exculpatory, the magistrate did not err in denying the request.

First, Appellant failed to show that either of the categories of information he sought were material. The only linkage Appellant demonstrated between him and either Mr. Verduzco or the white van is that they were all referenced on the same dispatch tape, meaning that agents in the same sector discussed them within the same broad timeframe. This is far short of showing the evidence was material. The Brown Field sector is a large geographic area, covering approximately 568 square miles. *See* https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/san-diego-sector-california/brown-field-station, last accessed July 10, 2023. It covers everything from the Tecate Port of Entry to the City of Poway. *Id.* And, as Agent Nirelli testified, the area is commonly used by aliens entering illegally. As such, it is entirely implausible to suggest that every alien apprehended in that sector is related to every suspected alien smuggler or every suspicious vehicle in the sector seen within the same rough timeframe. In short, all that Appellant showed (or points to now) is that Mr. Verduzco, he, and the white van were within the same 568 square mile area within approximately an hour of each other, and that all three were suspected of being involved with immigration offenses. This is far short of showing that the information was material or relevant.

Appellant also fails to show that the evidence was exculpatory. Some of this is due to his misapprehension of the elements of the charge; as stated above, the United States was not required to prove the manner of his entry, as he was charged with *attempted* illegal entry. Even assuming the United States was required to prove how he entered, the evidence was in no way exculpatory. Appellant now speculates that either

Mr. Verduzco or the driver of the white van may have driven him into the United States. However, Appellant stated in his interview that he crossed on foot through the mountains. App. Exh. G. The man he was crossing with also told agents that he entered the United States illegally afoot. App. Exh. C. Neither of them gave any indication that anyone drove them into the United States. As such, there is no reason to believe that there would have been any evidence that Appellant was driven in through a port of entry.Therefore. there was no exculpatory evidence to discover.

Nor is Appellant's theory particularly logical. Per Appellant, he crossed into the United States the day before his arrest at about 4 p.m. App. Exh. G at 9. As such, if he had been driven into the United States through a port of entry and then dropped off in the wilderness, there is no reason that the driver would still be around in the same area some 24 hours later. It would be a remarkable coincidence for the driver to happen to return to the area precisely when agents found Defendant.

Appellant argues that the evidence is relevant because it was close in time, which suggests it could have been the driver that crossed him over the border. This does not comport with the evidence. Per Appellant, Mr. Verduzco was observed driving at 4:16. App. Brief at 22. However, at 4:15, Appellant was observed by Agent Rainey walking through the brush in rugged terrain, with no indication that he had just gotten out of a car. Tr. at 28; App Exh. B. Nor did Agent Rainey ever indicate that he saw any cars close to where Appellant was apprehended, as would have been the case if Mr. Verduzco or the van had just dropped him off. As such, the fact that Mr. Verduzco was discussed so close in time to Defendant's apprehension cuts *against* any suggestion that he was involved. And as discussed above in Part I, the theory that Appellant was driven across the border, then dropped off in a remote area and made to hike the rest of the way, is also farfetched on its face. There is no reason why an alien smuggler would bring someone across the border in a car and then drop them off in the wilderness; indeed, Agent Nirelli has never heard of a similar occurrence in 13 years as a Border Patrol agent.

To sum up, Appellant, who previously stated that he entered the United States on foot the day before and was not found near any cars, alleges that two separate people suspected of possibly being involved in smuggling were driving within the same 568 square mile area as him within the same hour he was discovered. This does not show that there is anything material or exculpatory about those two people, and so the court properly denied discovery.

**VI.   The Magistrate Judge did not Force Appellant to Choose Between two Rights**

Lastly, Appellant argues that he was forced to choose between a speedy trial and his constitutional right to exculpatory evidence. He claims that the government withheld evidence and that the court improperly forced him to choose between receiving the evidence and having a speedy trial. This is entirely unsupported by the record.

Appellant's argument begins from a faulty premise: that "the magistrate judge's delay in responding to the motion to compel" forced him to choose between a speedy trial and fully litigating his discovery requests. App. Brief at 25. This is simply not true. Appellant chose to file his motion to compel discovery on October 23, 2020, just over two weeks before the trial date. All motions were due by October 15, 2019, over a year prior, and Appellant filed several motions prior to that due date. ECF 10. Had Appellant filed his motion to compel timely, the magistrate judge would have ruled on it well in advance of trial. That the motion to compel was heard on the morning of trial was entirely due to Appellant's decision to delay filing it until shortly before the trial date, in contravention of both the court's filing deadlines and its prior ruling that further motions would only be entertained if based on new evidence. Appellant was not forced by the court to choose between filing his discovery motion and having his trial timely; he placed himself in a position where he could not have both by choosing to file his motion just before trial. As such, the magistrate court did not err.

Appellant's claim also fails on the merits, as he was not entitled to the discovery he sought. Appellant first bases his argument on a claim that the government failed to

produce discovery on "Agent Nirelli's conduct and dishonesty in another case." App. Brief at 24. However, as the record makes clear, there was no evidence to discover. As the Government explained at the hearing, the allegation of wrongdoing against Agent Nirelli was only ever raised by that other, prior defendant in a motion before Judge Bashant. The defendant never made any form of complaint to CBP or the Department of Homeland Security. And before his motion was ruled on, he withdrew it and pled guilty. Transcript of Trial at 11, 12. Because no complaint was ever filed, there was never an investigation into the agent. *Id.* at 19, lines 18-21. And contrary to trial defense counsel's assertions at trial and in the letter attached at Defense Exhibit J, the other case was not dismissed or resolved with a favorable plea in exchange for dropping the allegations; the defendant was re-indicted under a new case number, pled to the same felony, and was sentenced to 27 months in prison. *See United States v. Valdes*, 17cr503-BAS.

In short, Appellant sought discovery that does not exist about an investigation that did not occur. There was no *Henthorn* or *Giglio* information to disclose, because no formal complaint was ever filed and no investigation was ever done by the agency. Nor did the agency, the court, or the Government ever make any adverse finding about Agent Nirelli's credibility. Judge Berg said it best: "But as Mr. Benjamin said, there is no file that exists. So I'm not faulting him for not bringing in something that does not exist." Tr. at P.17, lines 15-17. Because there was no responsive *Henthorn* or *Giglio* material, Appellant could not have been forced to give up receiving it.

Appellant also argues that he was entitled to A-file documents relating to the asylum application of the other man who was arrested with him, and that it was error not to provide him with those documents. This fails for several reasons. For one, the records were, as the Government pointed out, not in the possession of the prosecution team, but rather in the possession of the immigration court. Tr. at 6. The Government has no duty to disclose materials not in the possession of the prosecution team.

Further, there is no reason to believe that the evidence would be material and exculpatory. To obtain discovery under Rule 16, a defendant must make a prima facie showing of materiality. *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984); *United States v. Cadet*, 727 F.2d 1453, 1468 (9th Cir.1984). Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense. *See Little*, 753 F.2d at 1445; *Cadet*, 727 F.2d at 1466–68. When interviewed by Border Patrol, Mr. Argueta stated that he entered the United States illegally afoot. App. Exh. C. As such, any statements he made about how he entered the United States are likely to have been *inculpatory*, not exculpatory.

Further, as the Government explained in its reply to Appellant's discovery motion, the asylum application is unlikely to have contained a detailed description of how Mr. Argueta and Appellant came to be arrested. An asylum application engages with the alien's experience in his home country, not the circumstances of his entry into the United States. This is even more important given that Mr. Argueta is from El Salvador while Appellant is from Mexico, so his application would deal with an entirely different country. The Form I-589, used to apply for asylum, merely asks for the date, place, and status of entries into the United States, not detailed descriptions of the manner of entry. Form I-589, Application for Asylum and for Withholding of Removal, available at https://www.uscis.gov/sites/default/files/document/forms/i-589.pdf. As such, there is no reason to believe his asylum application, or other documents relating to its adjudication, would be material and exculpatory. The evidence sought was not therefore discoverable.

Appellant was not forced to choose between exculpatory evidence and a speedy trial. He chose to file a discovery motion shortly before trial and more than a year after such motions were due, which necessarily meant that obtaining any such evidence

would require a continuance. Further, the evidence he sought either did not exist or was not discoverable. As such, the magistrate judge did not err.

### III

### CONCLUSION

Appellant's challenges to his conviction are unsupported by the facts of the case and the controlling case law. As such, they should be rejected, and the court should affirm the magistrate judge's decision.

DATED: July 13, 2023                                  Respectfully submitted,

     RANDY S. GROSSMAN

                                        United States Attorney

                                        */s/ Paul E. Benjamin*
                                        PAUL E. BENJAMIN
                                        Assistant United States Attorney
                                        Attorneys for Plaintiff
                                        United States of America

1  **STEPHEN J. PIOTRKOWSKI**
   California State Bar No. 339685
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California 92101-5030
   Telephone: (619) 234-8467
4  Facsimile: (619) 687-2666

5  Attorneys for
   Mr. Hernandez-Villalobos

6                    UNITED STATES DISTRICT COURT

7                   SOUTHERN DISTRICT OF CALIFORNIA

8                (HONORABLE ANTHONY J. BATTAGLIA)

9

10  UNITED STATES OF AMERICA,          CASE NO.: 19-mj-23508-MSB-AJB

11                  Plaintiff-Appellee,   Hon. Anthony J. Battaglia
                                          Courtroom 4A
12          v.                            Date: September 15, 2023
                                          Time: 3:00 p.m.
13  OLISER HERNANDEZ-
14  VILLALOBOS,                          **Appellant's Reply to the Government's**
                                         **Response in Opposition (Dkt. 83)**
15                  Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 1

I.     In addressing *corpus delicti*, the government mischaracterizes the law and the evidence, as well as known smuggling practices. ............... 1

II.    The government both failed to establish there was reasonable suspicion to enact the stop and the initial detention was, in fact, an arrest. ................................................................................................. 5

III.   The government's argument regarding the mistranslated *Miranda* warning misstates the law and common-sense synonyms. ................... 8

IV.   The court improperly denied discovery necessary to question the same circumstantial evidence on which the government relied. ........... 9

V.    The government makes several improper claims regarding the evidence the court would have ordered if Mr. Hernandez had given up his right to a speedy trial. .................................................... 10

Conclusion .................................................................................................. 11

SER-151

## INTRODUCTION

In its response, the government mischaracterizes the evidence as relevant to the doctrine of *corpus delicti*, fails to establish there was reasonable suspicion prior to Mr. Hernandez's arrest and subsequent questioning in the field, misstates the law and context when discussing his post-*Miranda* statement, ignores the importance of Mr. Hernandez's denied discovery requests, and makes improper claims regarding the discovery the court would have ordered the government to turn over to the defense.

## ARGUMENT

**I.   In addressing *corpus delicti*, the government mischaracterizes the law and the evidence, as well as known smuggling practices.**

In his opening brief, Mr. Hernandez makes clear that the government presented essentially no evidence to corroborate Mr. Hernandez's mode of entry in satisfying the doctrine of *corpus delicti*, solely relying on his statements. As an initial matter, the government appears to misstate what is required in proving the charge, hoping to use "attempt" as a talisman against the requirements of the conduct actually charged. As established in *United States v. Corrales-Vazquez*, the government must prove the conduct under the appropriately charged statutory provision. As the Ninth Circuit stated:

> Federal law makes it a crime for '[a]ny alien' to 'enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers,' 8 U.S.C. § 1325(a)(1), or to 'elude[] examination or inspection by immigration officers,' *id.* § 1325(a)(2). In this case, we consider whether an alien who crosses into the country at a non-designated time or place is guilty of 'elud[ing] examination or inspection by immigration officers' under § 1325(a)(2). We hold that the answer is no. To convict a defendant under § 1325(a)(2), the government must prove that the alien's criminal conduct occurred at a time and place designated for 'examination or inspection by immigration officers'—i.e., at a port of entry that is open for inspection.

931 F.3d 944, 946 (9th Cir. 2019). In this case, the converse is also true. In charging Mr. Hernandez under § 1325(a)(1), the government must show that Mr. Hernandez attempted to enter at a place *other* than a port of entry.

But in its response, the government claims that "Appellant was not charged with

1   *completed* illegal entry, but with *attempted* illegal entry; as such, the United States was not

2   required to prove how he entered at all." Gov't Response at 5. The government is

3   seemingly implying that "attempt" is a get-out-of-jail-free card, allowing it to ignore

4   the requirements of *Corrales-Vazquez* altogether and collapsing § 1325(a)(1) and (a)(2)

5   into a single charge. That is not allowed. Although attempt obviates the need for a

6   completed crime, it requires that a substantial step be taken towards completing that

7   crime. If the completed crime requires the government prove that he "enter[ed] or

8   attempt[ed] to enter the United States at any time or place other than as designated by

9   immigration officers," 8 U.S.C. § 1325(a)(1), the attempted version requires the

10   government to show that Mr. Hernandez made a substantial step and had the intent to

11   "enter[ ] or attempt[ ] to enter the United States at any time or place other than as

12   designated by immigration officers . . . ." *Id.* Attempt does not remove an element of

13   the offense altogether. To follow the government's argument to its logical conclusion,

14   any substantial step taken in the United States, related to mode-of-entry, is irrelevant.

15   But that would mean the substantial step must have occurred in Mexico, where the

16   court has no venue at all. Such an outcome would be both impossible and illegal.

17      While failing to provide additional evidence, the government claims that Mr.

18   Hernandez is attempting to have it both ways in providing deportation documents as

19   an *example* of evidence that could be used to prove alienage. This, again, misstates the

20   argument. Deportation documents were offered as an *example* of evidence that could

21   be used to prove deportation, not a requirement. Although in this case the Magistrate

22   Judge excluded the A-File documents as unreliable for proving alienage, that does not

23   excuse the government from providing any additional evidence of Mr. Hernandez's

24   alienage beyond his statements.

25      The government argues that the cases provided by Mr. Hernandez, evidencing

26   factually similar circumstances in which the government failed to prove alienage, are

27   somehow different, pointing to the idea that others *have* been convicted in this district.

28   Gov't Response at 7. First, claiming that there are other convictions while failing to

2

Appellant's Reply Brief

1    cite to a single factually similar circumstance is an unsupported assertion. Second the

2    government attempts to draw distinctions without a difference with each of the cases

3    in Mr. Hernandez's opening brief. As an example, in discussing *United States v. Gonzalez*

4    *Armenta*, 18-CR-5496-GPC, the government argues that the agent's failure was in

5    testifying that the area "was frequented," by noncitizens, not how commonly it was so

6    used. Gov't Response at 7. The government claims that because a single agent testified

7    in this case that he had not encountered citizens in the area, that was somehow

8    different testimony than what Judge Curiel found insufficient.

9       In *United States v. Hernandez*, the Court found that three things had combined to

10   corroborate the defendant's admission of alienage. 105 F.3d 1330 (9th Cir. 1997). In

11   the more than two decades since, the Ninth Circuit has never held that this "mode of

12   entry" evidence—like a single Border Patrol officer testifying that he apprehended the

13   defendant near the border—is adequate corroboration of alienage. For instance, in

14   *United States v. Gonzalez-Corn*, evidence of alienage included the defendant's "prior

15   deportation order, his prior statements that he was a native and citizen of Mexico and

16   not of the United States, and his Mexican photo identification and voter registration

17   cards." 807 F.3d 989, 992 (9th Cir. 2015). And in *United States v. Galindo-Gallegos*, the

18   Ninth Circuit found adequate corroboration based on the defendant's "prior

19   deportation orders, his repeated admissions of alienage during the numerous prior

20   deportation hearings, his admission of alienage at the scene of his apprehension, and

21   the circumstances surrounding his apprehension." 244 F.3d 728, 732 (2001).

22       Other cases confirm that the Ninth Circuit has generally required at least two or

23   more of the types of evidence discussed in *Hernandez* to corroborate alienage. *See United*

24   *States v. Ruiz-Lopez*, 749 F.3d 1138, 1141–42 (9th Cir. 2014) (relying on deportation and

25   other documents in the defendant's agency file, as well as prior admissions); *United*

26   *States v. Garcia-Villegas*, 575 F.3d 949, 951 (9th Cir. 2009) (finding sufficient

27   corroboration where one agent saw the defendant climb the fence, another agent

28   apprehended him with "torn clothes and bloody hands," and the defendant "twice

3

Appellant's Reply Brief

1   admitted" he was not a citizen); *United States v. Ramirez-Cortez*, 213 F.3d 1149, 1158 (9th

2   Cir. 2000) (finding sufficient corroboration based on the defendant's prior deportation

3   order, prior admissions of alienage, and the testimony of an INS agent); *United States v.*

4   *Dominguez-Zamdio*, 211 F.3d 1275 (9th Cir. 2000) (relying on prior deportation

5   documents, admissions of alienage during that deportation, and mode of entry); *United*

6   *States v. Sotelo*, 109 F.3d 1446, 1448–49 (9th Cir. 1997) (relying on prior deportation

7   documents and admissions of alienage during that deportation); *United States v.*

8   *Contreras*, 63 F.3d 852, 858 (9th Cir. 1995) (relying on a deportation order, admissions

9   of alienage during that deportation, and agent testimony). In short, the Ninth Circuit

10   has *never* held that evidence consisting of a single Border Patrol officer testifying that

11   he apprehended the defendant near the border is adequate corroboration of alienage.

12         The government also attempts to further limit the need for mode-of-entry

13   evidence by arguing that the arresting agent, Agent Nirelli, "had never heard of aliens

14   being smuggled across the broader in a vehicle and then dropped off . . . . Nor would

15   such a course of conduct be at all logical." Gov't Response at 5–6. This

16   mischaracterizes known conduct along the border. As far back as 1981, courts have

17   acknowledged that "[a]mong alien smugglers, a common tactic to avoid detection at a

18   checkpoint is to let the aliens out before reaching the checkpoint, let them walk *through*

19   *the desert* around it, and rendezvous with the smuggler's vehicle farther down the

20   highway. *United States v. Cardona*, 524 F. Supp. 45, 48 (W.D. Tex. 1981) (emphasis

21   added). This tactic has been seen from Texas to California. *See United States v. Martinez-*

22   *Lopez*, 846 F. App'x 283, 284 (5th Cir. 2021) ("[T]he agents believed that the eight

23   individuals had been dropped off south of the checkpoint and were attempting to walk

24   around the checkpoint to rejoin their driver . . . ."); *United States v. Ruiz-Hernandez*, No.

25   CR 16-511-TUC-CKJ, 2017 WL 1047236, at *4 (D. Ariz. Mar. 17, 2017), aff'd, 751 F.

26   App'x 1022 (9th Cir. 2019) ("[W]e look at all the immigration enforcement activities

27   that took place in proximity to this checkpoint as people, from our intell (sic) indicates,

28   that they're dropped off and asked to walk around the checkpoint to circumvent the

1   Border Patrol agents at this checkpoint . . . .").

2   While the government failed to provide corroborating information, the court
3   also ignored several pieces of contrary information. First, Agent Nirelli testified that
4   the border fence south of the area was covered in barbed wire, yet there was no
5   indication that Mr. Hernandez or the man he was travelling with, Mr. Argueta, had
6   torn clothing or other injuries that would have indicated such an obstacle. Second, in
7   denying discovery related to the potential smuggler and white van in the area, the
8   Magistrate Judge failed to consider corroboration that Mr. Hernandez and Mr. Argueta
9   had been smuggled through a port of entry. And although the government argued that
10  a database search indicated that Mr. Hernandez had not "entered lawfully though a
11  port of entry by presenting documents," *id.* at 81:11–14, that fails to address that
12  Mr. Hernandez may have gotten to the area through other means, particularly in light
13  of the other known activity in the area, including hiking.

14  Finally, in its response, the government summarily concludes Mr. Hernandez's
15  later admission of alienage is inherently reliable, satisfying the second prong as required
16  by the doctrine of *corpus delicti*, because it was "videotaped, voluntary, and occurred
17  after [the accused was advised] of his *Miranda* rights." *United States v. Valdez-Novoa*, 780
18  F.3d 906, 925 (9th Cir. 2015). However, that fully ignores the inadequate advisal based
19  on the mistranslation and two-step interrogation of Mr. Hernandez in the taking of his
20  statement, as discussed in both Mr. Hernandez's opening brief and further addressed
21  below. The government failed to corroborate already unreliable statements, and
22  deepened the error by making several claims that are not supported by the testimony.

23  **II.   The government both failed to establish there was reasonable**
24  **suspicion to enact the stop and the initial detention was, in fact, an**
    **arrest.**

25  As Mr. Hernandez argued at trial, "[He] and this other individual were found
26  near a hiking trail. One of the field agents testified they had backpacks. There was no
27  reason to stop them. All the government presented was that they were stopped because
28  there were two individuals with backpacks near hiking trails." Tr. at 82: 18–23. The

Appellant's Reply Brief

1  government, throughout its response, consistently argues this is a "classic immigration

2  stop." Gov't Response at 8, 9. There are several reasons this is not a classic stop,

3  especially in light of the Ninth Circuit's holding in *United States v. Brown*, 925 F.3d 1150

4  (2019), establishing that flight alone does not create reasonable suspicion.

5  In most of the cases the government cites to, agents were within *sight* of the

6  border. The government cited to *United States v. Ramos* as an analogous case, but *Ramos*

7  is a pre-*Brown*, unpublished opinion, which has since been foreclosed. That case, along

8  with the current one, is in tension with the reasoning in *Brown*.

> With no reliable tip, no reported criminal activity, no threat of harm, no
> suggestion that the area was known for high crime or narcotics, no
> command to stop, and no requirement to even speak with the police, we
> are left with little more than Brown's flight from the officers, which is not
> enough under the circumstances. In today's world, Justice Stevens'
> observations some twenty years ago are particularly prescient:
>> Among some citizens, particularly minorities and those
>> residing in high crime areas, there is also the possibility that
>> the fleeing person is entirely innocent, but, with or without
>> justification, believes that contact with the police can itself
>> be dangerous, apart from any criminal activity associated
>> with the officer's sudden presence.

17  *Brown*, 925 F.3d at 1151–52 (citing *Illinois v. Wardlow*, 528 U.S. 119, 132 (2000) (Stevens,

18  J., concurring in part and dissenting in part)). The only other case cited by the

19  government arguing that a "classic immigration stop" occurred some distance from

20  the border, *United States v. Cervantes-Flores*, 421 F.3d 825, 829-30 (9th Cir. 2005), *overruled*

21  *in part on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S.305 (2009), was overruled

22  by the time *Brown* was decided, obviating the need to address its holding. By virtue of

23  the distance from the border, this is not a "classic immigration stop," and requires

24  more than the bare facts provided by the government to establish reasonable suspicion:

25  two men, with backpacks, near hiking trails, who happened to be Latino.

26  Beyond the fact that the government lacked reasonable suspicion,

27  Mr. Hernandez was then improperly placed under arrest, especially when viewed in

28  light of the *Kim* factors discussed in Mr. Hernandez's opening brief. *United States v. Kim*,

292 F.3d 969, 973–76 (9th Cir. 2002). When Agent Nirelli approached Mr. Hernandez, he was wearing his full uniform, was armed, had a radio playing dispatch in English, and there was a loud helicopter clearly marked as law enforcement overhead. Appellant's Opening Brief, Exh. A at 62–63. Such a situation bears little resemblance to when a person willingly "comes to the police station" or "volunteer[s] to answer law officers' questions" and thus would feel free to leave. *Kim*, 292 F.3d at 974–95. Alone and away from other onlookers, the "physical surroundings of the interrogation" also support a finding of custody. *Kim*, 292 F.3d at 974. Where an encounter is public, such as a traffic stop, this "exposure to public view" not only "reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements," it also "diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984). By contrast, Agent Nirelli encountered Mr. Hernandez, and the only other person around, apart from the helicopter overhead, was also in handcuffs. These circumstances did not offer "solace or protection." *Galindo-Gallegos*, 244 F.3d at 735  (Paez, J., concurring). The surroundings of the encounter provided no "exposure to public view" that would reassure a reasonable person they would be free to leave. *Berkemer*, 468 U.S. at 438.

Also important, the year before Mr. Hernandez's arrest, then-Attorney General Jeff Sessions implemented a "zero-tolerance policy" requiring prosecution of all migrants who unlawfully cross the southwestern border.[1] Given this highly publicized push to arrest, punish, and deport migrants, no reasonable person in Mr. Hernandez's situation would have believed they could "freely walk away" from a Border Patrol officer who stopped them in a remote area near the border. *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013). And under decades-old Supreme Court precedent, Border Patrol agents may consider a person's race as a "relevant factor" in determining

---

[1] "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, *available at*: https://www.justice.gov/opa/pr/attorney-general-announces-zerotolerance-policy-criminal-illegal-entry.

1    whether a person has unlawfully crossed the border. *United States v. Brignoni–Ponce*, 422

2    U.S. 873, 885, 887 (1975); *see also United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.

3    1982) (confirming that Border Patrol may rely on "the characteristic appearance of

4    aliens" to detain an individual). While a white person detained by Border Patrol in a

5    remote area near the border might believe their detention is temporary, a person of

6    color in the same circumstances would correctly believe that a Border Patrol agent

7    could consider their race in deciding whether to arrest them, suggesting that they were

8    not free to leave. *See Brignoni-Ponce*, 422 U.S. at 885, 887. And because Mr. Hernandez

9    is a person of color, a "reasonable person" in his shoes would not have felt able to

10   "freely walk away" from the Border Patrol agents. *Barnes*, 713 F.3d at 1204.

11       In sum, the government both lacked reasonable suspicion, and by extension

12   probable cause, violating Mr. Hernandez's rights when he was placed under arrest.

13   **III.   The government's argument regarding the mistranslated *Miranda***

14   **      warning misstates the law and common-sense synonyms.**

15       *Miranda v. Arizona*, 384 U.S. 436 (1966), requires that a suspect be informed of

16   his constitutional rights before being interrogated—that requirement is unequivocal.

17   *United States v. Connell*, 869 F.2d 1349 (9th Cir. 1989), makes this clear, and as the

18   government includes in its response, the Ninth Circuit held that the warnings in that

19   case "fell below minimum required standards" because they were "equivocal and open

20   to misinterpretation." *Id.* at 1353. The government argues that the warnings were

21   inadequate solely because they left the impression that the government would not pay

22   for a lawyer. Gov't Response at 13. This misstates the holding of *Connell*, which is

23   instead questioning if the warnings were "equivocal and open to misinterpretation."

24   *Id.* In particular, the court in *Connell* said that "using the word 'may', leaves the

25   impression that providing an attorney, if Connell could not afford one, was

26   discretionary with the government . . . ." *Connell*, 869 F.2d at 1353. This was then

27   further exacerbated by additional statements made by the government.

28       This misstatement of the law is particularly troubling in light of the claim that

1   the use of "can" is more similar to "will" than "may." Using an example of helping

2   customers in a store, the government ignores common sense principles of synonyms.

3   In fact, Merriam-Webster itself has its own "Can vs. May: Usage Guide" to deal with

4   the interchangeability of the words, saying:

> 5   Can and may are most frequently interchangeable in uses denoting
> possibility; because the possibility of one's doing something may depend
> 6   on another's acquiescence, they have also become interchangeable in the
> sense denoting permission. The use of can to ask or grant permission has
> 7   been common since the 19th century and is well established, although
> 8   some commentators feel may is more appropriate in formal contexts.[2]

9   To argue otherwise is to ignore common sense in an effort to rectify the ambiguity of

10   the warnings given to Mr. Hernandez. Here, Agent Cadena used a non-standard form

11   of the Spanish-language *Miranda* advisement, translating it to say: "If you do not have

12   the money to employ an attorney, one *can* be provided to you before we ask any

13   questions, if you wish." Appellant's Opening Brief, Exh. G at 120–21 (emphasis

14   added). This is both equivocal and open to misinterpretation, just as in *Connell*,

15   "leav[ing] the impression that providing an attorney, if [Mr. Hernandez] could not

16   afford one, was discretionary with the government . . . ." *Connell*, 869 F.2d at 1353.

**IV.   The court improperly denied discovery necessary to question the same circumstantial evidence on which the government relied.**

19   The court's refusal to order the government to turn over information regarding

20   Eduardo Verduzco or the white van traveling northbound in the vicinity of Mr.

21   Hernandez's arrest, both discussed on the dispatch tape within minutes of the agent's

22   approach of Mr. Hernandez, violated his due process rights, as such information was

23   material and favorable to Mr. Hernandez's defense. Despite the government's

24   misleading "attempt" argument, it has failed to show how the discovery requested falls

25   outside of the scope of *Brady*. This situation is akin to *United States v. Stever*, 603 F.3d

---

[2] May, Merriam-Webster (2023), available at: https://www.merriam-webster.com/dictionary/may; *see also* 'Can' vs. 'May,' Merriam-Webster (2023, available at: https://www.merriam-webster.com/grammar/when-to-use-can-and-may.

1   747, 754 (9th Cir. 2010), where the district court erroneously denied access to evidence
2   in the government's possession related to third-party culpability. In *Stever*, the
3   government conceded its reliance on circumstantial evidence. *See id.* As stated in its
4   response, the government here similarly concedes that "[t]he circumstantial evidence
5   of Appellant's mode of entry more than corroborated his statements." Gov't Response
6   at 5. And as in *Stever*, the government asked the judge to infer Mr. Hernandez's guilt
7   based primarily on this circumstantial evidence. *Id.* Finally, "Stever sought to counter
8   the circumstantial inferences that the Government asked the jury to draw with
9   evidence of other, logically relevant circumstances from which obverse inferences to
10  those sought by the Government could be drawn." *Id.* Here, the government only
11  offered circumstantial evidence regarding the way Mr. Hernandez entered, as required
12  under *Corrales-Vazquez*, yet withheld discovery from which an adverse inference could
13  be made—specifically, that Mr. Hernandez entered through a port of entry.

14   **V.     The government makes several improper claims regarding the**
15   **evidence the court would have ordered if Mr. Hernandez had given**
     **up his right to a speedy trial.**

16          As an initial matter, the government makes several assertions regarding the
17  defense's tardiness in making discovery requests, while ignoring the discovery handed
18  over by the government on the eve of trial, including that Agent Nirelli—the very
19  agent who was the focus of the defense's discovery requests—was a member of the "I
20  am 10-15" Facebook group.

21          The government asserts that it "has no duty to disclose materials not in the
22  possession of the prosecution team," without including a single citation. On the
23  contrary, evidence within a prosecutor's "possession" is "not limited to what the
24  prosecutor personally knows." *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir.
25  2019). Prosecutors are in a "unique position to obtain information known to other
26  agents of the government" and thus "have an obligation to disclose what they do not
27  know but could have learned." *Id.* (quotations and alterations omitted). This obligation
28  may require prosecutors to "obtain information held by other executive branch

1   agencies." *Id.* At a minimum, the prosecutor "will be deemed to have knowledge of
2   and access to anything in the possession, custody or control of any federal agency
3   participating *in the same investigation of the defendant.*" *Id.* at 1025 (emphasis in *Cano*).

4        In this case, the defense requested information related to Agent Nirelli, a Border
5   Patrol Agent employed by United States Customs and Border Protection, the largest
6   federal law enforcement agency of the United States Department of Homeland
7   Security. Similarly, this same agency would have access to the requested Form I-589
8   of the man traveling with Mr. Hernandez, which could have been provided by the very
9   same A-File custodian who testified at trial. The government, in its response, states
10  that the "Form -I589, used to apply for asylum, merely asks for the date, place and
11  status of entries," seemingly to undermine the defense's need for this form. Yet, the
12  government has stated exactly why the defense requested it in discovery. It would show
13  Mr. Argueta's place of entry when he entered with Mr. Hernandez.

14       Finally, the government ignores that the court was willing to order such
15  discovery if Mr. Hernandez was willing to continue his trial date. As the Supreme Court
16  has made clear several times in *Brady* and its progeny, the disclosure of such
17  information, specifically requested before trial, is a continuing duty. *See United States v.*
18  *Agurs*, 427 U.S. 97, 103 (1976), *holding modified by United States v. Bagley*, 473 U.S. 667
19  (1985); *see also Bagley*, 473 U.S. at 709 (Stevens, J., dissenting). In this case, the defense
20  followed up on this discovery on June 14, 2023. *See* Exh. A, Email Request for
21  Discovery. The request for this evidence has gone ignored.

22                                **Conclusion**
23       For the above reasons, Mr. Hernandez's conviction should be vacated.

24                                    Respectfully submitted,

25  Dated: August 2, 2023          *s/ Stephen J. Piotrkowski*
                                   _____
26                                 Stephen J. Piotrkowski
                                   Federal Defenders of San Diego, Inc.
27                                 Attorneys Mr. Hernandez-Villalobos
                                   Email: Stephen_Piotrkowski@fd.org
28