No. 23-2362

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

OLISER HERNANDEZ,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
3:19MJ23508-MSB-AJB*

**ANSWERING BRIEF FOR THE UNITED STATES**

TARA K. MCGRATH
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division*

ANDREW Y. CHIANG
*Assistant U.S. Attorney*

*880 Front St., Rm. 6293
San Diego, CA 92101
(619) 546-8756*

**TABLE OF CONTENTS**

Page

Jurisdiction and Bail Status ....................................................1

Questions Presented.................................................................2

Statutory Provisions.................................................................2

Statement of Facts ..................................................................2

I.    Hernandez and another man were found hiding in
a large bush near the U.S.-Mexico border. ....................2

II.   Hernandez gave a full confession after waiving his
*Miranda* rights orally and in writing.............................5

III.  The United States issued a warrant to deport
Hernandez and simultaneously charged him under
the criminal laws.............................................................6

IV.  Hernandez's first motion to compel.................................7

V.   Hernandez requested multiple trial postponements,
filed untimely motions, and instituted a civil lawsuit....8

VI.  Hernandez's second (untimely) motion to compel. .......10

VII. After allowing time for full briefing, the court held
a hearing on the second discovery motion the morning
of trial..........................................................................13

VIII.Hernandez was convicted in a two hour long
bench trial.....................................................................18

IX.  The district judge affirmed the conviction. ..................19

Summary of Argument...........................................................20

Argument ...............................................................................22

I.  The district court properly affirmed the denial of the motion to suppress because Hernandez received an adequate *Miranda* warning......................................22

    A.  Standard of review. ..................................23

    B.  The word "can" in the warning to Hernandez did not convey uncertainty about his right to appointed counsel..................................23

    C.  Any error was harmless. ...........................26

II. The magistrate judge was within his discretion in denying discovery related to Eduardo Verduzco. .........28

    A.  Standard of review. ..................................28

    B.  Information relating to Eduardo Verduzco did not fall under *Brady* or Rule 16...........................28

III. The magistrate judge did not force Hernandez to choose between his right to discovery and his right to a speedy trial. .............................................32

    A.  Hernandez waived his claims to additional discovery. ...............................................32

    B.  The Speedy Trial Clause did not require Hernandez's trial to begin on November 10, 2020....................................................34

    C.  Hernandez also had no right under *Brady* or Rule 16 for Argueta's asylum file or Agent Nirelli's personnel file. ......................................40

Conclusion..............................................45

Certificate of Compliance

Addendum..............................................A1

## TABLE OF CONTENTS

Cases:

*Arizona v. Fulminante*,
499 U.S. 279 (1991) ........................................................26

*Barker v. Wingo*,
407 U.S. 514 (1972) .................................................35, 36

*Brady v. Maryland*,
373 U.S. 83 (1963) .........................................................28

*California v. Prysock*,
453 U.S. 355 (1981) .......................................................24

*Chapman v. California*,
386 U.S. 18 (1967) .........................................................26

*Demarest v. Manspeaker*,
498 U.S. 184 (1991) .......................................................38

*Doggett v. United States*,
505 U.S. 647 (1992) .......................................................37

*Florida v. Powell*,
559 U.S. 50 (2010) ..............................................23, 24, 25

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) .........................................................38

*Hunt v. Mitchell*,
261 F.3d 575 (6th Cir. 2001) ..........................................37

*Kyles v. Whitley*,
514 U.S. 419 (1995) .................................................28, 44

*Linney v. Cellular Alaska*,
151 F.3d 1234 (9th Cir. 1998) ..................................33, 44

*Reyn's Pasta Bella LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006) ............................................3

*Ryan v. ICE,*
    974 F.3d 9 (1st Cir. 2020)..........................................10, 39

*Sablan v. Dept. of Finance of Northern Mariana Islands,*
    856 F.2d 1317 (9th Cir. 1988) .............................33, 34, 44

*Simmons v. United States,*
    390 U.S. 377 (1968) ........................................................37

*United States v. Amlani,*
    111 F.3d 705 (9th Cir. 1997) ..........................................31

*United States v. Bagley,*
    473 U.S. 667 (1995) ........................................................28

*United States v. Bernal-Sanchez,* No. 21-50276,
    2023 WL 7179469 (9th Cir. Nov. 1, 2023) .....................43

*United States v. Bibiano-Mayo,* No.3:19MJ23205,
    2020 WL 3250182 (S.D. Cal. June 15, 2020).................27

*United States v. Butler,*
    249 F.3d 1094 (9th Cir. 2001) ........................................27

*United States v. Clymer,*
    25 F.3d 824 (9th Cir. 1994) ....37*United States v. Connell,*
    869 F.2d 1349 (9th Cir. 1989). .................................25, 26

*United States v. Corrales-Vazquez,*
    931 F.3d 944 (9th Cir. 2019) ..........................................29

*United States v. Esquivel,*
    88 F.3d 722 (9th Cir. 1996) ..............................................3

*United States v. Gonzalez-Godinez,*
    89 F.4th 1205 (9th Cir. 2024)...................................23, 45

*United States v. Grimaldo,*
    993 F.3d 1077 (9th Cir. 2021) ........................................33

*United States v. Henthorn,*
    931 F.2d 29 (9th Cir. 1991) .................................41, 42, 43

*United States v. Jackson*,
    390 U.S. 570 (1968) ........................................................ 37

*United States v. Jennings*,
    960 F.2d 1488 (9th Cir. 1992) ........................................ 41

*United States v. Jimenez-Peralta*, No. 23-1290,
    2024 WL 4304895 (9th Cir. Sept. 26, 2024) .................. 44

*United States v. Lam*,
    251 F.3d 852 (9th Cir. 2001) .......................................... 35

*United States v. Leal-Del Carmen*,
    697 F.3d 964 (9th Cir. 2012) .......................................... 41

*United States v. Loud Hawk*,
    474 U.S. 302 (1986) ........................................................ 36

*United States v. Lucas*,
    841 F.3d 796 (9th Cir. 2016) ....................................28, 29

*United States v. Mandel*,
    914 F.2d 1215 (9th Cir. 1990) ........................................ 29

*United States v. McDonald*,
    456 U.S. 1 (1982) ............................................................ 36

*United States v. Mehrmanesh*,
    652 F.2d 766 (9th Cir. 1981) .......................................... 34

*United States v. Morales*,
    684 F.3d 749 (8th Cir. 2012) ....................................34, 44

*United States v. Muniz-Jazquez*,
    718 F.3d 1180 (9th Cir. 2013) ........................................ 31

*United States v. Murillo*,
    288 F.3d 1126 (9th Cir. 2002) ..................................34, 35

*United States v. Nance*,
    666 F.2d 353 (9th Cir. 1982) .......................................... 35

*United States v. Nickerson,*
  731 F.3d 1009 (9th Cir. 2013) ........................................34

*United States v. Olano,*
  507 U.S. 725 (1993) ................................................33, 39

*United States v. Perez,*
  116 F.3d 840 (9th Cir. 1997) (en banc) ..........................33

*United States v. San Juan-Cruz,*
  314 F.3d 384 (9th Cir. 2002) .......................................23

*United States v. Santiago,*
  46 F.3d 885 (9th Cir. 1995) ..............................28, 29, 40

*United States v. Stever,*
  603 F.3d 747 (9th Cir. 2010) .................................28, 31

*United States v. Tiger,*
  223 F.3d 811 (8th Cir. 2000) .......................................34

*Velazquez-Hernandez v. ICE,*
  500 F.Supp.3d 1132 (S.D. Cal 2020) ............................38

Statutes:

  8 U.S.C. § 1325............................................................ passim

  8 U.S.C. § 1357(a) ........................................................39

  18 U.S.C. § 3231 ............................................................1

  18 U.S.C. § 3402 ............................................................1

  18 U.S.C. § 3581(b)(7) ..................................................34

  28 U.S.C. § 1291 ............................................................1

Rules:

  Fed. R. App. P. 4(b)(1)(A)(I)..........................................1

  Fed. R. Crim. P. 58(g)(2)(B)...........................................1

Fed. R. Evid. 201(b) ............................................................3

No. 23-2362

# United States Court of Appeals
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

OLISER HERNANDEZ,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court*
*for the Southern District of California*
*3:19MJ23508-MSB-AJB*

## JURISDICTION AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231 after Hernandez was charged with a misdemeanor count of attempting to illegally enter the United States. Excerpts of Record (ER)-272. He was tried before a magistrate judge who found him guilty and sentenced him to time served. ER-21. He timely appealed to the district judge under 18 U.S.C. § 3402 and Fed. R. Crim. P. 58(g)(2)(B). ER-283. After a years-long stay for this Court to resolve a legal issue not relevant here, ER-283–84, the district judge denied the appeal. ER-16. Hernandez timely noticed an appeal under Fed. R. App. P. 4(b)(1)(A)(I) to this Court, which has jurisdiction under 28 U.S.C. § 1291. ER-274. Hernandez is at liberty.

1

## QUESTIONS PRESENTED

1.     An agent told Hernandez that if he could not afford an attorney "one can be provided to you before we ask you any questions." Did this advisal convey uncertainty about the right to appointed counsel such that it violated *Miranda*?

2.     Was the magistrate judge within his discretion in denying discovery related to "Eduardo Verduzco," a name briefly mentioned over helicopter dispatch around the time Hernandez was spotted, but which otherwise had no perceptible connection to Hernandez or his charged offense?

3.     By giving Hernandez the option to postpone trial to discover additional items belatedly sought, did the judge force him to choose between the right to discovery and the right to a speedy trial, when Hernandez had no right for trial to begin by November 10, 2020, no right to the discovery at issue, and no ruling to appeal because he withdrew his claims for a strategic purpose?

### STATUTORY PROVISIONS

Pertinent statutory provisions are set forth in the addendum to this brief.

### STATEMENT OF FACTS

I.    Hernandez and another man were found hiding in a large bush near the U.S.-Mexico border.

Hernandez lived in the United States for a time before he got into trouble with the law. See ER-111. In 2011, he was convicted of DUI. Some years later, in 2014, he was convicted of spousal abuse. Next year he was convicted of hit-and-run. In November 2018, Hernandez was deported by order of an immigration judge. 2-Supplemental Excerpts of Record (SER)-326–28.[1]

Less than a year later, on August 22, 2019, around 4:15 p.m., a border agent operating a surveillance scope in the Brown Field area of responsibility spotted two people making "their way across the rugged terrain" by "cutting across country through the brush and on the hillside." ER-45, 49 and 50. They were about 2.5 miles north of the border and eight miles west of the Tecate port of entry.

---

[1] Hernandez incorporates in this appeal court proceedings and docket entries outside of the district court record, including the 2020 lawsuit to enjoin in-court immigration arrests. See, e.g., AOB 18–19 (omitting that Hernandez was one of the plaintiffs). To provide a fair and accurate response, the United States has compiled relevant docket entries from the Southern District of California and presented them in Volume 2 of the SER. These entries are not subject to reasonable dispute and, where necessary, this Court "may take judicial notice of court filings and other matters of public record." *Reyn's Pasta Bella LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); see *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996) (taking judicial notice "to rebut similar data presented by" appellant); Fed. R. Evid. 201(b).

3

ER-72. The agent called out their location over the radio to a CBP helicopter and other agents positioned nearby. ER-49.

Agent Luke Nirelli responded and was guided by the helicopter to a large bush. ER-78. There he found Hernandez and another man, Luis Argueta-Zavala, hiding inside the bush. ER-78–79 and 230. They were in a remote area commonly traversed by illegal border crossers because there was no border wall to the south but instead just a small barbed-wire fence. ER-73.

 

1-SER-98 and 100.

Agent Nirelli asked Hernandez and Argueta in Spanish about their immigration statuses. ER-80–81. Hernandez said he was from Mexico; Argueta said he was from El Salvador. ER-82 and 134. Both admitted they had entered the United States illegally without documents. ER-82 and 134. Both were arrested. ER-134.

4

II.   Hernandez gave a full confession after waiving his *Miranda* rights orally and in writing.

At the border patrol station, Agent Juan Cadena gave Hernandez the standard *Miranda* warnings. See ER-258. The agent followed the Spanish section of the following I-214 form:

**I-214 (Spanish)**

Antes de que le hagamos cualquier pregunta, usted debe de comprender sus derechos:

- Usted tiene el derecho de guardar silencio.
- Cualquier cosa que usted diga puede ser usada en su contra en un juzgado de leyes, o en cualquier procedimiento administrativo o de inmigración.
- Usted tiene el derecho de hablar con un abogado para que él lo aconseje antes de que le hagamos alguna pregunta, y de tenerlo presente con usted durante las preguntas.
- Si usted no tiene el dinero para emplear a un abogado, se le puede proporcionar uno antes de que le hagamos alguna pregunta, si usted lo desea.
- Si usted decide contestar nuestras preguntas ahora, sin tener a un abogado presente, siempre tendrá usted el derecho de dejar de contestar cuando guste. Usted también tiene el derecho de dejar de contestar cuando guste, hasta que puede hablar con un abogado.

**I-214 (English)**

Before we ask you any questions, you must understand your rights:

- You have the right to remain silent.
- Anything you can say can be used against you in court, or in any immigration or administrative proceeding.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.
- You also have the right to stop answering at any time until you talk to a lawyer.

Do you understand each of these rights as I have read them to you?  YES  Iniciales XO H
Entiende usted a cada uno de sus derechos como se los he leído?
Are you willing to answer my questions without an attorney being present?  YES  Iniciales O H
Esta usted dispuesto a contestar mis preguntas sin tener a un abogado presente?

**Yes.**          **No.**

Oliser Hernandez                    X
Nombre/Name                          Firma/Signature

ER-228; compare ER-263–64.

The interview transcript translated Agent Cadena's advisal about appointed counsel to say: "If you do not have the money to employ an attorney, one *can* be provided to you before we ask you any questions." ER-264 (emphasis added). This was slightly

5

different from the English text on the I-214 form: "If you cannot afford a lawyer, one *will* be appointed for you before any questioning if you wish." ER-228 (emphasis added).

Hernandez told Agent Cadena he understood his rights and was willing to forego an attorney. ER-265. Hernandez confirmed the same in writing by initialing and signing the I-214 form. ER-228. Hernandez then confessed that he had illegally entered the United States the previous afternoon, on August 21, by "walk[ing] through the mountain." ER-268–69. He explained that he did not present himself for proper inspection at an entry port because he had been deported from the United States. ER-269. He was trying to reach Los Angeles to be with his family. ER-270.

III. **The United States issued a warrant to deport Hernandez and simultaneously charged him under the criminal laws.**

The next day, the Department of Homeland Security reinstated Hernandez's order of removal and issued a warrant to deport him. 2-SER-326–28. The warrant "command[ed]" immigration officials to "take into custody and remove from the United States the above-named alien." 2-SER-326.

At the same time, DHS transferred Hernandez to the custody of the Department of Justice for prosecution. ER-272. DOJ charged

Hernandez with a misdemeanor count of attempting to illegally enter the country in violation of 8 U.S.C. § 1325(a)(1). ER-272.

Hernandez was arraigned in federal court in the Southern District of California. ER-278. A magistrate judge set bond at $8,000, to be secured by the signature of another adult, half of which needed to be paid up front in cash. ER-278. Because Hernandez could not meet this bond, the judge later waived the adult surety requirement and permitted a nonprofit advocacy group, The Bail Project, to post the cash. ER-279. Hernandez was released on October 1, 2019, after 40 days in custody. ER-279.

IV. Hernandez's first motion to compel.

After being released, Hernandez, through his attorneys, began filing motions. He filed a 48-page omnibus motion arguing the many ways his prosecution purportedly violated the Constitution and various reasons why evidence should be suppressed. 1-SER-3–50. Embedded in the filing was a request to compel the United States to produce information regarding Argueta, who requested asylum and who under the Migrant Protection Protocols had been sent to Mexico to await further hearings. 1-SER-31; ER-138. Hernandez also requested information as to whether any agent involved in his case was a member of the "I'm 10-15" Facebook group. 1-SER-33. In response,

7

the United States produced Argueta's arrest report and sworn statement. 1-SER-65. In that statement, Argueta revealed he had "jumped a border wall" around 3:00 a.m. on August 22, 2019, a different time and day from when Hernandez "walked through the mountain." 1-SER-77; ER-268. In regard to agent impeachment information, the United States said it would follow the requirements established by this Court in *Henthorn*. 1-SER-66.

The court held a hearing on the motions on November 21, 2019. ER-209. It denied each of Hernandez's motions to dismiss. ER-212. It denied his motions to suppress, including the request to suppress his confession at the station. ER-212. Turning to the motion to compel, counsel for Hernandez agreed that it could be denied as moot, because the United States had "produced substantial discovery" and there was no "ongoing issue." ER-212.

The magistrate judge set trial for February 21, 2020, which Hernandez said was "perfect." ER-212. The judge made clear that going forward, additional motions would be permitted only if they were based on newly discovered evidence. ER-212 and 281.

V. Hernandez requested multiple trial postponements, filed untimely motions, and instituted a civil lawsuit.

Trial did not occur in February 2020. The court granted four continuances (three joint requests and one request to which

Hernandez did not object) that postponed the trial for a period of nine months until November 2020. ER-281–82. The continuances were based on the COVID-19 pandemic as well as "familial emergencies." 1-SER-84. Meanwhile, the United States continued to produce relevant discovery, 1-SER-80, and Hernandez continued to live at liberty in the United States. ER-280–82.

Many months later, on October 9, 2020, Hernandez filed a "Motion for Leave to File Untimely Motions." 1-SER-84. He notified the court that he now wished to litigate "his likely civil removal arrest at his trial," request additional discovery, and relitigate the constitutionality of 8 U.S.C. § 1325. 1-SER-84–85. Hernandez assured the court that his speedy trial rights would not be impacted by additional delays because he was "on bond and delay to resolve the motions will not prejudice him." 1-SER-85.

Without awaiting the court's approval, Hernandez then filed a motion "to prohibit his unlawful and unconstitutional" arrest by immigration authorities in court. ER-193. He requested the court to "stay the pending trial" to resolve that motion. ER-194. If the court did not grant him relief, Hernandez asked to further postpone the upcoming trial so he could appeal. ER-206. The court denied Hernandez's motions, finding them "inexcusably late" and not based on newly discovered evidence. 1-SER-88.

9

Shortly afterwards, on October 19, Hernandez filed a civil lawsuit and motion for temporary restraining order. 2-SER-199 and 224. He was joined by a group of other § 1325 defendants who all shared a common interest in stopping immigration officers from taking them into custody at the federal courthouse. 2-SER-199 and 224. Their legal theory had previously been litigated without success in the Southern District of California, *United States v. Velazquez-Morales*, No. 20MJ20275-MDD-JLS, 2020 WL 5993918 (S.D. Cal. October 9, 2020), and in the First Circuit Court of Appeals. *Ryan v. ICE*, 974 F.3d 9 (1st Cir. 2020).

The lawsuit was assigned to a (different) district judge. 2-SER-189. On October 21, this judge temporarily suspended immigration arrests in the courthouse until the TRO could be fully briefed and heard. 2-SER-262. The hold on in-court arrests was scheduled to be "in effect through November 11, 2020." 2-SER-262.

VI.   Hernandez's second (untimely) motion to compel.

On October 23, two weeks before trial, Hernandez brought a second motion to compel. ER-119. This motion was filed one year after the October 15, 2019 motion deadline, ER-279, eleven months after the court forbade additional motions absent newly discovered evidence, ER-281, and two weeks after the court had admonished Hernandez for filing inexcusably late motions. 1-SER-88.

10

The second motion to compel sought a number of additional items from the United States, none of which was newly discovered. ER-123–130. For example, Hernandez sought records relating to Argueta's asylum claim, ER-126, even though Hernandez previously told the court there was no issue with what the United States had already produced in relation to Argueta. ER-212. Hernandez also sought information regarding "Eduardo Verduzco," whose name was mentioned over helicopter dispatch around the time Hernandez was spotted near the border. ER-126 and 143. Notwithstanding that Hernandez had the dispatch tape for about a year, ER-212 and 250, he now wanted more information about Verduzco because "it appears agents were interested in" his "questionable crossing record" and his vehicle. ER-126.

Counsel for Hernandez also asked the court to order the production of Agent Nirelli's disciplinary history and other items in his agency personnel file. ER-129. She claimed that she had conducted an "independent investigation" into Agent Nirelli's conduct in a past criminal case, *United States v. Valdes*, No. 16CR2950-BAS (S.D. Cal.), and learned that he "beat[] a defendant who was lying face down on the ground," "wrote a false arrest report," and "adopted false reports of fellow agents." ER-128.

11

Counsel's representations about Agent Nirelli were not consistent with court records. In that other case, Jeffery Valdes was charged by information with transporting aliens after absconding from a checkpoint with two aliens in the trunk of his car. 2-SER-165; ER-189. After a high speed chase, Valdes ditched the vehicle with the engine running and fled the scene. ER-189. As agents tended to the people trapped in the car, Agent Nirelli searched for Valdes, finding him hours later in a residential area. ER-189–90. According to Agent Nirelli's report, he pursued Valdes and handcuffed him "after a short struggle" because Valdes would not "give me his hands." ER-185. Agent Nirelli's report focused on his own conduct and did not adopt anyone else's statement. ER-185.

In pretrial litigation, Valdes tried to dismiss the case by claiming "outrageous government conduct." ER-165. He alleged that Agent Nirelli had "stomped on his back" and hit him "two to three times with an object that he believes was a flashlight." ER-162–163. He also alleged that a different agent had abused the material witnesses hidden in the car. ER-161.

Valdes abandoned these allegations. Medical records submitted in litigation showed that Valdes complained to agents about heroin withdrawal and back pain, but he never complained about being hit with a flashlight, and later at the hospital, did not

12

complain about any pain at all or display observable injuries. ER-180; 2-SER-173. Subsequently, a grand jury indicted Valdes for the same incident under a different case number. 2-SER-183. The United States dismissed the first case and Valdes pleaded guilty in the new case to transporting aliens. 2-SER-170 and 178. He never raised his allegations again or filed another motion to dismiss. Valdes was sentenced to 27 months in prison. 2-SER-185–86.

VII.  After allowing time for full briefing, the court held a hearing on the second discovery motion the morning of trial.

After giving the United States an opportunity to respond to the belated motion to compel, 1-SER-89, and for Hernandez to file a reply, ER-115, the magistrate judge convened a hearing on November 10, 2020, the morning of trial—one day before the scheduled end to the pause on in-court immigration arrests. ER-24–42; 2-SER-262. Concurrently, on the same day, the civil judge held a hearing on the TRO but did not make a ruling. 2-SER-196.

At the hearing in the criminal case, Hernandez previewed what his defense was going to be. He suggested he did not enter outside a port of entry, as charged, but that he possibly snuck through or was smuggled through the port in violation of § 1325(a)(2)—not charged. ER-29. He argued that his manner of entry might be established by Argueta's asylum records. ER-26.

13

The magistrate judge was skeptical. "[H]ow would [Argueta's] immigration records contain any statements about Mr. Hernandez?" ER-27. The AUSA was also incredulous. He said it was "unlikely" that Argueta's asylum file had "anything to do with" Hernandez's entry. ER-28. The AUSA pointed out that Argueta's statements about his own entry had already been produced. ER-27. And, in any case, the asylum file was being maintained by the immigration court, not by the prosecution. ER-27.

The judge raised a practical problem. "Well, I can't get these records to you today. So that's your call then." ER-28. Counsel for Hernandez, after conferring with her client, decided, "we'll proceed today without discovery." ER-28. She complained, however, that her motion was filed "a couple weeks ago" and yet the AUSA did not bring the records to court "in the event that the court did rule in our favor today." ER-28. The judge clarified, "Well, I haven't ruled in your favor." ER-29. "I'm willing to, but if you're not wanting me to, then either, A, we move forward and you withdraw your request, or B, we put it over. I mean, you sort of don't get it both ways." ER-29. Counsel confirmed she would "withdraw" her request with respect to Argueta's asylum file. ER-29.

The discussion turned to Eduardo Verduzco. The AUSA argued that the mere mention of that name on the helicopter

14

dispatch bore no relevance to Hernandez. ER-30. "The only thing that links the two of them together is they're being discussed in the same sector which is a large area of the Southern District on the same day. So that is simply not enough to link it to this case." ER-30. The judge agreed and denied the discovery request. ER-30.

The parties next took up the matter of Agent Nirelli's personnel file. The AUSA notified the judge that CBP had completed the review required under *Henthorn* and found no derogatory information. ER-31. Counsel for Hernandez countered by contending, without support, that "there is questionable, perhaps actual lying, in [Agent Nirelli's] report writing" from the *Valdes* case that the United States failed to turn over. ER-31. She added, "I will admit [the AUSA] did e-mail me last night" revealing that Agent Nirelli was part of the 10-15 Facebook group. ER-32. Counsel expressed frustration that she was "finding out bits and pieces" about it the day before trial. ER-32. But she did not request further information about his involvement in that group. ER-32.

The AUSA replied that the Valdes incident "was absolutely not *Henthorn* in that it was something that was raised in the middle of the litigation of the case, apparently as a litigation tactic." ER-32. The AUSA pointed out that Valdes "never made a formal complaint to CBP, never made a formal complaint to any other

15

agency," and subsequently withdrew his allegations before they were ruled on and pleaded guilty. ER-32–33.

Defense counsel represented, again without support, that "there were hospital reports to substantiate this claim"—to which the judge inquired what more she wanted if the *Henthorn* process had been followed. ER-33. Counsel was ambivalent. She conceded, "if the government is saying that now they have done it, then I suppose this is the end of the inquiry." ER-33. But she also insisted that the AUSA did not actually comply with *Henthorn* because "it does appear that Agent Nirelli was untruthful." ER-33–34.

The magistrate judge expressed doubt about counsel's accusations. "Based on what? That there was a defendant that one time said it but didn't file a formal complaint? I mean, tell me what's that based on?" The judge continued to press counsel. "Why are you saying he appears to be untruthful if an individual four years ago made a complaint but never followed through with it? Why would you say he appears to be untruthful?" ER-34.

The judge also did not understand what counsel wanted when the AUSA had already informed the court about the absence of impeachment material. ER-34–35. Counsel responded by claiming, contrary to the facts, that Valdes pleaded guilty only because he received "a very favorable disposition because of the motion that the

16

defense attorney had filed." ER-35. And counsel repeated the inaccurate assertion that Valdes's injuries had been "substantiated by hospital records." ER-36. Based on counsel's speculation that there must have been an internal investigation against Agent Nirelli, she insisted that the AUSA must produce the agent's personnel file for *in camera* inspection. ER-36.

The judge again noted the problem with that proposal. "I'm happy to do that, but again, that's going to require a continuance which you don't seem to want to do." ER-36. The judge said he understood why Hernandez did not want to continue the trial. "I mean, it's very obvious. But I can't just do that today because they can't just bring it over here right now." ER-36. Counsel inquired whether Agent Nirelli's file was accessible "online or something, and we can trail the matter to the afternoon." ER-37. The judge rebuffed this proposal. "[T]hat's not how it works." ER-37.

When counsel again criticized the AUSA for evading his *Henthorn* obligations, the judge stopped her. ER-37. "Hold on a second. They're not evading it. I'm happy to do it. It's you that don't want to continue the case to have me check because, basically, the situation with immigration right now." ER-37.

Counsel confirmed the judge had accurately identified why she "would end up withdrawing" the request. ER-38. Yet she

17

assailed the AUSA for not having the agent's file available "in the off-chance the court" ordered its production. ER-37–38. The judge made clear, however, that he was "not faulting [the AUSA] for not bringing in something that does not exist." ER-38. "On the other hand," the judge wanted "the record to reflect" that he was "more than happy" to postpone the trial "to bring in any documentation" from CBP, but it was counsel's position that Hernandez did not want any further postponements in the case. ER-38.

Counsel then asked for permission to "double check" with her client about what he wanted to do. ER-38. After conferring with Hernandez, counsel confirmed, "we will continue today without this information." ER-38–39.

After Hernandez withdrew his request for Agent Nirelli's personnel file, the AUSA put forth on the record that he did indeed follow up with CBP about any investigations into Agent Nirelli and the agency "did not conduct a formal investigation because, again, no formal complaint was ever filed." ER-40.

VIII. Hernandez was convicted in a two hour long bench trial.

The parties proceeded immediately to the bench trial. ER-42. The AUSA called three witnesses. The surveillance agent described seeing Hernandez and Argueta "make their way across the rugged terrain." ER-42–66. A CBP records custodian testified that

18

Hernandez did not have permission to enter or reside in the United States. ER-93–99. Agent Nirelli described apprehending and questioning Hernandez about his immigration status. ER-67–91. He also explained that although he had been "part" of the "I'm 10-15" Facebook group, which contained "several inappropriate posts," he never interacted with such content. ER-86–89. Finally, the parties stipulated into evidence the transcript of Hernandez's post-arrest confession at the border patrol station. ER-92.

Hernandez did not call witnesses or present a case. ER-99–100. At closing, counsel focused her argument on "how Mr. Hernandez could have entered." ER-106. She maintained that Hernandez, "for all we know, could have come through the port of entry just without an inspection." ER-108.

The magistrate judge found Hernandez guilty two hours after the first witness was called, and imposed a time served sentence. ER-42, 110, and 113. While pronouncing sentence, the judge observed, "immigration is not currently in the courtroom to take you into custody so that has gone well for you." ER-113.

IX. The district judge affirmed the conviction.

Hernandez appealed his conviction to a district judge. 1-SER-101. In the intermediate appeal, Hernandez did not challenge the

19

propriety of courthouse immigration arrests or argue how they impacted his rights. See 1-SER-108–127 and 152–162.

The district judge affirmed. This appeal follows.

### SUMMARY OF ARGUMENT

1. Hernandez received an adequate *Miranda* warning at the border patrol station. He was properly advised that if he could not afford an attorney "one can be provided to you before we ask you any questions." The word "can" instead of "will" did not turn the statement into a hollow advisal suggesting that appointment of counsel was at the government's whim and might be denied. Warnings under *Miranda* are to be construed with practicality and common sense. In ordinary English, the word "can" conveys certitude across many contexts common to daily life—just as it did in the case of Hernandez's interview at the station house.

2. The magistrate judge did not abuse his discretion by denying discovery regarding a name mentioned over helicopter dispatch, "Eduardo Verduzco." The name had no rational connection to Hernandez or his defense—that he was smuggled through a port of entry—which was itself puzzling because Hernandez confessed to crossing outside a port "through the mountain." In any case, there was no indication that Verduzco was

20

a smuggler, the timing of the reference did not align with the timing of Hernandez's entry, and the reference was made with respect to a vast geographical area with no specific link to where Hernandez was found. It also made no sense that Verduzco, after supposedly taking the risk of smuggling individuals through a secure international port, would then dump them in an open field monitored by border agents just a couple miles from the border.

3. Hernandez waived any claim to additional discovery regarding Argueta's asylum file or Agent Nirelli's personnel file. Hernandez intentionally withdrew those claims so he could complete his illegal entry trial within the period when the pause on in-court immigration arrests was still in effect. He did not know whether his civil suit would succeed or how the civil judge would rule on the TRO. Hernandez made a calculated decision to not pursue further discovery, to not postpone his trial, and to guarantee that after the trial he would not be arrested and deported.

By giving Hernandez the option to postpone trial in order pursue the discovery he belatedly sought, the magistrate judge did not "force" Hernandez to choose between his right to discovery and the right to a speedy trial. The forced choice envisioned by Hernandez is a false dilemma. There was no speedy trial deadline prohibiting further continuances beyond November 10, 2020.

21

Hernandez himself requested months of delays while living free in the community and had sought to pursue even more when it benefited him, that is, before the temporary hold on courthouse immigration arrests went into effect. Hernandez was therefore not forced to waive discovery, and his desire to avoid deportation or removal by immigration authorities did not undercut his waiver.

In any case, Hernandez had no right to the discovery at issue. The United States confirmed it had complied with its *Henthorn* obligations with respect to Agent Nirelli. Hernandez's attempts to cast doubt on the government's compliance were based on misleading, if not outright false, information about Agent Nirelli that Hernandez continues to spread in this appeal. There was also no basis for believing Argueta's asylum records would contain anything relevant to Hernandez's mode of entry, since Argueta admitted to jumping over a border wall on a different day than when Hernandez crossed into the United States. Hernandez's arguments about discovery hence fall short on every level.

## ARGUMENT

I.  The district court properly affirmed the denial of the motion to suppress because Hernandez received an adequate *Miranda* warning.

A.    Standard of review.

The adequacy of *Miranda* warnings is viewed de novo. *United States v. Gonzalez-Godinez*, 89 F.4th 1205, 1208 (9th Cir. 2024).

B.    The word "can" in the warning to Hernandez did not convey uncertainty about his right to appointed counsel.

Hernandez was given a complete set of *Miranda* warnings contained in a standard I-214 advisal form. ER-228. When Agent Cadena reached the part about appointed counsel, he properly informed Hernandez that if he could not afford an attorney "one can be provided to you before we ask you any questions." ER-264. Hernandez claims the word "can" instead of "will" left the false impression that such an attorney was "discretionary with the government" and implied "the possibility of rejection." AOB 53–54.

This Court should reject Hernandez's "counterintuitive" interpretation of an otherwise plain and easy to understand statement. *Florida v. Powell*, 559 U.S. 50, 62 (2010). It is true that *Miranda* warnings "must be clear and not susceptible to equivocation" in order to provide "meaningful advice to the unlettered and unlearned[.]" *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2002). For precisely that reason, courts should not "examine the words employed as if construing a will or defining the terms of an easement" but should simply inquire

23

"whether the warnings reasonably conveyed to a suspect his rights as required by *Miranda*." *Powell*, at 60 (cleaned up).

There is therefore no "desirable rigidity in the *form* of the required warnings" and "no talismanic incantation" required to satisfy *Miranda*. *California v. Prysock*, 453 U.S. 355, 359 (1981) (emphasis in original). What matters is that the warnings "were sufficiently comprehensive and comprehensible when given a commonsense reading." *Powell*, 559 U.S. at 63.

Here, nothing in the statement that an appointed attorney *can* be provided for the suspect "suggested any limitation on the right to the presence of appointed counsel[.]" *Prysock*, 453 U.S. at 360–61. In ordinary English, the word "can" is used to convey certitude across many contexts common to everyday life.

For example, a teacher who assures a tardy student that he "can retake the quiz next week" is not holding the prospect of uncertainty over the worried pupil's head. Similarly, a law clerk who promises a judge that she "can write the bench memo" would surely disappoint her boss if nothing was prepared by the time of argument. In addition, a parent who hears her spouse say that he "can go pick up the kids after work" would be surprised to find him relaxing at home without the children. She might even be shocked if her partner responded by pointing out, "I didn't say I *will*."

24

In the same way, when Agent Cadena told Hernandez that an appointed attorney "can be provided to you before we ask you any questions," there was no mystery about the contours of the right. No "reasonable suspect in a custodial setting who has just been read" those rights would "come to the counterintuitive conclusion that" the government might deny the appointment of counsel if one were requested. *Powell*, 559 U.S. at 62.

This is especially true because the English text of the I-214 form that Hernandez reviewed provided that an attorney "*will* be appointed for you before any questioning if you wish." ER-228 (emphasis added). This supports the natural meaning of the Spanish translation on the same form that the agent followed. It also reinforces the fact that the agent here did not ad lib the advisal but had proceeded by the book by adhering to the language on the printed form. Furthermore, Hernandez, who previously lived in the United States, read and signed the form before waiving his rights.

Agent Cadena therefore did not "provide[] the same mis-advisal found in *Connell*." AOB 53. In that case, the defendant was orally advised that counsel "may be appointed to represent you" after being told, "you must make your own arrangements to obtain a lawyer and this will be at no expense of the Government." *United States v. Connell*, 869 F.2d 1349, 1350 and 1353 (9th Cir. 1989).

25

Together, these statements implied that appointment of counsel was discretionary. *Id.* at 1353. On top of that, the defendant also received an ambiguous written warning saying that any appointment of counsel would be made "in accordance with the law," which only "created additional confusion." *Id.* at 1353.

The statements in *Connell* are not comparable to the oral and written warnings here. The warnings given to Hernandez plainly conveyed his rights under *Miranda*. At a minimum, his rights could "readily be inferred from the combination of" the warnings given. *Connell*, 869 F.2d at 1353. The magistrate judge therefore properly declined to suppress the confession.

C. Any error was harmless.

Moreover, any error in admitting the confession was harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 26 (1967). Even without the post-*Miranda* confession, the United States still had Hernandez's field statements, made to a different agent, in which Hernandez admitted he was a citizen of Mexico, possessed no immigration documents, and entered the country illegally. ER-82; see *Arizona v. Fulminante*, 499 U.S. 279, 299 (1991) (when evaluating harmlessness "in some cases two confessions, delivered on different occasions to different listeners, might be viewed as being independent of each other"); see also

26

*United States v. Butler*, 249 F.3d 1094, 1101 (9th Cir. 2001) (admission of suppressed statement harmless beyond reasonable doubt when "most of what" defendant said "was repetitious of statements he made at primary inspection").

In addition, the other evidence of Hernandez's guilt was compelling. The United States presented evidence from Hernandez's A-file showing he did not have the right to enter or reside in the United States. ER-95–96. The United States also presented evidence that Hernandez was spotted "cutting across country through the brush" on "rugged terrain" not known or used for civilian hiking, ER-49–50 and 77; was found hiding in a bush in a remote area about 2.5 miles from the border, eight miles away from the nearest port of entry, ER-72–73, 78; and had traversed a route commonly used by illegal border crossers because there was no border wall to the south but rather a small barbed wire fence, ER-73. The additional evidence convincingly proved every element of attempted illegal entry. The outcome of the trial would have been the same with or without the post-*Miranda* admission.[2]

---

[2] See *United States v. Bibiano-Mayo*, No.3:19MJ23205, 2020 WL 3250182 at *1 (S.D. Cal. June 15, 2020) (elements of § 1325(a)(1) include: defendant was an alien; had specific intent to enter outside port of entry; had specific intent to enter free from official restraint; and took substantial step towards committing the crime).

27

II.  The magistrate judge was within his discretion in denying discovery related to Eduardo Verduzco.

    A.  Standard of review.

Discovery rulings are reviewed for abuse of discretion. *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995). This is a "significantly deferential" test that looks at whether the lower court "reached a result that is illogical or implausible." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010) (cleaned up).

    B.  Information relating to Eduardo Verduzco did not fall under *Brady* or Rule 16.

The Due Process Clause, as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963), requires disclosure of evidence that is both favorable to the accused and material to guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 674 (1985). Evidence is material only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. A reasonable probability of a different result is shown when the government's suppression of the evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Rule 16 has a lower materiality threshold. Evidence is material if it would have "helped" a defense. *United States v. Lucas*, 841 F.3d 796, 804 (9th Cir. 2016). Even under this standard,

"conclusory allegations of materiality" do not suffice. *Id.* Rather, "a defendant must present facts which would tend to show that the government is in possession of information helpful to the defense." *Id.* (cleaned up). "Without a factual showing there is no basis upon which the court may exercise its discretion." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990).

Hernandez contends that discovery into "Eduardo Verduzco," the name uttered over helicopter dispatch, might have revealed that Verduzco was a human smuggler who transported Hernandez through a port of entry. AOB 46–47. This supposedly "tended to support a specific defense to the crime charged—that Mr. Hernandez entered through the Tecate Port of Entry." AOB 49; see *United States v. Corrales-Vazquez*, 931 F.3d 944, 950 (9th Cir. 2019) (whereas § 1325(a)(1) covers aliens who enter or attempt to enter outside a port of entry, § 1325(a)(2) sets forth a different offense of crossing *through* the port of entry by eluding inspection).

His tenuous arguments "do not satisfy the requirement of specific facts, beyond allegations, relating to materiality." *Santiago*, 46 F.3d at 894–95. In fact they are preposterous. Hernandez *confessed* to entering the United States outside a port by "walk[ing] through the mountain." ER-269. It was pure speculation that any information on Verduzco would have undercut that admission.

29

This is especially true because Hernandez's claims of materiality were irrational in other ways. Vague references to Verduzco's crossing history and vehicle did not establish that he was a smuggler. ER-126. The timing of those references, ER-143, did not align with the fact that Hernandez had entered the *previous* day. ER-268. The geography also did not match. Brown Field is a vast sector "covering approximately 568 square miles" encompassing "all of the Otay Mountain Preserve and that area further north." ER-70; 1-SER-144. Mere mention of a name within that sector did not connect to the specific location where Hernandez was found, especially since the surveillance agent did not mention any vehicles traveling in that area. Finally, it made no sense that Verduzco would risk smuggling people through a heavily guarded international port only to dump them in an open field monitored by border agents less than three miles from the border. ER-72.

Hernandez cites cases describing a common strategy wherein smugglers will drop off migrants before reaching an interior checkpoint, order the migrants to walk around that checkpoint, and then link up farther up the road. AOB 45. None of those cases, however, involved smugglers who had just transported people through a secure border port. Moreover, Hernandez never argued or established below that there were interior checkpoints nearby.

30

*Stever* and *Muniz-Jaquez* do not help Hernandez either. Those cases involved discovery with rational connections to plausible defenses. See *Stever*, 603 F.3d at 753 (evidence "tended to show that a Mexican DTO planted the marijuana"); *United States v. Muniz-Jazquez*, 718 F.3d 1180, 1184 (9th Cir. 2013) (dispatch tapes "clearly relevant" to official restraint defense). Here, both the requested discovery and the defense theory were nonsensical.

Neither *Brady* nor Rule 16 required producing the Verduzco material. The magistrate judge's ruling was a plausible exercise of discretion and the district judge properly affirmed.[3]

---

[3] Any error in declining to order further discovery was also harmless. *United States v. Amlani*, 111 F.3d 705, 712 (9th Cir. 1997). Had the magistrate judge granted Hernandez's requests for production of all DHS reports, logs, and TECS records relating to Verduzco, ER-143, Hernandez's entry outside the port was still proven by his confession, ER-269, and by his arrest near the border line but eight miles from the nearest port. ER-72. Furthermore, for the reasons outlined below, there is little reason to think that Hernandez would have waited for the United States to locate and produce the requested information even had the judge ordered it. To the contrary, Hernandez would have withdrawn his request and chosen to "proceed today without discovery." ER-28.

31

III.   The magistrate judge did not force Hernandez to choose between his right to discovery and his right to a speedy trial.

A.   Hernandez waived his claims to additional discovery.

According to Hernandez, the magistrate judge's "delay" in addressing his second motion to compel "forced a choice between his right to discovery and his right to a speedy trial." AOB 31. Because the judge thus "effectively denied" his requests for Argueta's asylum file and Agent Nirelli's personnel file, AOB 29, Hernandez asks this Court to remand for production of that discovery. AOB 43.

Hernandez's contrived legal theory significantly distorts the circumstances below. The judge did not "fail[] to timely" act on Hernandez's second discovery motion. AOB 29. In reality, the timing of the hearing was controlled by Hernandez's own delay. He filed his second motion to compel one year late, ER-279 (motion deadline was October 15, 2019); "two weeks before trial," ER-9; after filing various other "inexcusably late" motions. 1-SER-88. Out of fairness, the judge then allotted time for the United States to file an opposition and for Hernandez to file a reply. 1-SER-89; ER-115.

Just as the magistrate judge did not delay in acting on the motion, he did not "effectively" deny it. AOB 29. Hernandez made the considered choice—after consulting with counsel—to "withdraw" his requests. ER-29 (withdrawing request for asylum

32

file); ER-37–38 (withdrawing request for personnel file because of "the situation with immigration right now").

Waiver is "the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotations omitted). "In determining whether waiver occurred," this Court looks to "the defendant's knowledge" of the circumstances and whether his decision was made for a "tactical" purpose. *United States v. Grimaldo*, 993 F.3d 1077, 1081 (9th Cir. 2021). If Hernandez "relinquished a known right, then the error is waived and therefore unreviewable." *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc).

Because the magistrate judge explained that pursuing discovery would "require a continuance," ER-36, and because Hernandez did not "want to continue the case," ER-37, he affirmatively withdrew the discovery requests. That was waiver.

Hernandez cannot waive his claims, demand that trial proceed, and then seek appellate review of the same abandoned claims. They were withdrawn from consideration. There is no ruling for this Court to review. See *Linney v. Cellular Alaska*, 151 F.3d 1234, 1242 n.5 (9th Cir. 1998) ("discovery request was not made before the district court and thus has been waived"); *Sablan v. Dept. of Finance of Northern Mariana Islands,* 856 F.2d 1317, 1322 (9th

33

Cir. 1988) ("no request for discovery" means "there can be no abuse of discretion"); see also *United States v. Morales*, 684 F.3d 749, 755 (8th Cir. 2012) (claim waived because defendant "never sought a final ruling" and court "made no such definitive ruling"); *United States v. Tiger*, 223 F.3d 811, 814 (8th Cir. 2000) ("no ruling to review" because "counsel withdrew" matter from consideration).

B.    The Speedy Trial Clause did not require Hernandez's trial to begin on November 10, 2020.

Aside from waiver, Hernandez's unwieldy legal theory also collapses on itself. There was no speedy trial deadline requiring trial to begin on the same day as the discovery hearing.

No statutory provision commanded that trial must begin by November 10, 2020. An offense under § 1325(a)(1) is a Class B misdemeanor; see 18 U.S.C. § 3581(b)(7); and this Court has repeatedly pronounced that "the Speedy Trial Act as a whole does not apply to Class B misdemeanors." *United States v. Nickerson*, 731 F.3d 1009, 1014 (9th Cir. 2013).

Because Congress enacted the STA to "put teeth into" the "broader limits of the sixth amendment"; *United States v. Mehrmanesh*, 652 F.2d 766, 769 (9th Cir. 1981); *United States v. Murillo*, 288 F.3d 1126, 1131 (9th Cir. 2002); "it will be an unusual case in which" the STA is not violated "but the sixth amendment

34

right to speedy trial has been violated." *United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982). Indeed, it is "impossible to determine with precision" when the Speedy Trial Clause is violated because there is "no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial." *Barker v. Wingo*, 407 U.S. 514, 521 (1972).

Wherever the "flexible" boundaries of the Speedy Trial Clause might have lain, *Murillo*, 288 F.3d at 1131, they were not close to the date of the November 10 discovery hearing. The contours of the constitutional speedy trial right depends on four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker*, 407 U.S. at 530.

While the 15 month period from arrest to trial "militate[d] slightly" in favor of Hernandez, the remaining factors "weigh[ed] heavily against him." *United States v. Lam*, 251 F.3d 852, 857 (9th Cir. 2001). Each prior continuance was requested or accepted by Hernandez based on "legitimate needs." *Lam*, at 858; 1-SER-84 (citing "COVID-19 pandemic" and "familial emergencies"). More importantly, Hernandez never asserted his speedy trial rights. Far from it, he actually encouraged the judge, one month before trial, to grant him *additional* continuances to resolve his untimely motions. He assured the court that because he was "on bond," any "delay to

35

resolve the motions will not prejudice him." 1-SER-85. His "failure to assert the right" makes it "difficult" for Hernandez to show that an additional postponement would have resulted in the denial of his speedy trial right. *Barker*, 407 U.S. at 532.

Finally, Hernandez was not prejudiced by the continuances he requested and would not have been prejudiced by another one. "The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. McDonald*, 456 U.S. 1, 8 (1982). None of these concerns were implicated. Hernandez was not incarcerated; he put up no cash for his bail (it had been paid for by an advocacy group); and despite a warrant for his removal, Hernandez lived at liberty in the United States while repeatedly seeking continuances in his case over many months. "[W]hen defendants are not incarcerated or subjected to other substantial restrictions on their liberty, a court should not weigh that time towards a claim under the Speedy Trial Clause." *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986).

Nor would an additional postponement have impaired his defense "by dimming memories and loss of exculpatory evidence."

36

*Doggett v. United States*, 505 U.S. 647, 654 (1992). Hernandez called no witnesses at his trial. His only defense was that he committed an uncharged offense under § 1325(a)(2) by sneaking through the port of entry, a theory not supported by any evidence and directly contradicted by his own confession.

Because Hernandez had no speedy trial right to be tried by November 10, the magistrate judge could not have "forced" him to select that "right" over "his right to discovery." AOB 31. This is not a situation where "one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). The judge could not have "penalize[d] the assertion of a constitutional right" that Hernandez simply did not have. *United States v. Jackson*, 390 U.S. 570, 583 (1968).

No case cited by Hernandez says otherwise. *Hunt v. Mitchell* involved a choice presented to a defendant on the final day of his statutory speedy trial period. 261 F.3d 575, 584 (6th Cir. 2001). *United States v. Clymer* held that certain pretrial motions failed to exclude time under the STA. 25 F.3d 824, 830 (9th Cir. 1994). Both cases are inapposite because their holdings rested on statutorily governed speedy trial limits not applicable here.

For similar reasons, the magistrate judge also did not force Hernandez to "choose between his right to discovery" and his

37

claimed "rights" to avoid arrest and deportation at the conclusion of his criminal trial.[4] AOB 31 and 33. Hernandez does not persuasively link the threat of a courthouse immigration arrest to a specific personal right under the Constitution. Even the civil judge (who ultimately granted the TRO on the ground that a common law privilege against civil courthouse arrests was silently incorporated into the INA) recognized that such a "privilege belongs not to the defendant, but to the court." *Velazquez-Hernandez v. ICE*, 500 F.Supp.3d 1132, 1143 (S.D. Cal 2020). Hernandez does not elucidate how a discretionary privilege belonging to the court translates to a personal right that belongs to him. *Valazquez-Hernandez* is also ill-suited to support Hernandez's sweeping argument, since the plaintiffs dismissed the lawsuit before it could be litigated to completion, 2-SER-372, and its holding is contrary to

---

[4] Hernandez did not raise the issue of immigration arrests in his intermediate appeal. 1-SER-101. The district judge therefore never considered it. ER-4. Since Hernandez "did not raise this question in the courts below," this Court should "decline to consider it here for the first time." *Demarest v. Manspeaker*, 498 U.S. 184, 189 (1991). Not only has Hernandez "failed to raise it below," the argument he now obliquely "poses has not been adequately briefed and argued." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 38 (1989). Indeed, this argument is not even mentioned in the Issues for Review section or in his Summary of Argument. AOB 7 and 21–24.

*Ryan v. ICE*, 974 F.3d 9, 28 (1st Cir. 2020) (INA did not silently adopt privilege barring courthouse arrests by immigration officers).

Nor does Hernandez show how any specific right under the Constitution was imperiled. No right relating to "access to the court" was violated. AOB 33. Hernandez was required to be in court for his criminal trial. The rights of criminal defendants are not impinged by the prospect of custodial detention after trial—that is an inherent characteristic of our judicial system. And Hernandez called no witnesses so he cannot claim that any defense witness would have been discouraged from testifying under threat of immigration arrest. Also, he was not "subject to a warrantless arrest." AOB 35. DHS had (and continues to have) a warrant to "take into custody and remove" him. 2-SER-326. To the extent he claims a different kind of warrant was required, he does not show that DHS would have failed to obtain such a warrant or that DHS could not dispense with a warrant under 8 U.S.C. § 1357(a).

In short, Hernandez, with knowledge of the circumstances, made the decision to withdraw his discovery claims in order to take advantage of an unique situation that could, and apparently did, allow him to avoid apprehension and deportation after his criminal trial was complete. This was an "intentional relinquishment or abandonment of a known right." *Olano*, 507 U.S. at 733.

C.  Hernandez also had no right under *Brady* or Rule 16 for Argueta's asylum file or Agent Nirelli's personnel file.

Even had Hernandez not waived his claims, he had no right to the discovery at issue. Just because the judge took a solicitous approach towards discovery does not mean he "acknowledged the materiality of the evidence." AOB 21. He did not. To the contrary, the judge was deeply skeptical about Hernandez's requests.

For instance, the judge wondered how Argueta's asylum records would "contain any statements about Mr. Hernandez?" ER-27. The answer is it would not. An "asylum application engages with the alien's experience in his home country, not the circumstances of his entry into the United States." 1-SER-148. And, as the discovery already showed, Argueta admitted to "jump[ing] a border wall" on a different day than when Hernandez crossed. ER-268; 1-SER-77. The contention that this other person's asylum file "would have spoken directly to Mr. Hernandez's mode of entry," AOB 36, does not meet Rule 16's "requirement of specific facts, beyond allegations, relating to materiality." *Santiago*, 46 F.3d at 894–95. Nor does its absence undermine confidence in the trial, as *Brady* requires, because the circumstances of Hernandez's entry was established by his own confession and by other evidence.[5]

---

[5] In a three-sentence argument, Hernandez suggests that the United States violated due process by deporting Argueta. AOB 37.

40

Similarly, Hernandez was not entitled to *in camera* inspection of Agent Nirelli's personnel file. The AUSA properly fulfilled the "duty to examine personnel files upon a defendant's request." *United States v. Henthorn*, 931 F.2d 29, 31 (9th Cir. 1991). "[F]ollowing that examination, the files need not be furnished to the defendant or the court unless they contain information that is or may be material to the defendant's case." *Id.* The AUSA complied with *Henthorn* by making inquiries to CBP's general counsel and relying on the agency's response that there was no impeachment information to disclose and no investigation to provide. ER-31 and 39; see *United States v. Jennings*, 960 F.2d 1488, 1492 n.3 (9th Cir. 1992) (approving practice of having agency conduct review).

Counsel for Hernandez attempted to inject doubt about the AUSA's compliance by making inaccurate and inflammatory

---

It did not. The United States did not "deport" Argueta, know that he had "potentially exculpatory evidence," "act in bad faith," or "prejudice" Hernandez. See *United States v. Leal-Del Carmen*, 697 F.3d 964, 970 (9th Cir. 2012). Argueta was transported to Mexico to await further asylum hearings in accordance with the Migrant Protection Protocols. 1-SER-31; ER-138. Like Hernandez, Argueta had also crossed outside of a port, but on a different day. ER-268; 1-SER-77. Argueta therefore had no exculpatory evidence to provide and his unavailability did not prejudice Hernandez.

allegations about Agent Nirelli based on a prior case. ER-31–40. Hernandez repeats those inflammatory allegations to this Court.[6]

Those allegations were not credible then and are not credible now. As the AUSA pointed out, "that earlier incident was absolutely not *Henthorn* in that it was something that was raised in the middle of the litigation of the case, apparently as a litigation tactic." ER-32. The accuser "never made a formal complaint to CBP, never made a formal complaint to any other agency," and then abandoned the allegations wholesale before pleading guilty. ER-32–33. Even the magistrate judge appeared frustrated by defense counsel's antics. ER-34 ("Why are you saying he appears to be untruthful if an individual four years ago made a complaint but never followed through with it? Why would you say he appears to be untruthful?").

---

[6] See AOB 1 (Agent Nirelli "had history of abusing arrestees"); AOB 2 ("Agent Nirelli's history of providing false reports regarding his own violent and threatening behavior"); AOB 4 (Agent Nirelli "previously used excessive force" and "lied in a false report"); AOB 10 (Agent Nirelli "lied in official reports about his use of excessive force that was central to a dismissal motion for outrageous government misconduct"); AOB 14 (Agent Nirelli "beat[] a defendant who was lying face down on the ground following arrest commands"); AOB 38 ("pointed to specific incidents of excessive force and false reports in Agent Nirelli's past); AOB 40 (Agent Nirelli's file "would have shown that the agent had used excessive force and worked in concert with other agents to lie about it").

42

Accordingly, the judge refused to "fault" the AUSA "for not bringing in" an internal investigation "that does not exist." ER-38. *Henthorn* therefore did not require production of the agent's personnel file.

Separately, Hernandez also criticizes the AUSA for failing to investigate or turn over any internal information as to Agent Nirelli's involvement with the "I'm 10-15" Facebook group. AOB 41–43. He argues this too constituted error under this Court's unpublished decision in *United States v. Bernal-Sanchez*, No. 21-50276, 2023 WL 7179469 (9th Cir. Nov. 1, 2023).

*Bernal-Sanchez* rested on different facts. The defendant in *Bernal-Sanchez* "requested information" about relevant "saved Facebook records" *outside* of the agent's personnel file, which the magistrate judge denied. See 2023 WL 7179469 at *1; see also 2023 WL 7179469 at *4–*5 (Christen, J., concurring in part).[7] Here, the

_____

[7] This Court remanded because the record was not clear if "investigations into all Border Patrol agents' Facebook group activities had been completed or that all 'I'm 10-15' disciplinary actions had been recorded in each agent's files." 2023 WL 7179469 at *1. After remand, CBP confirmed it had opened investigations into 135 employees who interacted with derogatory posts, which investigations had all been completed by June 2020 and reported to its general counsel's office. See *United States v. Bernal-Sanchez*, No. 3:20MJ20169 (S.D. Cal.) (ECF No. 142-1) (CBP Decl.). Hence in this case, the AUSA's negative *Henthorn* check in November 2020 meant there had been no 10-15 investigation into Agent Nirelli.

43

only item Hernandez sought in relation to Agent Nirelli were his personnel records in the *Valdes* case. ER-36. After the AUSA notified defense counsel that Agent Nirelli was part of the 10-15 Facebook group, she did not pursue this matter further or ask the judge to order additional discovery. ER-32. Because Hernandez did not seek a ruling, there is no order for this Court to review, thereby waiving the claim. See *Morales*, 684 F.3d at 755; *Linney*, 151 F.3d at 1242 n.5; *Sablan,* 856 F.2d at 1322. Of course, the claim is also waived because Hernandez dropped all discovery relating to Agent Nirelli to avoid a trial continuance. Supra, Ans. Br., Sec. III(A).

In any case, any undisclosed impeachment evidence would not create a "reasonable probability that its disclosure would have produced a different result." *Kyles*, 514 U.S. at 422. "[E]ven assuming that [the agent's] testimony was impeachable by any undisclosed information, his testimony could not be completely discounted, and in any event was amply supported by the government's other evidence." *United States v. Jimenez-Peralta*, No. 23-1290, 2024 WL 4304895 at *3 (9th Cir. Sept. 26, 2024).

Agent Nirelli's testimony about Hernandez's arrest location and field statements was fully corroborated by Hernandez's confession to a different agent later at the border patrol station. ER-258. The confession was additionally substantiated by the

44

surveillance agent's testimony about Hernandez's movement through rough terrain often used by illegal border crossers; ER-49 and 53–54; and by the record custodian's testimony about Hernandez's lack of permission to be in the United States. ER-95.

* * *

The contention that Hernandez was forced to choose between essential rights is a factual and legal contrivance. "Criminal defendants often face a fork in the road with potential peril on either path." *Gonzalez-Godinez*, 89 F.4th at 1207. That Hernandez faced "tough choices" does not mean those choices posed "an inherent contradiction" violative of his rights. *Id.* at 1209.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

<div style="margin-left:40%">

TARA K. MCGRATH
  *United States Attorney*

DANIEL E. ZIPP
  *Assistant U.S. Attorney*
  *Chief, Appellate Section*
  *Criminal Division*

s/ANDREW Y. CHIANG
  *Assistant U.S. Attorney*

OCTOBER 18, 2024.

</div>

45

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2362

I am the attorney or self-represented party.

**This brief contains** | 9,528 | **words,** including | 352 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

🔘 complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Andrew Y. Chiang | **Date** | 10/18/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

# ADDENDUM

## § 1325. Improper entry by alien

### (a) Improper time or place; avoidance of examination or inspection; misrepresentation and concealment of facts

Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under Title 18 or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under Title 18, or imprisoned not more than 2 years, or both.

* * *

A1

## Rule 16. Discovery and Inspection

\* \* \*

**(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

**(i)** the item is material to preparing the defense;

**(ii)** the government intends to use the item in its case-in-chief at trial; or

**(iii)** the item was obtained from or belongs to the defendant.

\* \* \*

A2